# Exhibit A

**IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY**

| | |
|---|---|
| **GIRL SCOUTS OF MIDDLE TENNESSEE, INC.**<br><br>        **Plaintiff,**<br><br>v.<br><br>**GIRL SCOUTS OF THE UNITED STATES OF AMERICA,**<br><br>        **Defendant.** | )<br>)<br>)<br>)<br>)<br>)    Case No. _____<br>)<br>)<br>)<br>)<br>)<br>) |

---

**PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**

Plaintiff Girl Scouts of Middle Tennessee, Inc. ("GSMT"), by and through counsel, brings this action against Girl Scouts of the United States of America ("GSUSA") to protect GSMT's contractual right to offer Girl Scouting in Middle Tennessee. GSMT has provided Girl Scouting in Middle Tennessee for more than 100 years and desires to continue to do so. GSMT operates as a chartered council of GSUSA under what is referred to as the "Charter Agreement" between GSUSA and GSMT—in essence, the contract affiliating the two separate entities. GSUSA has declared GSMT to be deficient in fulfilling an alleged requirement of the Charter Agreement based on GSMT's decision not to enter into commercially unreasonable agreements with GSUSA for, and onboard onto, what GSUSA refers to as its "common technology platform." GSUSA has indicated that GSMT is in a "viability review" to address this deficiency, a GSUSA-initiated

4834-9941-7830

1

process that culminates in a GSUSA-prescribed corrective action plan that GSMT is expected to execute under GSUSA monitoring. GSUSA has given GSMT a deadline of April 30, 2021, to enter into the technology agreements with GSUSA and have a migration plan to onboard to GSUSA's technology platform.

For several years, GSMT has attempted to work with GSUSA to try to resolve GSMT's fundamental concerns regarding the technology agreements and the significant negative operational impacts that would result from migration from GSMT's current technology platform to that offered by GSUSA. However, for years, and continuing to date, GSUSA has been unwilling to modify its agreements to address the most fundamental of GSMT's objections. For example:

- GSUSA's technology agreements permit GSUSA to increase fees it charges GSMT based on increased costs to GSUSA without any limit. GSMT is unwilling to give GSUSA a perpetual blank check to pass on to GSMT costs that GSUSA decides to incur.

- GSUSA's technology agreements will permit GSMT to host website pages only on templates provided by GSUSA and would not permit GSMT to host website pages necessary to utilize GSMT's proprietary software that it developed to allow girls, parents, and volunteers/troop leaders to register for GSMT's programs and make reservations at the properties (camp facilities) it operates, among other functions. GSUSA's technology platform is devoid of any solution for girls and volunteers to register for activities offered by their local councils or make reservations at camps or other properties utilized by local councils. GSUSA requiring GSMT to abandon

these important functionalities is not reasonable and directly conflicts with GSMT's ability to fulfill its mission.

- GSMT cannot reasonably be expected to adopt a technology platform from GSUSA that would be central to its mission and operations when GSUSA's agreements would (i) offer the platform only on an "as is" and "as available" basis, (ii) disclaim all warranties of any kind, (iii) require GSMT to agree that "GSUSA cannot commit to nor be liable for system availability," and (iv) reserve the right of GSUSA to unilaterally modify the functionality of the technology at any time.

GSUSA's attempt to coerce GSMT into entering into commercially unreasonable technology agreements as an alleged requirement of being a chartered Girl Scout council is without legal basis and is a violation of Tennessee state law. GSUSA's governing documents set forth procedures for GSUSA to establish requirements for chartered Girl Scout councils. GSUSA has not followed its own governance procedures and, thus, its efforts to mandate use of the technology platform and force GSMT into contractual agreements with it related to the technology as a requirement to be a chartered council are null and void. Additionally, Tennessee state law protects GSMT's rights under the Charter Agreement by prohibiting GSUSA from terminating or not renewing the Charter Agreement, or taking other discriminatory conduct against a Tennessee nonprofit without good cause. Tenn. Code Ann. § 48-53-201, *et seq.* To protect its rights to offer Girl Scouting in Middle Tennessee pursuant to the terms of the Charter Agreement between GSUSA and GSMT and to prevent GSUSA from taking action inconsistent with its rights, GSMT seeks relief in this Court.

4834-9941-7830

3

## THE PARTIES

1.      GSMT is a Tennessee nonprofit corporation with its principal place of business located at 4522 Granny White Pike, Nashville, Tennessee, 37204.

2.      Upon information and belief, GSUSA is a Congressionally chartered nonprofit corporation with its principal place of business at 420 Fifth Avenue, New York, New York, 10018. GSUSA was incorporated in 1950 by an Act of Congress, 36 U.S.C. §§ 80301, *et seq*. (referred to as GSUSA's "Congressional Charter").  GSUSA's Congressional Charter states that "[GSUSA] is a body corporate and politic of the District of Columbia" with its domicile in the District of Columbia.  36 U.S.C. § 80301.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this dispute pursuant to Tenn. Code Ann. § 16-11-101, *et seq*. and the Tennessee Declaratory Judgment Act, Tenn. Code Ann. § 29-14-101, *et seq*.

4.      This Court has personal jurisdiction over GSUSA pursuant to Tenn. Code Ann. §§ 20-2-223, 20-2-223, and 20-2-225 because, as more fully detailed herein, GSUSA has contracted with GSMT for GSMT to provide Girl Scouting in Middle Tennessee.

5.      GSUSA has transacted business in Tennessee through its relationship with GSMT as well as other chartered Girl Scout councils in the state and by its collection of membership dues from GSMT and councils from girls and volunteers in Tennessee.

6.      GSUSA's board members, officers, and other employees have sent numerous communications to GSMT in Tennessee by mail and e-mail related to GSUSA's technology platform and claim that GSMT is required to onboard to the platform and enter into related

contracts with GSUSA.

7.      GSUSA's board members, officers, and other employees have visited GSMT in person in Nashville, Tennessee, related to GSUSA's technology platform and GSUSA's position that GSMT is required to onboard to the platform and enter into related contracts with GSUSA.

8.      Venue is proper in this Court pursuant to Tenn. Code Ann. §§ 16-11-114 and 20-4-101, *et seq*.

## FACTS

### A.  The Relationship Between the Parties

9.      GSUSA is a national, nonprofit organization that has adopted a business model of distributing Girl Scouting indirectly by licensing more than one hundred separate, independent nonprofit corporations referred to as "councils" or "local councils."

10.     Local councils recruit members and volunteers and provide programming within their exclusive geographic jurisdictions.

11.     GSUSA does not recruit girls or volunteers, collect dues directly from members, or provide training to volunteers or programming to girls.  Instead, GSUSA relies on the local councils to do so.

12.     Councils are responsible for developing, managing, and maintaining the Girl Scout program in their respective jurisdictions.

13.     The relationship between GSUSA and each council is akin to that of a trademark licensor and licensee or a franchisor and franchisee.  *See, e.g., Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America*, 646 F.3d 983, 984 (7th Cir. 2008) ("The councils are not subsidiaries of the national organization [GSUSA]; rather, the national organization …

4834-9941-7830

5

relates to the councils as franchisor to franchisee.  It 'charters' (that is, licenses) the local councils, thereby authorizing them to sell cookies and merchandise under the 'Girl Scout' trademark, which the national organization owns.").

14.     GSMT is a legal entity separate and distinct from GSUSA.

15.     GSMT is not owned by or a subsidiary of GSUSA.

16.     GSUSA has no ownership or membership interest in GSMT.

17.     The Charter Agreement is not a management agreement and does not provide GSUSA with any management powers over GSMT.

18.     GSMT receives no funding or financial support from GSUSA.  Indeed, it is the opposite: GSMT transmits money to GSUSA in the form of dues from members and volunteers that GSMT recruits and registers.

19.     GSMT is responsible for its own governance, finances, operations, and expenses, including purchasing Girl Scout cookies and other products at wholesale prices to support its fundraising efforts; costs associated with the acquisition, ownership, maintenance and operations of its offices and camps; costs associated with hiring and staffing; the payment of overhead; the payment of health, general liability, and other insurance; the payment of employee benefits; the payment for professional services; and the payment of all other expenses and costs associated with the ownership and operation of a Girl Scout council.

20.     GSUSA has no responsibility for hiring, retaining, overseeing, or supervising the employees and volunteers of GSMT.

21.     GSUSA does not own, lease, or have any right in any of the real property utilized for Girl Scout programming in Middle Tennessee.  GSMT or its supporting organization own and

4834-9941-7830

6

operate Camp Sycamore Hills in Ashland City, Camp Piedmont in Readyville, Camp Holloway in Millersville, as well as GSMT's central office in Nashville without financial contribution from GSUSA.

## B. GSUSA's Governance Documents Provide the National Council (not the GSUSA National Board) with Sole Authority to Establish Requirements for Chartered Councils

22.     GSUSA's Congressional Charter provides that its governing body shall be the National Council, which may adopt and amend a constitution and bylaws and elect a board of directors, officers, and agents. 36 U.S.C. §§ 80303(a)(1)-(2).

23.     The National Council adopted a constitution for the organization in November 1957 (the "GSUSA Constitution"), which has been amended from time to time.

24.     Various documents related to GSUSA and council operations are compiled by GSUSA in what is called the Blue Book of Basic Documents (the "Blue Book"), which is updated and amended from time to time by GSUSA.  The most current version of the Blue Book as of the filing of this Petition is attached as **Exhibit A**.

25.     The GSUSA Constitution, which is reprinted in the Blue Book, provides for the local council model of Girl Scouting: "[l]ocal Girl Scout councils shall be organized to further the development of the Girl Scout Movement in the United States; to establish local responsibility for leadership, administration, and supervision of the program; and to develop, manage, and maintain Girl Scouting in accordance with the terms of their charters."  (Ex. A, Blue Book at 9; Const. Art. VII).

26.     The membership of GSUSA consists of the members of the National Council of GSUSA.  (Ex. A, Blue Book at 7; Const. Art. IV, § 1).

4834-9941-7830

7

27.     The National Council membership includes (1) delegates elected from Girl Scout councils who are registered through such local councils; and (2) members of the GSUSA Board of Directors (the "National Board"), among others.  (Ex. A, Blue Book at 8; Const. Art. IV, § 4).

28.     Each local council is entitled to at least two delegates and additional delegates based on the number of registered girls in its jurisdiction.  (Ex. A, Blue Book at 7; Const. Art. IV, § 5).

29.     The GSUSA Constitution provides for a National Board and delineates the authority of the National Board from that of the National Council.

30.     The GSUSA Constitution provides that "[t]he National Council **shall establish requirements** for certificates of membership, local council charters, and all other credentials." (Ex. A, Blue Book at 10; Const. Art. VIII at § 1) (emphasis added).

31.     With respect to local council charters, the Constitution provides "[t]he National Board of Directors **shall administer the requirements** for the credentials established by the National Council, and **may establish standards and issue standards, procedures, and interpretations** regarding such requirements **provided such standards, procedures, and interpretations are consistent with the requirements established by the National Council**. (Ex. A, Blue Book at 10; Const. Art. VIII at § 2) (emphasis added).

32.     The GSUSA Constitution provides that "[t]he National Board of Directors, in its sole discretion, shall have the power to issue these credentials [for certificates of membership and local council charters] subject to the requirements established by the National Council, and to revoke them when, in its opinion, the terms and conditions thereof or requirements therefore are being violated or when the best interests of Girl Scouting are not being furthered." (Ex. A, Blue Book at 10; Const. Art. VIII at § 3).

Case 3:21-cv-00433   Document 1-1   Filed 06/03/21   Page 9 of 166 PageID #: 15

33.     The language of the Constitution indicates that the National Council has the sole authority to establish requirements for local council charters, and the National Board has the sole authority to issue local council charters subject to the requirements established by the National Council.  *See Farthest N. Girl Scout Council v. Girl Scouts of the United States*, 454 P.3d 974 (Alaska 2019) (recognizing the delineation of authority between the GSUSA National Council and the National Board and holding that the GSUSA Constitution gave the National Council the exclusive right to establish the requirement of membership dues).

34.     The GSUSA Constitution does not grant the National Board authority to create requirements for local council charters.

### C.  The National Council Has Not Approved Any Requirement for Councils Related to a Common Technology Platform

35.     No proposal related to the GSUSA technology platform at issue here nor any proposal purporting to require the platform's use has ever come before or been approved by the National Council.

36.     No proposal related to the contracts GSUSA has demanded councils enter into with GSUSA related to the technology platform at issue here or purporting to require councils to agree to such contracts has ever come before or been approved by the National Council.

37.     The National Council has never taken any action with respect to the GSUSA technology platform or related contracts.

38.     Rather, during an April 26-27, 2017, National Board meeting, the National Board approved a revision to the Blue Book to reflect "a new standard that councils utilize a Movement-wide common technology platform with respect to membership, volunteer management, delivery

4834-9941-7830

9

system, and data analytics and reporting to better serve Girl Scout members and enhance the Girl Scout brand." *See* April 2017 National Board Meeting Highlights, attached as **Exhibit B**.

39.     In essence, the National Board has attempted to usurp authority provided to the National Council to establish a new requirement for chartered Girl Scout councils.

40.     The alleged requirement that councils utilize and agree to commercially unreasonable terms related to the GSUSA technology platform is not consist with any requirement for chartered councils established by the National Council.

### D.  GSMT's Objections to the Terms of the Technology Platform

41.     GSUSA has presented onboarding to the technology platform as requiring GSMT to enter into the following agreements with GSUSA: (1) the Membership Management Systems Use Agreement (the "MMSUA") and Schedules 5, 6, and 7 of the MMSUA.  Copies of what GSUSA has indicated are the current versions of the MMSUA and Schedules 5, 6 and 7, are attached as collective **Exhibit C**.

42.     GSUSA has not permitted GSMT to onboard onto the technology without entering into the MMSUA and Schedules 5, 6, and 7 with GSUSA.

43.     Since at least as early as 2017, GSMT has participated in good faith in numerous meetings and discussions with GSUSA and made countless offers and proposals under which GSMT would adopt certain portions of GSUSA's technology platform and enter into agreements with GSUSA related to those portions, including proposing a comprehensive Amendment and Addendum prepared by GSMT that, had GSUSA accepted it, would remedy GSMT's objections to the then-current versions of GSUSA's agreements.  With few limited exceptions, GSUSA has not addressed GSMT's objections.

4834-9941-7830

10

44.     While GSMT does not object to the concept of utilizing a technology platform common to other Girl Scout councils, it cannot agree to do so under terms that are commercially unreasonable and would expose GSMT to open-ended costs and business interruption.

45.     To be clear, GSMT's objections to the technology agreements are objections to terms in the proposed agreement between GSUSA and GSMT—*not* terms from GSUSA's vendors (including Adobe Systems Incorporated, Salesforce.org, roundCorner, Inc., and others) whose products may be integrated into the GSUSA platform.

46.     Most recently, following GSUSA's rejection of two scenarios that GSUSA had solicited in early 2021 from GSMT under which GSMT would sign the technology agreements and onboard to the technology platform, GSMT yet again invited GSUSA to participate in negotiation of reasonable terms related to the technology platform and articulated to GSUSA its most fundamental objections as follows:

a.      GSMT must be able to predict and control its technology costs in future years. GSUSA's technology agreements permit fee increases based on increased costs to GSUSA without any limit.  GSMT is unwilling to give GSUSA a perpetual blank check to pass on to GSMT costs that GSUSA decides to incur.  Additionally, should there be any new equipment requirements, GSMT needs advance notice so that it can plan from a budgetary perspective and otherwise for the impact of having to acquire or upgrade its existing equipment; GSUSA is not required to provide this commonly required notice to GSMT under the terms of the GSUSA proposed agreements.

b.      GSMT must maintain control of its website and not be limited to hosting website pages on templates provided by GSUSA that do not allow registration for programs and camps. GSMT invested in developing its own custom software that it utilizes successfully to allow girls,

4834-9941-7830

11

parents, and volunteers/troop leaders to register for GSMT's programs and make reservations at the properties (camp facilities) it operates. By entering into GSUSA's technology agreements, GSMT would not be permitted to host website pages necessary to provide these functions for its constituents. GSUSA's technology platform is devoid of any solution for program registration and property reservation. GSUSA requiring GSMT to abandon this important functionality is not reasonable and directly conflicts with GSMT's ability to fulfill its mission.

        c.      GSMT must maintain control over its staffing and resource allocation. GSUSA's technology agreements require councils to provide "sufficient" technical and non-technical resources to properly implement, operate, and support the technology services "as required by GSUSA or third party vendors [*sic*]." (Ex. C, MMSUA, § 9). GSMT cannot agree to give GSUSA or a third-party vendor open-ended authority for its staffing and resource allocation.

        d.      GSMT cannot adopt a technology platform that is central to fulfilling its mission from a provider that (i) offers the platform only on an "as is" and "as available" basis, (ii) has disclaimed all warranties of any kind, (iii) would require GSMT to agree that "GSUSA cannot commit to nor be liable for system availability," and (iv) would reserve to GSUSA unilaterally the right to modify the functionality of the systems at any time. (Ex. C, MMSUA, § 8; Schedule 5, §§ I(1), F(10); Schedule 6, §§ I(1), F(8); Schedule 7, §§ H(1), F(7)). GSMT reasonably requires greater functionality, operability, availability, and service level assurances. GSUSA's attempt to require GSMT to utilize a technology platform (and pay unspecified fees for it) while providing no assurances or indemnification to GSMT (and, instead, limiting the liability of GSUSA and requiring that GSMT indemnify GSUSA) related to software that would underpin the operations of GSMT is commercially unreasonable.

4834-9941-7830

e.      GSMT cannot give GSUSA unilateral free reign to change the terms of the technology agreements in the future.  Each of Schedules 5, 6, and 7 provides: "GSUSA shall have the right to add to, modify or delete any provision of this Schedule," and only requires GSUSA to provide GSMT notice of "material adverse changes" to the schedule.  (Ex. C, Schedule 5, § F(10); Schedule 6, § F(8); Schedule 7, § F(7)).  Setting aside whether this is legally enforceable, it is commercially unreasonable.  GSMT must reserve its rights to control its legal obligations.

f.      GSMT cannot agree that the Blue Book and unspecified GSUSA policies, which may be amended unilaterally by GSUSA, are the agreed-upon authority to set standards for compliance with respect to the technology platforms and data use.  Accordingly, without reference to static terms or other resolution, GSMT cannot agree to permit GSUSA to use data collected on or related to the member registration and volunteer recruitment platform "in accordance with the Blue Book and applicable [GSUSA] policies," as they may exist with future unknown amendments.  (Ex. C, Schedule 6, § F(7)).

g.      GSMT's ability to terminate the technology agreements must not be illusory.  Currently, GSUSA is threatening to revoke or not renew GSMT's charter (its license to be a Girl Scout council) because GSMT has not signed GSUSA's technology agreements and onboarded to GSUSA's technology platform.  If a council were in breach of the technology agreements or decided to exercise its right to terminate the technology agreements under the terms currently provided, would GSUSA then immediately revoke its charter?  Being a chartered Girl Scout council is something GSMT values and desires to protect from being contingent on its agreement to or fulfillment of commercially unreasonable technology agreements.

4834-9941-7830

13

h.     GSMT cannot agree to the exclusive jurisdiction of the courts of New York and agree that venue of any action arising under the MMSUA shall be in New York, New York. (Ex. C, MMSUA, § 20). As a Tennessee nonprofit located and operating in Middle Tennessee and executing on its mission to serve girls in Middle Tennessee, GSMT must remain entitled to seek relief from a court located in Tennessee should it desire to do so.

47.     GSMT's Board of Directors has determined that the terms of the agreements related to the technology platform are commercially unreasonable. *See* Resolution dated April 26, 2021, attached as **Exhibit D**.

48.     GSUSA has asserted that the Charter and the Blue Book require a council to utilize GSUSA's common technology platform.

49.     GSUSA has asserted that the only way for a council to utilize GSUSA's common technology platform is to sign the technology agreements GSUSA has presented to the councils.

50.     GSUSA has filed a lawsuit seeking a declaratory judgment that refusal to utilize GSUSA's common technology platform is a breach of an obligation of a local council under the Charter Agreement and the Blue Book. *See* Complaint for Declaratory Relief, *Girl Scouts of the USA v. Farthest N. Girl Scout Council,* Case No. 1:21-cv-03496 (S.D.N.Y. April 20, 2021), attached as **Exhibit E**.

51.     GSUSA has asserted that GSMT is in a "viability review," an unspecified process GSUSA asserts it has the right to initiate and which culminates in a GSUSA-prescribed corrective action plan that the council is expected to execute under GSUSA monitoring.

52.     GSUSA has given GSMT an April 30, 2021, deadline to sign the technology agreements with GSUSA and have a migration plan for onboarding onto the GSUSA technology

4834-9941-7830

14

platform.

53. On April 8, 2021, GSMT was informed that GSUSA had removed two of GSMT's representatives from Girl Scout advisory committees as a result of GSUSA's "viability review" of GSMT.

54. GSMT has requested that GSUSA reverse this decision so that GSMT can continue to participate in the activities and business of Girl Scouts as it has a right to do under its Charter Agreement.

55. GSUSA has asserted that GSMT owes it more than $200,000.00 in fees that it unilaterally began to charge GSMT for GSUSA's data processing outside of GSUSA's technology platform.

56. These data processing fees amount to an unauthorized *de facto* $3.00 membership dues surcharge for girls and volunteers in the GSMT jurisdiction. This dues increase has not been approved by the National Council as is required under GSUSA governance documents. *See Farthest N. Girl Scout Council v. Girl Scouts of the United States*, 454 P.3d 974 (Alaska 2019) (holding that GSUSA Constitution gave the National Council exclusive right to establish the requirement of membership dues and the National Board did not have authority to increase dues).

57. GSMT has offered to create, at GSMT's expense, an API (application programming interface) to allow for interaction between GSMT's proprietary membership data software and the Salesforce-based membership platform utilized by GSUSA.

58. GSUSA has indicated that its IT team has said that its Salesforce-based membership platform cannot accept an API to accept transmission of membership data from GSMT.

59. GSUSA has failed to process GSMT's membership data transmitted to GSUSA in

4834-9941-7830

15

January 2021.

60.    GSUSA has restated and reemphasized its demands to GSMT time and time again including most recently via a letter dated December 4, 2020, a copy of which is attached as **Exhibit F**, and during phone calls between GSUSA and GSMT officers and board members on February 5, 2021; March 24, 2021; and March 31, 2021.

61.    In addition to prior communications, most recently on December 11, 2020, GSMT responded to GSUSA's notice that it was issuing GSMT a charter with conditions that GSMT onboard to the GSUSA technology platform and wrote to GSUSA again on March 16, 2021, to offer scenarios under which GSMT would utilize the technology platform or enter into the related agreements, proposing amendments to the agreements that would resolve GSUSA's concerns. These letters are attached as **Exhibit G** and **Exhibit H**, respectively.

62.    At all times relevant to this action until January 1, 2018, GSMT had operated under three-year term charter agreements with GSUSA.

63.    On November 5, 2017, GSUSA informed GSMT that it has been issued a one-year charter beginning January 1, 2018, and ending December 31, 2018 "intended to provide time for GSMT to work with GSUSA to move toward adoption of the Girl Scout Movement's common technology platform…."

64.    GSMT has received similar one-year charters for each subsequent year to present.

65.    GSMT's current charter agreement will expire by its terms on December 31, 2021.

66.    GSMT desires to continue to serve as a Girl Scout council and offer its strong delivery of the Girl Scout Mission to positively impact Middle Tennessee and create goodwill for the Girl Scout brand without being subjected to coercion and baseless threats from GSUSA.

4834-9941-7830

16

# CLAIMS FOR RELIEF

## COUNT I - DECLARATORY JUDGMENT

67.     GSMT re-alleges and incorporates by reference each of the foregoing allegations in this Petition.

68.     Based on the foregoing, a current and actual case or controversy has arisen between GSMT and GSUSA regarding GSUSA's authority—or lack thereof—to require GSMT to onboard onto and enter into agreements related to GSUSA's technology platform.  This is a real question and is not merely theoretical.

69.     The Court's declaratory judgment or decree, if rendered or entered, would terminate uncertainty or controversy giving rise to the proceeding.

70.     GSUSA has and will continue to harm GSMT by demanding that GSMT make Hobson's choice: capitulate to GSUSA's demands by signing the technology agreements and onboarding to the platform or lose its ability to offer Girl Scouting in Middle Tennessee.

71.     GSMT desires to serve its constituents in Middle Tennessee and not spend valuable resources in disputes with GSUSA.  However, through its actions, GSUSA has left GSMT with no option but to seek judicial relief to protect its ability to continue to serve as a chartered Girl Scout council.

72.     A declaratory judgment would end the harm to GSMT caused by GSUSA's wrongful actions and would minimize the disruption and harm to Girl Scout members and volunteers in Middle Tennessee who participate in Girl Scouting activities organized by GSMT.

73.     GSMT seeks a declaratory judgment: (i) that the GSUSA governance documents require the National Council to approve requirements for a chartered council by a majority vote;

4834-9941-7830

(ii) that the National Board does not have the authority to establish requirements for a chartered council; (iii) that the National Board's "standard" related to the GSUSA common technology platform is outside the scope of any National Council requirement and not consistent with any requirement established by the National Council; (iv) that GSUSA's attempts to require GSMT to onboard onto the technology platform and enter into related agreements with GSUSA related to the technology platform is without authority; (v) that GSUSA's initiation of a "viability review" against GSMT related to the technology platform is without authority because the National Council has not approved any requirement related to a technology platform; (vi) that GSUSA does not have the right to terminate, revoke, or not renew the GSMT Charter Agreement for failure of GSMT to onboard onto or enter into agreements with GSUSA related to GSUSA's technology platform; and (vii) that GSUSA's imposition of a *de facto* dues surcharge unique to members and volunteers registered by Middle Tennessee is void as it was not authorized by the National Council, which has sole authority for setting dues.

## COUNT II- VIOLATIONS OF THE
## TENNESSEE NONPROFIT FAIR ASSET PROTECTION ACT

74.     GSMT re-alleges and incorporates by reference each of the foregoing allegations in this Petition.

75.     Tennessee has a significant interest in protecting the assets of Tennessee nonprofit corporations. In recognition of this interest, among other reasons, Tennessee has enacted the Nonprofit Fair Asset Protection Act, Tenn. Code Ann. § 48-53-201, et seq.

76.     Tenn. Code Ann. § 48-53-202 states: "Notwithstanding any provision of law to the contrary, it is unlawful for: (1) A national nonprofit corporation that has received a charter under

4834-9941-7830

18

36 U.S.C. Subt. II, Pt. B., to terminate, revoke, suspend, or fail to renew a license or charter affiliating a Tennessee nonprofit corporation with the national corporation absent good cause; (2) A national nonprofit that has received a charter under 36 U.S.C. Subt. II, Pt. B., to discriminate against a licensed or chartered affiliated Tennessee nonprofit corporation by imposing requirements not imposed on other similarly situated affiliates of the national nonprofit corporation; or (3) A national nonprofit corporation that has received a charter under 36 U.S.C. Subt. II, Pt. B., to act indirectly to accomplish what would be otherwise prohibited under this part."

77.     Tenn. Code Ann. § 48-53-203 defines "good cause" "to exclude any refusal or failure by the Tennessee nonprofit corporation to make purchases of or to contract to make purchases of goods or services where the board of directors of the Tennessee nonprofit corporation determines … that making a purchase or contracting to make a purchase is not in the best interest of the Tennessee nonprofit corporation or is commercially unreasonable."

78.     Tenn. Code Ann. § 48-53-204(a) provides that any condition, stipulation, provision, or term of any agreement that is in conflict with this part or that would purport to waive or restrict the application of any provision of this part is void and unenforceable.

79.     Tenn. Code Ann. § 48-53-204(c) provides that a Tennessee nonprofit corporation that is injured by a violation or threatened violation of this part may bring a private right of action for injunctive relief and to recover costs and reasonable attorneys' fees if the Tennessee nonprofit corporation is the prevailing party in the action.

80.     GSUSA is a national nonprofit corporation that has received a charter under 36 U.S.C. Subt. II, Pt. B.

81.     GSUSA threatened to terminate, revoke, suspend or fail to renew the license

4834-9941-7830

19

affiliating GSMT, a Tennessee nonprofit, with GSUSA without good cause.

82.     GSMT has determined that adopting GSUSA's technology platform and contracting with GSUSA to do so is commercially unreasonable and not in the best interest of GSMT due to the unlimited financial liability and business interruption it would create, among other reasons.

83.     GSUSA has taken retaliatory action against GSMT by imposing requirements on GSMT not imposed on other councils including: (1) issuing GSMT a one-year charter instead of a three-year charter, as is the norm; (2) by imposing a $3.00 fine or surcharge to membership dues for members and volunteers registered by GSMT; (3) by failing to process GSMT's membership transmittals; (4) by removing GSMT representatives from Girl Scout advisory committees; (5) by announcing a "viability review" of GSMT despite the fact that the GSMT complies with all valid requirements for a chartered council and operates debt-free with .89 cents per dollar spent on programs, financial aid for members and incentives for both girl and adult membership, and reduced fees for camps and other programmatic experiences for girls.

84.     GSUSA's actions are in violation of the Tennessee Nonprofit Fair Asset Protection Act and are, therefore, void and unenforceable pursuant to Tenn. Code Ann. § 48-53-201, *et seq*.

85.     GSMT is entitled to injunctive relief pursuant to Tenn. Code Ann. § 48-53-204(c).

86.     GSMT is entitled to a declaration that GSUSA is in violation of Tenn. Code Ann. § 48-53-201, *et seq*. and its actions to force GSMT to adopt its technology platform and enter into agreements with GSUSA related to the same are null and void.

87.     GSMT is entitled to recover costs and reasonable attorneys' fees pursuant to Tenn. Code Ann. § 48-53-204(c).

4834-9941-7830

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Girl Scouts of Middle Tennessee, Inc., prays for the following relief:

1.      That the Court declare: (i) that the GSUSA governance documents require the National Council to approve requirements for a chartered council by a majority vote; (ii) that the National Board does not have the authority to establish requirements for a chartered council; (iii) that the National Board's "standard" related to the GSUSA common technology platform is outside the scope of any National Council requirement and not consistent with any requirement established by the National Council; (iv) that GSUSA's attempts to require GSMT to onboard onto the technology platform and enter into related agreements with GSUSA related to the technology platform is without authority; (v) that GSUSA's initiation of a "viability review" against GSMT related to the technology platform is without authority because the National Council has not approved any requirement related to a technology platform; (vi) that GSUSA does not have the right to terminate, revoke, or not renew the GSMT Charter Agreement for failure of GSMT to onboard onto or enter into agreements with GSUSA related to GSUSA's technology platform; and (vii) that GSUSA's imposition of a *de facto* dues surcharge unique to members and volunteers registered by Middle Tennessee is void as it was not authorized by the National Council, which has sole authority for setting dues;

2.      That the Court find GSUSA to be in violation of the Tennessee Nonprofit Fair Asset Protection Act, Tenn. Code Ann. § 48-53-101, *et seq.*;

3.      That the Court grant GSMT injunctive relief barring GSUSA: (i) from future enforcement of the unauthorized requirement of a council adopting its technology platform or

4834-9941-7830

21

entering into agreements related to the technology platform and from penalizing councils that do not adopt GSUSA's technology platform; (ii) from imposing a "viability review" against GSMT related to the technology platform;  (iii) from terminating, revoking, or not renewing the Charter Agreement between GSUSA and GSMT as a result of GSMT's decision not to onboard onto or enter into agreements with GSUSA related to GSUSA's technology platform; (iv) from purporting to condition acceptance of a Charter Agreement on acceptance of requirements not approved by the National Council; (v) from charging or attempting to collect a *de facto* membership dues surcharge unique to members in jurisdictions that have not adopted GSUSA's technology platform unless authorized by the National Council; and (vi) from taking any other action inconsistent with the Court's declaration;

4. That the Court award reasonable attorneys' fees and costs to GSMT;

5. That the costs be taxed to Defendant; and

6. That the Court fashion such other or additional relief as appropriate.

Respectfully submitted,

Dated: April 28, 2021

/s/ Laura P. Merritt
Laura P. Merritt (BPR No. 026482)
Karolyn Perry (BPR No. 036900)
Waller Lansden Dortch & Davis, LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN  37219
Phone: 615-244-6380
Fax:    615-244-6804
Email: laura.merritt@wallerlaw.com
Email: karolyn.perry@wallerlaw.com

Attorneys for Plaintiff Girl Scouts of Middle Tennessee, Inc.

4834-9941-7830

22

# EXHIBIT
# A



# Blue Book

## OF BASIC DOCUMENTS

# 2021

Revised March 2021



# Blue Book

## OF BASIC DOCUMENTS

# 2021

This edition supersedes all previous editions of the *Blue Book.*

Girl Scouts of the USA
420 Fifth Avenue
New York, NY 10018-2798



**National President**
Karen P. Layng

**Interim Chief Executive Officer**
Judith Batty

This book may not be reproduced, disseminated, or distributed in whole or in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system now known or hereafter invented, without prior permission of Girl Scouts of the United States of America, 420 Fifth Avenue, New York, NY 10018-2798, or a local Girl Scout council. Members are authorized to print one copy of this book for their personal use.

© 2021 Girl Scouts of the United States of America

All rights reserved. Electronic edition published 2021.

# CONTENTS

6     Constitution of Girl Scouts of the United States of America

14    Bylaws of Girl Scouts of the United States of America

19    Policies of Girl Scouts of the United States of America

23    Credentials

29    Criteria and Standards for an Effective Girl Scout Council

31    Congressional Charter of Girl Scouts of the United States of America

# CONSTITUTION
## OF GIRL SCOUTS OF THE UNITED STATES OF AMERICA

Founded by Juliette Low, March 12, 1912
Chartered by special act of Congress
(Public Law 460; approved March 16, 1950)
Congressional Charter subsequently revised under Public Law 105-225;
approved August 12, 1998

## PREAMBLE

PROMISE

**THE PROMISE**
On my honor, I will try:
To serve God and my country,
To help people at all times,
And to live by the Girl Scout Law.

LAW

**THE LAW**
I will do my best to be
honest and fair,
friendly and helpful,
considerate and caring,
courageous and strong,
and responsible for what I say and do,
and to
respect myself and others,
respect authority,
use resources wisely,
make the world a better place,
and be a sister to every Girl Scout.

BELIEFS & PRINCIPLES OF THE GIRL SCOUT MOVEMENT IN THE USA

**BELIEFS AND PRINCIPLES**
We, the members of Girl Scouts of the United States of America, united by a belief in God, hold that the Girl Scout Promise and Law is the cornerstone of our Movement,

FOUNDERS' NAMES

And inspired by the Founder of the Girl Scout Movement in the United States, Juliette Low, and by the aims of the Founder of the Scout Movement, Lord Baden-Powell, attest to the following:

MISSION

**MISSION**
Girl Scouting builds girls of courage, confidence, and character, who make the world a better place.

SPIRITUAL FORCE

**SPIRITUAL FORCE**
The motivating force in Girl Scouting is spiritual. The ways in which members identify and fulfill their spiritual beliefs are personal and private.

OPEN MEMBERSHIP

**OPEN MEMBERSHIP**
The Girl Scout Movement is open to all girls and adults who accept the Girl Scout Promise and Law and meet membership requirements.

PATRIOTISM, CITIZENSHIP, & COMMUNITY SERVICE

**PATRIOTISM, CITIZENSHIP, AND COMMUNITY SERVICE**
Local, national, and global service and action are core elements of the Girl Scout experience.

DIVERSITY & PLURALISM

**DIVERSITY AND PLURALISM**
Girl Scouts advance diversity and pluralism in our Movement and in the communities in which we live.

**RESPONSIBILITY FOR MOVEMENT/DEMOCRATIC PROCESS**

**RESPONSIBILITY FOR THE MOVEMENT AND THE DEMOCRATIC PROCESS**
The ultimate responsibility for the Girl Scout Movement rests with its members. We govern by an efficient and effective democratic process that demonstrates our leadership in a fast-changing world.

**GIRL/ADULT PARTNERSHIP**

**GIRL/ADULT PARTNERSHIP**
Adults partner with girls to guide and inspire growth and achievement. Volunteers are essential to the strength and capacity of our Movement.

**WORLD ASSOCIATION**

**WORLD ASSOCIATION OF GIRL GUIDES AND GIRL SCOUTS (WAGGGS)**
We are active partners in a worldwide sisterhood through our affiliation with WAGGGS. We work with WAGGGS to address the needs of girls and to build a network of global citizens.

**COMMUNITY PARTNERS**

**COMMUNITY PARTNERS**
We take an active leadership role and are collaborative partners in the community.

**VOICE FOR GIRLS**

**VOICE**
We are a premier voice for girls and an expert on their growth and development.

**NAME**

## ARTICLE I   NAME OF THE CORPORATION

The name of this corporation is Girl Scouts of the United States of America.

**PURPOSE OF CORPORATION**

## ARTICLE II   PURPOSE OF THE CORPORATION

**PURPOSE/JURISDICTION**

The purpose of the corporation is to promote the Girl Scout Movement in the United States of America, which includes the United States, its territories, and possessions, by directing and coordinating the Movement and by providing and administering the Girl Scout program in accordance with the purposes set forth in its Congressional Charter.

**GIRL SCOUT PROGRAM**

## ARTICLE III   THE GIRL SCOUT PROGRAM

Grounded in the Girl Scout Promise and Law, Girl Scouting is a nonformal, experiential, and cooperative education program that promotes girls' personal growth and leadership development. Partnering with caring adults, girls design fun and challenging activities that empower them and raise their voices within a local, national, and global sisterhood.

**NATIONAL COUNCIL**

## ARTICLE IV   THE NATIONAL COUNCIL

**CORPORATION MEMBERSHIP**

1. The membership of this corporation shall consist of the members of the National Council of Girl Scouts of the United States of America, and the corporation in meeting assembled shall be known as the National Council.

**POWERS**

**2.** The National Council shall have all the powers conferred by the Congressional Charter and by other applicable laws, and shall exercise these powers with due regard for its position as the coordinating head of the Girl Scout Movement in the United States.

**ELIGIBILITY FOR MEMBERSHIP**

**3.** Only citizens of the United States who are members of the Girl Scout Movement in the United States and who are 14 years of age or over may be members of the National Council.

7

**4.** The membership of the National Council shall consist of:
   a.   delegates elected by Girl Scout councils who are registered through such local councils;
   b.   delegates from USA Girl Scouts Overseas;[1]
   c.   members of the National Board of Directors;
   d.   members of the National Board Development Committee;
   e.   Past Presidents of Girl Scouts of the United States of America; and
   f.   such other persons as may be elected by the National Council.

The total membership of the National Council shall not exceed 1,500, and at least four-fifths of the entire membership shall consist of delegates from local councils and from USA Girl Scouts Overseas.

**5.** Each local council to which a charter has been issued and remains in force shall be entitled to the following delegates based on the number of girls under its jurisdiction who are members of the Girl Scouts of the United States of America as of September 30 of the year preceding the regular session of the National Council:
   a.   two (2) delegates;
   b.   one (1) additional delegate for up to 3,500 girls;
   c.   one (1) additional delegate for every 3,500 girls thereafter.

USA Girl Scouts Overseas collectively shall be entitled to the number of delegates according to the same formula prescribed for local councils.

The prescribed figure of 3,500 girls may be adjusted when necessary to keep the total membership of the National Council no larger than 1,500.

**6.** Executive staff members employed by any local council shall be eligible for election as delegates to the National Council, provided that the number of such executive staff members from any local council shall not exceed the number of volunteers elected for the same period as delegates from that local council.

**7.** Subject to the requirements of the preceding sections of this article, delegates elected by local councils shall be elected in the calendar year preceding the National Council Session and shall serve as members of the National Council for three years from the date of their election or until their successors are elected, provided they remain the delegates of the local council which elected them; delegates from USA Girl Scouts Overseas shall serve as members for three years from the date of their selection or until their successors are selected, provided they remain delegates from USA Girl Scouts Overseas; members of the National Board of Directors and National Board Development Committee shall be members of the National Council during their term of office; those persons elected by the National Council shall serve until the next regular session of the National Council.

## ARTICLE V   SESSIONS OF THE NATIONAL COUNCIL

**1.** There shall be a regular session of the National Council held triennially at such time and place as determined by the National Board of Directors. Notice of the time, place, and purpose of such session shall be mailed not less than 60 days before the session to each local council, to each USA Girl Scouts Overseas committee, and to each member of the National Board of Directors and National Board Development Committee.

**2.** The National Council at its sessions shall hold elections, amend the Constitution, establish requirements for credentials, and shall determine the general lines of policy of the Girl Scout Movement and program by considering and acting upon proposals directed toward the fostering and improvement of Girl Scouting, by receiving and acting upon reports of its National Board of Directors, and by giving guidance to the National Board upon general lines of direction of the Movement and program.

---

1. "Overseas" is a designation for the Girl Scouts of the USA program delivered outside the jurisdiction of a chartered Girl Scout council.

**3.** Special sessions of the National Council shall be called by the President upon written request of a majority of the members of the National Board of Directors or twenty percent (20%) of the membership of the National Council, which shall represent at least twenty-five percent (25%) of the councils chartered by GSUSA. The purpose of the session shall be stated in the written request.

The purpose of the special session shall be limited to legitimate business of the National Council, and no other business shall be transacted except that for which the session has been specifically called.

Notice of the special session, stating the time, place, and specific purpose, shall be mailed not less than 30 days before the session to each local council, each delegate from USA Girl Scouts Overseas, each member of the National Board of Directors and the National Board Development Committee, each Past President, and each member elected by the National Council who is entitled to vote at such session.

**4.** Two hundred members of the National Council present in person shall constitute a quorum for the transaction of business at sessions of the National Council, provided, however, that delegates are present from one or more local councils in a majority of the geographical areas of the country as defined in the Bylaws. In the absence of a quorum, a majority of those present at the time and place set for a session may take an adjournment from time to time until a quorum shall be present.

**5.** Each member present in person at the National Council shall be entitled to one (1) vote. Decision on membership dues shall require a majority of votes cast. All matters shall be determined by a majority vote of the members present and voting, unless otherwise provided by this Constitution.

## ARTICLE VI    PROPOSALS TO THE NATIONAL COUNCIL

**1.** Proposals directed toward the fostering and improvement of Girl Scouting that are to be acted upon by the National Council may be originated (a) by the National Board of Directors and (b) by local councils. Proposals shall be submitted according to the following procedures:

a.  Proposals originated by the National Board of Directors: (1) such proposals shall be sent to local councils for consideration prior to the next session of the National Council, together with the recommendations of the National Board of Directors; (2) action shall be taken on such proposals by the National Council at its next session.

b.  Proposals originated by local councils: (1) such proposals shall be sent to the National Board of Directors by such date as shall be determined by the National Board of Directors; (2) the National Board of Directors, in its sole discretion, shall determine whether such proposals relate to matters which should properly be acted upon by the National Council, except that a proposal submitted by a minimum of 15 percent of all Girl Scout councils holding a charter issued by the National Board of Directors of Girl Scouts of the USA as of September 30 of the year preceding the regular session of the National Council shall be determined by the National Board of Directors to relate to matters which should properly be acted upon by the National Council; (3) proposals which the National Board determines relate to matters which should properly be acted upon by the National Council shall be sent to local councils for consideration prior to the next session of the National Council, together with the recommendations of the National Board of Directors; (4) action shall be taken on such proposals by the National Council at its next session.

**2.** Any proposal involving a constitutional amendment shall be governed by the provisions of the article on amendments.

## ARTICLE VII    LOCAL GIRL SCOUT COUNCILS

Local Girl Scout councils shall be organized to further the development of the Girl Scout Movement in the United States; to establish local responsibility for leadership, administration, and supervision of the program; and to develop, manage, and maintain Girl Scouting in accordance with the terms of their charters.

## ARTICLE VIII    CREDENTIALS

REQUIREMENTS

**1.** The National Council shall establish requirements for certificates of membership, local council charters, and all other credentials.

ADMINISTRATION

**2.** The National Board of Directors shall administer the requirements for the credentials established by the National Council, and may establish standards and issue standards, procedures, and interpretations regarding such requirements provided such standards, procedures, and interpretations are consistent with the requirements established by the National Council.

ISSUANCE REVOCATION

**3.** The National Board of Directors, in its sole discretion, shall have the power to issue these credentials subject to the requirements established by the National Council, and to revoke them when, in its opinion, the terms and conditions thereof or requirements therefore are being violated or when the best interests of Girl Scouting are not being furthered.

DURATION

**4.** Charters and other credentials shall be issued for no more than six years. Certificates of membership shall be issued for annual, lifetime, or other applicable periods. All the credentials shall bear the name of Juliette Low.

## ARTICLE IX    MEMBERSHIP DUES

MEMBERSHIP DUES

Every person accepting the principles of the Girl Scout Movement and desiring to be a member of the Girl Scout Movement in the United States of America shall pay annual, lifetime, or other applicable membership dues to Girl Scouts of the United States of America. Dues are set by the National Council or the National Board.

The National Board shall implement procedures for communicating with and seeking input from Girl Scout councils and National Council delegates prior to any membership dues change by the National Board.

NATIONAL BOARD OF
DIRECTORS

## ARTICLE X    NATIONAL BOARD OF DIRECTORS

MANAGEMENT OF
CORPORATION/EXECUTIVE
COMMITTEE

**1.** The affairs of the corporation between sessions of the National Council shall be managed by a National Board of Directors, except that the Bylaws may provide for an Executive Committee to exercise the powers of the National Board in the interim between its meetings.

COMPOSITION

**2.** The National Board of Directors shall consist of the President, the Vice Presidents, the Secretary, and the Treasurer; and 25 members-at-large. The Chair of the National Board Development Committee, if not already elected to the National Board, shall be ex officio a member of the National Board. The Chief Executive Officer shall be an ex officio member without vote. The National Board shall at all times be representative of the various geographical areas of the country.

ELECTION OF MEMBERS
TERMS

**3.** All members-at-large of the National Board of Directors shall be elected by the National Council at each regular session to serve a three-year term beginning at the time of their installation at the session when elected and ending upon the installation of their successors at the next regular session of the National Council except that National Board members elected also as members of the National Board Development Committee shall have a three-year term to coincide with the term of National Board Development Committee members.

Of those nominated by the National Board Development Committee at least one-third shall be serving at the time of their nomination either a first or second term as members of the National Board of Directors.

NUMBER OF TERMS

Members of the National Board of Directors shall serve for no more than three consecutive terms, except that, regardless of the number of terms any person shall have served as a member of the National Board of Directors, such person may be eligible to be a member of the National Board when serving as an officer of the corporation elected by the National Council or as Chair of the National Board Development Committee.

**NON-PARTICIPATING MEMBERS**

**4.** Any National Board member who is absent from two consecutive National Board meetings in their entirety without good cause, acceptable to the President or designee, shall be removed from the National Board by a majority vote of the National Board members present and voting at any regular meeting of the National Board of Directors.

Further, a National Board member may be removed with or without cause by a three-fourths vote of the total number of the National Board of Directors.

**VACANCIES**

**5.** The National Board of Directors shall have the power to fill vacancies in its own membership until the next regular session of the National Council, including any vacancy created by the election of a member-at-large to another capacity on the National Board and installation in such capacity. In filling vacancies, the National Board shall conform to the requirement of Section 2 of this article.

**EMERGENCY POWERS**

**6.** In the event of an emergency which makes it impossible for the National Council to meet, all the powers of the National Council, except the conducting of elections, shall, to the extent permissible by law, be automatically conferred on the National Board of Directors until such time as a session of the National Council can be held. Action taken by the National Board of Directors under these emergency powers shall be reported to the National Council at its next session. In such an emergency, the term of office of all members of the National Board of Directors and National Board Development Committee shall be extended until elections are held and successors installed at the next regular session of the National Council. Such an extended term shall be considered to be one term of office.

**TERM OF MEMBERS IN EMERGENCY**

**OFFICERS**

## ARTICLE XI   OFFICERS

**OF THE CORPORATION**

**1.** The officers of the corporation shall be the President, who shall have the working title Chair of the National Board of Directors; the First and Second Vice Presidents, who shall have the working titles of Vice Chairs; the Secretary; the Treasurer; the Chief Executive Officer; and such other officers as the Bylaws may provide.

**ELECTION TERM**

**2.** The President, the Vice Presidents, the Secretary, and the Treasurer shall be elected by the National Council at each regular session to serve a three-year term beginning at the time of the installation at the session when elected and ending upon the installation of their successors at the next regular session of the National Council. Each person shall serve no more than three consecutive terms in any one or any combination of these offices. Regardless of the number of consecutive terms any person shall have served in any one or any combination of these offices other than that of President, such person shall be eligible for two consecutive terms as President.

**MAXIMUM NUMBER OF TERMS**

**CHIEF EXECUTIVE OFFICER & OTHER OFFICERS**

**3.** The Chief Executive Officer shall be appointed by the National Board of Directors to hold office at its pleasure. Such other officers as the National Board of Directors may deem necessary may be elected or appointed by the National Board as provided in the Bylaws.

**VACANCIES**

**4.** A vacancy among the officers of the corporation shall be filled by the National Board of Directors for the remainder of the unexpired term.

**PAST PRESIDENTS**

**5.** In recognition of distinguished service, all Past Presidents of Girl Scouts of the United States of America shall be honorary officers and members of the National Council with full voting rights.

**HONORARY OFFICERS**

**6.** The National Council may elect distinguished citizens as honorary officers of the National Council.

**NATIONAL BOARD DEVELOPMENT COMMITTEE**

## ARTICLE XII   NATIONAL BOARD DEVELOPMENT COMMITTEE, NOMINATIONS, AND ELECTIONS

**MEMBERSHIP RELATIONSHIP TO NATIONAL BOARD**

**1.** The National Board Development Committee shall consist of seven (7) members, including the chair of the committee; the CEO of Girl Scouts of the United States of America shall serve as an ex officio nonvoting member. Between meetings of the National Council, the National Board Development Committee shall work in partnership with and report to the National Board of Directors.

**COMPOSITION**    **2.** At least two (2) members shall be members of the National Board of Directors and at least three (3) members shall be non-National Board members.

**ELECTION**    **3.** Members shall be elected by the National Council.

**TERMS OF OFFICE**    **4.** The term of office shall commence at the adjournment of the National Council Session when elected, and shall end at the adjournment of the next regular session, or until successors are elected and assume office.

**TERM LIMITS**    **5.** At least two (2) members, but no more than three (3), shall serve a second consecutive term. No individual shall serve more than two (2) consecutive terms as a member of the committee.

**APPOINTMENT & APPROVAL OF CHAIR**    **6.** The chair of the committee shall be appointed by the President from amongst the members of the National Board Development Committee and approved by either the Executive Committee or the National Board. Individual(s) shall serve no more than one (1) term as chair of the National Board Development Committee.

**VICE CHAIR ELECTION**    **7.** The committee shall elect a Vice Chair from amongst its membership.

**VACANCIES**    **8.** A vacancy in any position, including the chair, shall be filled by the National Board for the unexpired term.

**SINGLE SLATE OF NOMINEES**    **9.** The committee shall present at each regular session of the National Council a single slate of nominees for: a) the President; b) the Vice Presidents; c) the Secretary; d) the Treasurer; e) members-at-large of the National Board of Directors; and f) members of the National Board Development Committee. No member of the National Board Development Committee shall be eligible to be nominated for any officer position. A nominee for President shall be a current member of the National Board of Directors.

**NOMINATIONS FROM FLOOR**    **10.** Nominations may be made from the floor of the National Council Session provided that notice of such nomination and written consent to serve by the nominee(s) shall have been provided to the President and the Chair of the National Board Development Committee at least forty-eight (48) hours prior to the published time for the convening of the meeting at which the election shall be held.

**VOTES REQUIRED FOR ELECTION**    **11.** Election to any position on the National Board or the National Board Development Committee shall require a majority of votes cast by those present and voting at the National Council Session.

**BALLOTS**    **12.** Elections shall be by ballot, including electronic balloting, except if there is only one nominee for a position, the election may be held by acclamation.

**REMOVAL FROM COMMITTEE**    **13.** Any National Board Development Committee member who is absent from two (2) consecutive National Board Development Committee meetings in their entirety without good cause, acceptable to the National Board Development Committee Chair, upon recommendation of the National Board Development Committee to the National Board of Directors, shall be removed from the National Board Development Committee by a majority vote of the National Board members present and voting at any regular meeting of the National Board of Directors. Further, upon recommendation of the National Board Development Committee to the National Board of Directors, a National Board Development Committee member may be removed with or without cause by a three-fourths vote of the total number of the National Board of Directors.

**PARTIAL TERMS**

## ARTICLE XIII    PARTIAL TERMS

A person who has served more than half of a specific term, as that specific term is set forth in the Constitution or Bylaws, shall be considered to have served the full term.

## ARTICLE XIV    FINANCE

FINANCE

CONTRIBUTIONS

**1.** Contributions for the purposes of this corporation shall be collected only as authorized by the National Council or the National Board of Directors.

DEBTS

**2.** Debts of the corporation shall be incurred only as directed by resolution of the National Council or the National Board of Directors.

LIMITATIONS OF LIABILITY

**3.** The corporation shall not be liable for the debts of any local council or other unit holding a credential or any group of members of the Movement, or any representative of any such unit or group, or any representative of this corporation unless incurred by resolution of the National Council or National Board of Directors.

## ARTICLE XV    INSIGNIA

INSIGNIA

TREFOIL, BADGES, INSIGNIA & UNIFORMS

The official emblem of the Girl Scout Movement in the United States is the trefoil. The badges, insignia, and uniforms of Girl Scouts of the United States of America shall be protected to the fullest extent possible and shall be made available to and used only by members registered with Girl Scouts of the United States of America, or persons authorized by the National Board of Directors.

## ARTICLE XVI    BYLAWS

BYLAWS

ADOPTION

The National Council or the National Board of Directors shall have power to adopt Bylaws not inconsistent with this Constitution, the Congressional Charter, or other applicable laws.

## ARTICLE XVII    AMENDMENTS

AMENDMENTS

VOTE BY NATIONAL COUNCIL

RECOMMENDATION BY NATIONAL BOARD

AMENDMENT TO AN AMENDMENT

This Constitution may be amended by a two-thirds vote of those present and voting at any session of the National Council, provided that the National Board of Directors, in its sole discretion, shall have deemed the proposed amendment appropriate as an amendment and provided that it shall have been included in the call of the session together with the National Board's recommendation thereon. An amendment to an amendment properly before any session of the National Council may be made by a majority vote of those present and voting in accordance with the rules governing the session, provided the proposed amendment thereto does not alter the intent or increase the scope of the amendment acted upon by the National Board of Directors.

# BYLAWS
## OF GIRL SCOUTS OF THE UNITED STATES OF AMERICA

**NATIONAL BOARD OF DIRECTORS**

## ARTICLE I   MEETINGS OF THE NATIONAL BOARD OF DIRECTORS

**REGULAR MEETINGS**

**1.** The National Board of Directors (hereinafter referred to as the "National Board") shall hold at least two regular meetings a year. Meetings shall be held at such date, time, and place as the National Board may direct. Notice of date, time, and place of each meeting shall be provided to each member of the National Board not less than 10 days before the meeting.

**SPECIAL MEETINGS**

**2.** Special meetings may be called by the President and shall be called by the President upon the request of at least 10 members of the National Board. Notice of date, time, place, and purpose of a special meeting shall be provided in advance to each member of the National Board.

**QUORUM**

**3.** A majority of the National Board members must be present (in person or linked by telecommunication or by means such that all members participating in the meeting are able to hear one another) to constitute a quorum.

**OFFICERS**

## ARTICLE II   OFFICERS

**DUTIES OF OFFICERS**

**1.** The officers shall perform the duties prescribed in this Article and such other duties as are prescribed for the office in the Constitution or Bylaws of GSUSA, by the National Board, the Executive Committee, the National Council, the President, and in the adopted parliamentary authority, as well as such other duties as are usual to this office.

**PRESIDENT**

**A.** The President, who shall have the working title of Chair of the National Board, shall:

    i.   be the principal officer of the corporation;

    ii.   preside at all meetings of the National Council, the National Board, and the Executive Committee, except at such meetings for which the duty of presiding is delegated to the First Vice President, the Second Vice President, the Secretary, the Treasurer, or any member-at-large of the National Board of Directors;

    iii.   see that the lines of direction given by the National Council and the action of the National Board are carried into effect;

    iv.   report to the National Council and the National Board as to the conduct and management of the affairs of the corporation; and

    v.   serve ex officio as a member of all committees established by the National Board.

**FIRST VICE PRESIDENT**

**B.** The First Vice President, who shall have the working title of First Vice Chair, shall:

    i.   assist the President with any and all duties assigned by the President;

    ii.   preside at meetings of the National Council, the National Board, or the Executive Committee in the absence or inability of the President, or when delegated the responsibility of presiding; and

    iii.   in the event of the vacancy in the office of President, succeed to the office for the unexpired term.

**SECOND VICE PRESIDENT**

**C.** The Second Vice President, who shall have the working title of Second Vice Chair, shall:

    i.   assist the President with any and all duties assigned by the President;

    ii.    preside at meetings of the National Council, the National Board, or the Executive Committee in the absence of the President and First Vice President or in the President's and First Vice President's inability to preside or when delegated the responsibility of presiding; and

    iii.    in the event of the vacancy in both the offices of President and First Vice President, succeed to the office of President for the unexpired term.

**D.** The Secretary shall:

    i.    ensure that proper notice is given for all meetings of the National Council, the National Board, and the Executive Committee;

    ii.    ensure that minutes of all meetings of the National Council, the National Board, and the Executive Committee are kept;

    iii.    have responsibility for the seal of the corporation and ensure its safekeeping; and

    iv.    preside at meetings of the National Council, the National Board, or the Executive Committee when delegated the responsibility of presiding.

**E.** The Treasurer shall:

    i.    provide effective stewardship, control, and oversight of the corporation's finances;

    ii.    execute directives of the National Board in connection with all financial issues including, but not limited to:

        a.    the receipt, custody, disbursement, and borrowing of money;

        b.    the receipt, custody, and disposal of securities;

    iii.    execute, in the name of the corporation, all contracts or other instruments authorized by the National Board;

    iv.    serve as a member, or chair, of the Finance Committee; and

    v.    preside at meetings of the National Council, the National Board, or the Executive Committee, when delegated the responsibility of presiding.

**F.** The Chief Executive Officer, hereinafter referred to as the "CEO," shall:

    i.    be responsible to the National Board;

    ii.    serve ex officio without vote as a member of the National Board; and

    iii.    perform such duties as prescribed by the National Board.

## ARTICLE III   INTERNATIONAL COMMISSIONER

The President shall appoint from among the members of the National Board the International Commissioner, who shall assist the President in the work with the World Association of Girl Guides and Girl Scouts.

## ARTICLE IV   EXECUTIVE COMMITTEE

**1. Composition**. The Executive Committee shall consist of no more than 11 members, as follows:

A.   The President, the First Vice President, the Second Vice President, the Secretary, and the Treasurer;

B.   The Chair of the National Board Development Committee;

C.   The International Commissioner;

D.   Up to four members-at-large, appointed by the President;

E.   The CEO, who shall serve as an ex officio member without vote.

**2. Duties.**

A.   Authority Between Board Meetings. The Executive Committee shall exercise the authority of the National Board between meetings of the National Board except that the Executive Committee shall not (except in the case of an emergency when these powers are deemed to be delegated):

i.   determine what reports and proposals are to be submitted to the National Council;

ii.   approve the budget;

iii.   adopt or amend the Bylaws of GSUSA;

iv.   fill vacancies on the Board of Directors or on any committees of the Board.

B.   Reports. The Executive Committee shall submit to the National Board reports of all actions taken between meetings of the National Board.

**3. Meetings.** The Executive Committee shall meet as needed. Notice of date, time, and place of such meetings shall be provided in advance to each member of the Executive Committee. Such meetings shall be called by the Chair. Special meetings may be called by either the Chair or upon the written request of at least four members. Notice of date, time, place, and purpose of a special meeting shall be provided in advance to each member of the Executive Committee.

**4. Quorum.** A majority of the Executive Committee members then in office must be present (in person or linked by telecommunication or by means such that all members participating in the meeting are able to hear one another) to constitute a quorum for transaction of business.

## ARTICLE V   COMMITTEES

**1.** The National Board has the authority to establish standing committees of the board and advisory committees. The National Board shall establish the functions of these committees, which shall operate under the general supervision of the National Board.

**2.** Except where otherwise provided in the Constitution and Bylaws, the chairs of standing committees of the National Board shall be recommended by the President from members of the National Board, and approved by a majority of all the National Board members in office when the action is taken, for a term beginning at the time of the approval of the appointment and ending at the close of the next regular session of the National Council. No individual shall serve as the chair of the same committee for more than two consecutive terms.

**3.** Members of standing committees established by the National Board shall be National Board members recommended by the President, in consultation with the chair of the respective committee, and approved by a majority of all the National Board members in office when the

action is taken, for a term beginning at the time of the approval of the appointment and ending at the close of the next regular session of the National Council. No individual shall serve as a member of the same committee for more than three consecutive terms. Members of advisory committees need not be members of the National Board.

FINANCE

## ARTICLE VI    FINANCE

FISCAL YEAR

**1.** The fiscal year of the corporation shall begin on October 1 and shall end on September 30.

EXAMINATION OF ACCOUNTS

**2.** Certified public accountants shall be retained by the National Board to make an annual examination of the financial accounts of the corporation. The certified public accountants shall submit a report of this examination to the National Board.

BONDING

**3.** All persons having access to or responsibility for the handling of monies and securities shall be bonded.

APPROVED SIGNATURES

**4.** a.    The National Board shall designate the monetary limit at which transactions as defined in 4c, in amounts equal to or in excess of the limit, shall require the signature/approval of the Treasurer, or one of the Treasurer's nominees, and the signature/approval of the CFO, or one of the CFO's nominees, such nominees having been approved by either the Executive Committee or the National Board.

b.    Transactions as defined in 4c and in an amount less than the monetary limit designated by the National Board shall require the signature/approval of the Treasurer, or one of the Treasurer's nominees, or the signature/approval of the CFO, or one of the CFO's nominees, such nominees having been approved by either the Executive Committee or the National Board.

c.    Transactions shall include checks, drafts, notes, orders, sales of securities, electronic funds transactions, and other forms of electronic commerce that the National Board may deem appropriate.

d.    The National Board shall approve means other than original signatures by which approval is effected.

ACCESS TO SECURITIES

e.    Access to securities held by the corporation shall be by two persons, namely the Treasurer or President, or their approved nominees, and by the CFO or the CFO's nominees, such nominees having been approved by either the Executive Committee or the National Board.

INDEMNIFICATION

## ARTICLE VII    INDEMNIFICATION

This corporation shall indemnify directors and officers against losses actually and reasonably incurred in connection with the defense of any action, suit, or proceeding relating to the performance of their duties to the extent permitted by law.

BLUE BOOK OF BASIC DOCUMENTS

## ARTICLE VIII    BLUE BOOK OF BASIC DOCUMENTS

DISTRIBUTION CONTENTS

A *Blue Book of Basic Documents* shall be published and distributed, which shall contain the Congressional Charter, the Constitution and Bylaws, requirements for credentials as established by the National Council, and such other material as the National Board shall direct.

## ARTICLE IX    GEOGRAPHICAL AREAS

Geographical areas, as referenced in the Constitution of GSUSA, shall consist of the following:

**Geographical Area 1:** Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, Vermont, Puerto Rico, and the United States Virgin Islands

**Geographical Area 2:** Delaware, District of Columbia, Kentucky, Maryland, Ohio, Pennsylvania, Virginia, and West Virginia

**Geographical Area 3:** Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee

**Geographical Area 4:** Illinois, Indiana, Michigan, Minnesota, North Dakota, South Dakota, and Wisconsin

**Geographical Area 5:** Arkansas, Colorado, Iowa, Kansas, Missouri, Nebraska, New Mexico, Oklahoma, Texas, and Wyoming

**Geographical Area 6:** Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, American Samoa, Guam, and Northern Mariana Islands

## ARTICLE X    PARLIAMENTARY AUTHORITY

The current edition of *Robert's Rules of Order Newly Revised* shall be the parliamentary authority of Girl Scouts of the USA.

## ARTICLE XI    AMENDMENTS

These Bylaws may be amended by a majority of those present (in person or linked by telecommunication as described under Article I, Section 3, of the Bylaws) and voting at any meeting of the National Board, or present and voting at any meeting of the National Council, provided that the proposed amendment shall have been included in the call for the meeting.

# POLICIES
## OF GIRL SCOUTS OF THE UNITED STATES OF AMERICA

### ENDORSEMENTS/TRADEMARK/ MARKETING/INTERNET SALES

**PERMISSION FOR COMMERCIAL ENDORSEMENTS**
Permission to endorse commercial products or to give endorsement of such by implication must be obtained from Girl Scouts of the United States of America and shall be granted only when such endorsement is in keeping with Girl Scout principles and activities.

**AUTHORIZATION OF BOOKS, PLAYS, MOTION PICTURES, RADIO AND TV PROGRAMS ABOUT GIRL SCOUTING**
A book, play, motion picture, or radio or television program about Girl Scouts or Girl Scouting shall be accepted as authorized by Girl Scouts of the United States of America only when the script, manuscript, or proof has been approved by Girl Scouts of the United States of America.

**INDIVIDUAL TESTIMONIALS**
Individual members of the Girl Scout Movement shall not allow their names, in their Girl Scout capacities, to be used in advertising testimonials directly or indirectly endorsing any product or service.

**POLITICAL AND LEGISLATIVE ACTIVITY**
Girl Scouts of the United States of America and any Girl Scout council or other organization holding a Girl Scouts of the United States of America credential may not, nor may they authorize anyone on their behalf to, participate or intervene directly or indirectly in any political campaign on behalf of or in opposition to any candidate for public office; or participate in any legislative activity or function which contravenes the laws governing tax-exempt organizations.

**GIRL SCOUT TRADEMARK**
Every product sold in connection with a Girl Scout council-sponsored product sale shall bear the Girl Scout name and service mark, either on the product or on its packaging. Every item bearing any of the registered Girl Scout names, logos, or marks purchased or developed for resale,[2] including items to be sold in council-sponsored product sales, shall be purchased (1) from a GSUSA-licensed vendor, (2) from Girl Scout Merchandise, or (3) produced with prior approval from GSUSA *when items are not readily available from a licensed supplier.*

Every item bearing the Girl Scout name and service mark, including items for resale or non-resale[3] by councils, shall conform to the Girl Scout *Graphic Guidelines* published by GSUSA. Items used for both resale and non-resale shall adhere to the stipulations stated above for resale items.

**CAUSE-RELATED MARKETING**
GSUSA may develop alliances and relationships with corporations and businesses for the purposes of advancing Girl Scouting. A Girl Scout council may develop similar alliances with businesses within its jurisdiction, or may work in partnership with GSUSA to develop strategic alliances outside of its jurisdiction. These corporations must have policies and operations compatible with the values of Girl Scouting. The guiding principles for such relationships shall be as follows:

- the Girl Scout image will be preserved and enhanced;
- significant revenue and/or visibility will be generated;
- program activities will be enriched;
- membership outreach efforts will be supported; and
- the integrity and financial well-being of GSUSA and Girl Scout councils will be maintained or enriched.

**INTERNET SALES**
For safety and security reasons, sales[4] and marketing[5] on the Internet for any Girl Scout troop/group money-earning activities may not be conducted by individual girls, parents, or other adults except as provided for in the Girl Scouts of the USA Product Sale Guidelines and with appropriate parental permission.

Sales on the Internet of Girl Scout merchandise, such as uniforms, insignia, publications, and equipment may only be conducted by duly authorized and licensed Girl Scout councils, council shops, retail agencies, and/or GSUSA-licensed vendors. Permission to sell on the Internet must be obtained from GSUSA.

---

3. "Non-resale" is defined as any item provided, consumed, or used for the promotion and delivery of Girl Scouts program. This includes items given as donor recognitions.

4. Sales on the Internet include any financial transaction concluded on any website, including online auctions or public sale sites.

5. Marketing includes advertising the sale and the solicitation and receipt of order commitments.

2. "Resale" is defined as any item resold or given away in connection with an event for which a fee, price, or admission is paid. This includes, but is not limited to, product sales.

## FUNDRAISING

### FUNDRAISING METHODS
All fundraising methods employed by Girl Scout groups must be in keeping with the principles for which the organization stands.

### FUNDRAISING BY GIRL SCOUTS OF THE UNITED STATES OF AMERICA AND GIRL SCOUT COUNCILS
Fundraising to promote the interests of the Girl Scout Movement may be conducted by Girl Scouts of the United States of America and Girl Scout councils both independently and collaboratively. GSUSA and councils are encouraged to work together to maximize contributions to Girl Scouting.

### SOLICITATION OF CORPORATIONS AND FOUNDATIONS
GSUSA requests for funding shall be initiated only after consultation with the council serving the jurisdiction where the funding source directs that solicitations be received. Prior to solicitation of a corporation or foundation located outside a council's jurisdiction, the initiating council shall consult with the council serving the jurisdiction where the funding source directs that solicitations be received.

### OWNERSHIP OF ASSETS
All money and other assets, including property, that are raised, earned, or otherwise received in the name of and for the benefit of Girl Scouting must be held and authorized by a Girl Scout council or Girl Scouts of the USA. Such money and other assets must be used for the purposes of Girl Scouting. They are the property of and administered by the Girl Scout council or Girl Scouts of the USA and shall not be sold, given, transferred, or conveyed to a third party for less than fair market value. Such assets are not the property of individuals, troops, geographic units, subordinate units, or communities within a Girl Scout council.

### FAMILY SOLICITATION
Financial support for Girl Scout councils is derived from the broader community. Local councils are encouraged to solicit the families of girl members for voluntary financial support as one part of an overall fundraising campaign. This may be done at the time of membership registration. Any such family contribution shall be voluntary, not a prerequisite for membership, and not considered a fee for local council services.

### SOLICITATION OF CONTRIBUTIONS
Adult members in their Girl Scout capacities may not solicit financial contributions for purposes other than Girl Scouting. Adults may engage in combined fundraising efforts authorized by the Girl Scout council and in which the local council is a beneficiary. Girl members may not engage in any direct solicitation for money except for Girl Scout Seniors and Ambassadors, who may solicit philanthropic donations to their councils of cash or in- kind goods for Girl Scout Gold Award projects, provided they have secured prior written permission from their council's Chief Executive Officer, Chief Development Officer, or their designee. In addition, girls must abide by their own council's policies and procedures with regard to this matter. The National CEO in consultation with the National Board Chair may give permission to raise money in times of a major national or international emergency, with prior written notice to the National Board. Councils will be notified of this action in writing.

### JULIETTE LOW WORLD FRIENDSHIP FUND
All monies collected for the Juliette Low World Friendship Fund must be used "for the promotion of Girl Guiding and Girl Scouting throughout the world as a contribution toward world peace and goodwill" and shall be administered by the National Board of Directors of Girl Scouts of the United States of America in its sole discretion. (The resolution creating the Juliette Low World Friendship Fund was adopted by the National Council, October 1927.)

## GIRL SCOUT COUNCIL/USAGSO

### GIRL SCOUT COUNCIL AUTHORITY AND RESPONSIBILITY
Within the terms of its charter, a Girl Scout council shall have the authority and responsibility to: provide and safeguard the Girl Scout program, build an organization to serve its membership, secure and direct personnel, extend membership opportunities to all girls within its jurisdiction, finance its work, and develop its community and public relationships. *A Girl Scout council shall not have the authority to establish any form of local council membership dues; however, Girl Scout councils may charge an annual council service fee for girl members, not to exceed the amount charged by GSUSA for annual membership dues.* A Girl Scout council shall not use membership dues collected from girls and adults registering with GSUSA through the council as a source of investment income. The local council shall be accountable to the National Board of Directors of Girl Scouts of the United States of America for proper exercise of this authority.

---

*The annual council service fee was created by action of the National Council in 2011. It provides councils with the option of assessing a fee to help cover costs related to the administration of Girl Scout program for girls. The amount of the fee is determined by the individual council and cannot exceed the cost of the full-year annual membership dues set by GSUSA for the year that the annual council service fee is being charged. This is a girl fee and only applies to girl members.

Any council charging an annual council service fee must charge the fee consistently, to all girls, throughout the entire membership year, including early registration. Funds must be collected at the time that GSUSA dues are collected.

### TROOPS AND COMMUNITIES WITHIN A GIRL SCOUT COUNCIL JURISDICTION

When a Girl Scout council is chartered and the territory in which it is to operate has been decided upon, all Girl Scout troops in all the communities within that territory shall be under its jurisdiction, and the Girl Scouts of the United States of America shall act through the local council in its relations with these troops and communities.

### ADMINISTRATION OF GIRL SCOUT CAMPING

All types of Girl Scout camping must be under the administration of a Girl Scout council or group licensed by Girl Scouts of the United States of America, except that camping by members of USA Girl Scouts Overseas (USAGSO) may be authorized by a USAGSO committee.

### USA GIRL SCOUTS OVERSEAS COMMITTEE RESPONSIBILITY

Every member of USA Girl Scouts Overseas must be affiliated with a USA Girl Scouts Overseas Committee, which shall accept responsibility for: seeing that overseas committee members, leaders, and girls meet individual membership requirements; seeing that each person subscribes to the purpose, adheres to the policies, and maintains the standards of Girl Scouts of the USA; securing and endorsing the leaders; and seeing that the work is financed and authorizing the methods and manner of collecting funds raised in the name of Girl Scouting.

## MEMBERSHIP REGISTRATION/ SECURITY OF MEMBERSHIP DATA

### MEMBERSHIP REGISTRATION

All girls and adults participating in the Girl Scout Movement shall be registered as members with Girl Scouts of the United States of America and individually pay the annual, or other applicable membership dues, except those adults who are lifetime members or who are working in a temporary advisory or consultative capacity.

### SECURITY OF GIRL SCOUT MEMBERSHIP DATA AND RESTRICTED USE OF MEMBERSHIP AND MAILING LISTS

The release and distribution of any Girl Scout membership list to a Girl Scout council or non–Girl Scout entity, or the release of any data or information on Girl Scout members, is prohibited except upon approval by the Girl Scouts of the United States of America. All Girl Scout councils and USA Girl Scouts Overseas locations accessing or transmitting membership information electronically must be in compliance with this security policy and all other GSUSA security procedures, policies, and standards, as well as all applicable local, state, and federal laws.

### SECURITY OF MEMBERSHIP DATA

Girl Scout councils and USA Girl Scouts Overseas use the GSUSA membership technology platform to register members with Girl Scouts of the USA, and the following procedures are in effect:

- To obtain and retain access to the GSUSA membership technology platform, every Girl Scout council must sign a written agreement, which defines the terms and conditions established by GSUSA.
- Every Girl Scout council and USA Girl Scouts Overseas committee must abide by GSUSA's security policies, standards, and confidentiality and nondisclosure agreements.
- Every Girl Scout council must consent to periodic audits by GSUSA, such as the annual review, to ensure compliance with technical configuration standards, security policies, and GSUSA and governmental security and privacy standards.

## PLURALISM AND DIVERSITY/ HUMAN RESOURCES

### PLURALISM AND DIVERSITY IN GIRL MEMBERSHIP

All Girl Scout councils and USA Girl Scouts Overseas committees shall be responsible for seeing that membership is reflective of the pluralistic nature of their populations and that membership is extended to all girls in all population segments and geographic areas in their jurisdictions. A girl who meets or can meet membership requirements shall not be denied admission or access to Girl Scout program because of race, color, ethnicity, creed, national origin, socioeconomic status, or disability. Reasonable accommodations shall be made for girls with disabilities to ensure that girls have access to activities.

### SELECTION OF ADULTS

Every adult volunteer and executive staff member in Girl Scouting must be selected on the basis of qualifications for membership, ability to perform the job, and willingness and availability to participate in training for it. In selection of adults, there shall be no discrimination on the basis of race, color, ethnicity, sex, creed, national origin, or socioeconomic status. There shall be no discrimination against an otherwise qualified individual by reason of disability or on the basis of age. Members of Girl Scout council boards of directors and the National Board of Directors shall be selected so that the boards of directors represent diverse population groups and can bring to their deliberations a variety of points of view and life experiences, as well as access to cultural, religious, educational, civic, and economic resources. Executive staff shall be selected as needed to provide managerial and specialist expertise, research capability, and continuity to support the delivery of program to girls through volunteers.

### AFFIRMATIVE ACTION FOR VOLUNTEERS

There shall be no discrimination against an otherwise qualified adult volunteer by reason of disability or on the basis of age. Furthermore, there shall be no discrimination on the basis of race, color, ethnicity, sex, creed, national origin, or socioeconomic status. In addition, to ensure full equality of opportunity in all operations and activities of the organization, affirmative action policies and procedures shall be utilized in the recruitment, selection, training, placement, and recognition of volunteers. Special emphasis shall be placed upon securing representation of underrepresented population groups.

**EEO/AFFIRMATIVE ACTION FOR EMPLOYED STAFF**
There shall be no discrimination on the basis of race, color, creed, sex, age, disability, national origin, citizenship, or marital status. In addition, to ensure full equality of opportunity in all operations and activities of the organization, every staff member employed in Girl Scouting shall be selected under fair employment procedures that provide equal employment opportunities to all people.

There shall be special efforts in affirmative action in the recruitment, hiring, training, and promotion of persons from underutilized ethnically and racially diverse groups and individuals with disabilities, and to make reasonable accommodations for physical and mental limitations of employees and applicants consistent with performance of essential job functions and the effective operations of the business.

**GRIEVANCE/SEPARATION OF EMPLOYED STAFF**
Every person employed in Girl Scouting shall be protected by fair personnel policies and procedures, including formal problem resolution procedures.

**HEALTH AND SAFETY**
Girl Scouts of the United States of America, local councils, other units holding a credential, and USA Girl Scouts Overseas committees shall be responsible for seeing that all activities are planned and carried out so as to safeguard the health, safety, and general well-being of the participants.

**SELECTION OF NATIONAL MEETING PLACES**
Gatherings planned and held by the national Girl Scout organization for nationwide attendance shall be held in communities where individuals attending will have freedom of choice in seating, eating, and living accommodations in hotels and buildings engaged by the organization.

## SPIRITUALITY/RELIGION

**FLEXIBILITY IN WORDING FOR SPIRITUAL BELIEFS IN THE GIRL SCOUT PROMISE**
Girl Scouts of the USA makes no attempt to define or interpret the word "God" in the Girl Scout Promise. It looks to individual members to establish for themselves the nature of their spiritual beliefs. When making the Girl Scout Promise, individuals may substitute wording appropriate to their own spiritual beliefs for the word "God."

**PLACE OF RELIGION IN THE GIRL SCOUT PROGRAM**
Girls are encouraged and helped through the Girl Scout program to become better members of their own religious group, but every Girl Scout group must recognize that religious instruction is the responsibility of parents and religious leaders.

**RESPECT FOR RELIGIOUS OPINIONS AND PRACTICES**
Every Girl Scout group shall respect the varying religious opinions and practices of its membership in planning and conducting activities.

**TROOPS SPONSORED BY RELIGIOUS GROUPS**
When a Girl Scout troop is sponsored by one religious group, members of different faiths or religious affiliations within the troop shall not be required to take part in religious observance of the sponsoring group.

# CREDENTIALS
## (SEE CONSTITUTION, ARTICLE VIII)

### CERTIFICATE OF MEMBERSHIP

A certificate of membership is issued to each girl or adult who meets the requirements for membership. Credentials that the National Board of Directors issues, other than the certificate of membership, include the Girl Scout council charter, the Girl Scout license, and the federation certificate (not in use at present).

Girl Scouts of the United States of America authorizes USA Girl Scouts Overseas in communities outside the U.S.A. where there is no chartered Girl Scout council. These troops are known collectively as USA Girl Scouts Overseas.

### MEMBERSHIP REQUIREMENTS

**Membership as a Girl Scout** is granted to any girl who:

- has made the Girl Scout Promise[6] and accepted the Girl Scout Law;

- has paid annual, or other applicable membership dues;

- meets applicable membership standards.

**Membership as a Girl Scout adult** is granted to any person who:

- accepts the principles and beliefs as stated in the Preamble of the Constitution;

- has paid annual, lifetime, or other applicable membership dues;

- meets applicable membership standards.

**Lifetime membership as a Girl Scout adult** is granted to any person (18 years of age or older or a high school graduate or equivalent) who:

- accepts the principles and beliefs as stated in the Preamble of the Constitution;

- has paid lifetime membership dues;

- meets applicable membership standards.

### APPLICABLE MEMBERSHIP STANDARDS

Membership standards are not credentials. They are included here only for ready reference in relation to membership requirements. Applicable membership standards are as follows:

**Girl Scout Membership Levels**

| | |
|---|---|
| Kindergarten–1 | Girl Scout Daisy |
| Grade 2–3 | Girl Scout Brownie |
| Grade 4–5 | Girl Scout Junior |
| Grade 6–8 | Girl Scout Cadette |
| Grade 9–10 | Girl Scout Senior |
| Grade 11–12 | Girl Scout Ambassador |

**Girl Scout Adults**

Minimum age—18 years of age or a high school graduate or equivalent.

### MEMBERSHIP DUES AND PROCEDURES FOR REGISTRATION

In order to be a member of the Girl Scout Movement in the United States of America, a person must register with and pay annual, lifetime or other applicable membership dues to Girl Scouts of the United States of America. This is done locally through the Girl Scout council or USA Girl Scouts Overseas committee with which she or he is affiliated or through national headquarters if she or he has no council affiliation. The National Board of Directors must obtain approval from the National Council whenever a planned dues increase will result in dues increasing more than a total of 25% in any one triennium. Girl Scout councils account for membership dues in the custodian fund and transmit to GSUSA within two months of receipt all monies received for membership dues. These funds are not to be invested by the council for the purpose of generating income for the council.

The **Girl Scout membership year** is October 1 through September 30.

**New girl members** pay $25 when they initially become members of the Movement.

**New adult members** pay $25 when they initially become members of the Movement.

**Extended year option:** New girl and adult members who sign up on or between April 1-September 30 of a membership year may elect to pay $35 and their membership will start immediately and continue through the end of the following membership year. This option is available on a one-time basis for new girl and adult members only; upon renewal, such individuals pay $25 for a regular membership year.*

6. See page 22, "Flexibility in Wording for Spiritual Beliefs in the Girl Scout Promise."

23

* One-time lapsed member option: Girls and adults who were previously members but did not purchase a 2021 membership are also eligible for this extended year option for MY 2021 – 2022 if they elect to renew from April 1, 2021 through September 30, 2021. If renewed during this time period, they may pay $35 and their membership will start immediately and continue through September 2022. Upon renewal, such individuals pay $25 for a regular membership year.

Case 3:21-cv-00433   Document 1-1   Filed 06/03/21   Page 47 of 166

**Continuing members**, both girls and adults, pay $25 when they renew their membership at the beginning of each membership year.

**Lifetime members** pay $400 lifetime membership dues at the time they become lifetime members; discounted lifetime membership dues of $200 shall be offered to anyone who was a registered Girl Scout member before the age of 18 and is under the age of 30 at the time of becoming a lifetime member; discounted lifetime membership dues of $200 shall be offered to anyone who is a registered member and has served as a volunteer for a period of 10 or more years at the time of becoming a lifetime member.

When a member transfers from one troop/group or position to another or to another local council, the member does not re-register until her/his current membership expires at the beginning of the next membership year.

The national organization determines the system and method for registering members through Girl Scout councils. Each Girl Scout council verifies the accuracy of the troop/group and/or individual member information and forwards it with the membership dues directly to national headquarters.

National Board members, other National Board committee members, including Advisory Committee members, other national volunteers, and other adult members who have their contact only with the national organization use registration forms received from the national organization. They forward the completed registration forms and dues directly to national headquarters.

USA Girl Scouts Overseas use registration forms received from the national organization. They also forward the completed registration forms and dues directly to national headquarters.

The membership dues of one person may not be transferred to the credit of another person. Membership dues are not refundable.

Adults serving in more than one Girl Scout position pay membership dues only once annually.

## COMMUNICATIONS PROCEDURES FOR NATIONAL BOARD DUES CHANGES

Prior to any vote by the National Board to change membership dues structure or amount, Girl Scouts of the USA shall communicate with and seek input from all local Girl Scout councils and National Council delegates on the proposed changes, intended use of the funds, and potential impact on the Girl Scout Movement. After action is taken by the National Board, there shall be a report to all local Girl Scout councils and National Council delegates of the decision taken and the impact of the dues change.

## GIRL SCOUT COUNCIL CHARTER

A Girl Scout council charter is a credential issued by the National Board of Directors of Girl Scouts of the USA in accordance with the Constitution of Girl Scouts of the USA, Article VII and Article VIII. A Girl Scout council charter defines the relationship between a council and Girl Scouts of the USA. It binds the elements of Girl Scouting across the nation into one large and cohesive Girl Scout Movement and gives us a common purpose.

A Girl Scout council charter is issued by the National Board of Directors of Girl Scouts of the USA to an organization exclusively devoted to the Girl Scout Movement in the United States, granting it the right to develop, manage, and maintain Girl Scouting in a specified area of jurisdiction, which is established by the National Board of Directors, and to call itself a Girl Scout council. A Girl Scout council charter is issued for no more than four years.

## REQUIREMENTS FOR A GIRL SCOUT COUNCIL CHARTER

**To receive and retain a charter, a Girl Scout council agrees:**

- to subscribe to the purpose, adhere to the policies, and be guided by the standards of Girl Scouts of the USA.

- to develop, manage, and maintain Girl Scouting throughout the areas of its jurisdiction, in such manner and subject to such limitations as prescribed in the Constitution, Bylaws, and policies of Girl Scouts of the USA.

- to participate in the activities and business of Girl Scouts of the USA.

- to make reports of its work to Girl Scouts of the USA; pay its charter fee, have at all times a registered board of directors; and make sure that all persons affiliating with the council meet individual membership requirements.

## CONDITIONS FOR A GIRL SCOUT COUNCIL CHARTER

**The work of a Girl Scout Council shall be based on the charter criteria.**
The charter Criteria are:

- A chartered Girl Scout council maximizes delivery of the Girl Scout mission by engaging and supporting volunteers and others to provide a nationally consistent quality leadership experience that achieves positive girl outcomes and reaches increasing numbers of girls.

- A chartered Girl Scout council advances the movement through strategic governance and

leadership that employ effective systems and structures to deliver the Girl Scout mission.

- A chartered Girl Scout council advances organizational impact by growing resources, effectively promoting a unified national brand and standing up for girls on issues that affect their well-being.

**In addition, a Girl Scout Council must:**

- comply with federal, state, and local laws as well as Girl Scouts of the USA policies.

- regularly review and file with Girl Scouts of the USA bylaws, articles of incorporation, and board-adopted strategic priorities.

- provide the following documents to Girl Scouts of the USA:

| | |
|---|---|
| Audit and management letter | Annually |
| 990 Form | Annually |
| Current Board Member List | Update when changes occur |
| Board Minutes/Board Packets | After each board meeting |
| Name of CEO and Board Chair | When there are changes |
| Headquarters Address | When there are changes |

- forward membership dues to Girl Scouts of the USA in a timely manner (within two months of receipt).

- participate in an annual review process with Girl Scouts of the USA and implement any agreed upon follow-up.

**The Charter, when issued to a Girl Scout council, will confer the following rights:**

- the right to be identified with the Girl Scout Movement in the United States of America, which is directed and coordinated by Girl Scouts of the USA, a member of the World Association of Girl Guides and Girl Scouts.

- the right to use the words "Girl Scouts" as part of the designation of the council (whether or not incorporated).

- the right to use Girl Scout program and the right to use Girl Scout insignia in connection with that program.

- the right to use the trademark "Girl Scouts" and the service mark as defined in Girl Scouts of the USA's *Graphic Guidelines*, on products or merchandise obtained and used for the day-to-day operations of the council, including stationery, office supplies,

items with council and camp names, and symbols, brochures, newsletters, and such items as Girl Scouts of the USA may hereinafter designate. Any other use of marks or insignia owned by Girl Scouts of the USA on products or merchandise must be approved by Girl Scouts of the USA. This includes but is not limited to merchandise to be sold by the council. This right is nonexclusive and nontransferable.

- the right to develop, manage, and maintain Girl Scouting throughout the jurisdiction of the council.

- the right to receive services from Girl Scouts of the USA.

- the right to respond to requests for proposals (RFPs) that are sent out from time to time by Girl Scouts of the USA.

- the right to raise funds in the name of Girl Scouts within the council's jurisdiction.

- the right, through delegates elected to the National Council of Girl Scouts of the USA, to participate in the business of Girl Scouts of the USA.

**In accepting a Charter, a Girl Scout Council assumes the following obligations:**

- We understand and agree that, in carrying out the terms and other obligations of the charter, we will act in accordance with the Constitution and Bylaws of Girl Scouts of the USA and that the rights and responsibilities granted in the charter are limited to the aforesaid Constitution and Bylaws.

- We also understand and agree that the rights and responsibilities granted by the charter cannot be delegated, nor can the jurisdiction for which the charter is sought be changed without the written authorization of Girl Scouts of the USA.

- By agreeing to adhere to the policies of Girl Scouts of the USA, we understand and agree to operate as a council in accordance with and to be limited by policies so identified, published, and distributed to councils by Girl Scouts of the USA, accepting them as binding on the council, on all its members, officers, employees, and those affiliating with it.

- By agreeing to be guided by the standards of Girl Scouts of the USA, we understand that as a council we have committed ourselves and those affiliating with us to follow and be guided by the standards published from time to time by Girl Scouts of the USA.

- We understand and agree that it is the council's responsibility to see that each person affiliating with it meets at all times the individual membership

requirements established by Girl Scouts of the USA, and to register with Girl Scouts of the USA all girls and adults participating in Girl Scouting within its jurisdiction, whether in pathways or in any other capacity, except those adults working in a temporary advisory or consultative capacity.

- We understand and agree that the charter, if accepted may be revoked or terminated by Girl Scouts of the USA under the provisions of its Constitution, that the rights conferred by the charter cease to exist upon termination or revocation of the charter, and that upon revocation or termination of the charter, the council can no longer and, therefore, will not exercise any of the rights granted to it therein.

- We understand and agree that the council's articles of incorporation and bylaws which are attached to the Girl Scout Council Charter Agreement are part of this agreement. Furthermore, we agree that any changes or amendments to these documents will be filed with Girl Scouts of the USA in a timely manner.

- We understand and agree to pay the council's charter fee as indicated on the Girl Scout Council Charter Agreement.

## PROCEDURES FOR REVIEWING AND ISSUING GIRL SCOUT COUNCIL CHARTERS

The council is issued a charter, and the charter is renewed subject to the steps outlined in the charter procedures:

**1.** The council engages in a strategy process resulting in council priorities and goals that are in alignment with GSUSA priorities and goals.

**2.** The council completes an Annual Review and submits such other documents or information as GSUSA requires to evaluate its performance compared to key national benchmarks and its own goals. Results of this review are reported to the council Board of Directors and included in a report to the National Board.

**3.** Following action by the National Board of Directors to reaffirm a council's charter, a letter is sent from the National Secretary to the Chair of the Board and the CEO of the council confirming this action. GSUSA processes the charter agreement and a charter certificate is sent to the council.

**4.** If multiple key indicators show shortfalls or negative trends, an On-Site Review may be initiated by the council or GSUSA to review key indicators and identify action plans and support needed. The review team can include national staff, national volunteers, and council representatives from the council being reviewed. The review team delivers an in-person report to the council Board of Directors following the review. A written report of the action plan is forwarded to GSUSA.

**5.** A Viability Review may be initiated by Girl Scouts of the USA if there is evidence or reason to believe one or more of the following circumstances exists:

   a. Action that threatens to undermine the mission and/or damage the brand.

   b. Risk of financial failure or failure to meet financial obligations.

   c. Corporate malfeasance.

   d. Disregard for mission-critical GSUSA policies, priorities and goals or other direction given by the National Board or CEO.

   e. Governance system in violation of US law, council bylaws, and/or GSUSA policies; and is not consistent, visible, or effective.

   f. Performance against national benchmarks and council goals continues to be consistently and critically below standard after an On-Site Review has been conducted.

   g. Any act or omission, or any course of conduct that, in the opinion of the National Board of Directors, is not in the best interests of Girl Scouting.

## PROCEDURES FOR A CHARTER VIABILITY REVIEW

The review can begin with a minimum of five (5) days notice. The communication concerning the review will include the specific concerns that need to be addressed and a timeline for the review. If circumstances warrant, the Viability Review can be initiated immediately. The Viability Review Process includes the following steps.

**1.** Following National Board action, GSUSA staff advises the council that a Viability Review will take place. GSUSA defines the scope of the review based on presenting issues and appoints an appropriate review team which will include council and national personnel. The review team is constituted based on the circumstances warranting the review. The council shall cooperate with the Viability Review and provide requested information.

**2.** Results of the review, including the prescribed action plan, are shared in a face-to-face meeting with the council Board Chair, CEO and subsequently with the council Board of Directors. The Viability Review team presents the findings with the expectation that the council takes immediate corrective action. In most cases Girl Scouts of the USA will develop the corrective action plan.

**3.** GSUSA monitors the execution of the prescribed action plan to ensure progress. Possible monitoring actions include:

   a. Monthly review meeting (on site/phone) with a member of the National Staff to evaluate progress.

b. Placement of a monitor in/with the council to provide on-the-ground support to the Board and the staff and to measure the report progress.

c. Immediate targeted, onsite support, as needed to key functions, i.e., staff development for membership staff, financial management and can include placement of interim staff in key roles.

d. Provide documentation to GSUSA in a timeframe prescribed.

**4.** If there is a cause for urgent action, GSUSA may request an immediate meeting of the council Board of Directors or take other appropriate action to address the situation and agree on an action plan for moving forward.

## PROCEDURES FOR NON-ISSUANCE OR REVOCATION OF CHARTERS

1. The National Board of Directors takes action on the recommendations of the CEO of Girl Scouts of the USA, if any of the following circumstances occurs in a council:

A. Deficiency in respect to its resources, finances, personnel, administrators, manner of supervising the program, effectiveness in its attempt to reach and serve all girls within its jurisdiction or otherwise, such that, in the opinion of the National Board of Directors, it appears that such council is unable adequately to develop, manage, or maintain Girl Scouting within its jurisdiction; or

B. Any act or omission, or any course of conduct that, in the opinion of the National Board of Directors, is not in the best interests of Girl Scouting; or

C. Failure to comply with any policy, credential standard, or directive issued or established by or under the authority of the National Board of Directors; or

D. Violation of any term, condition, or requirement of its charter.

**2.** In the event that charter revocation or non-issuance is contemplated, notice of reason will be provided to the council along with a reasonable time period for response. A time and location will be provided where the council can review and discuss the issue(s) with a team representing the National Board.

**3.** Following the meeting, the National Board will in its sole discretion, take action that it deems appropriate including revocation or non-issuance and will communicate the action to the council with follow-up measures. The decision of the National Board shall be final.

## STANDARDS FOR A GIRL SCOUT COUNCIL JURISDICTION

The requirements of local council charters are established by the National Council. The National Board administers the requirements for such credentials and may establish standards, procedures, and interpretations regarding requirements. The National Board sets council jurisdictions and has determined that it is in the best interests of Girl Scouting to establish minimum criteria for council jurisdictions except as prohibited by law. These criteria include an available girl population in the range of 100,000 or more and an aggregate household income in the range of $11 billion or more except in cases where these criteria cannot be met even within an entire state or states. Other criteria which will be considered include regional identification, diverse population, anticipated population growth or decline, established transportation patterns, state or municipal boundaries, geographic barriers, and media markets. The standard will enable local councils to have sufficient resources to support membership growth and diversity, differentiated program opportunities, and specialized council staff.

Except as provided above, all councils who do not meet the basic jurisdictional requirements will be expected to work in close collaboration with their neighbors in a way that brings benefit to all. Annual charter-related conversations will be driven by each council's performance against charter criteria and standards and by work with neighboring councils to develop joint programs, share services, and/or collaborate in a way that improves Girl Scouting in each of the jurisdictions. The National Board retains the right to initiate merger proceedings in any jurisdiction when the National Board deems it appropriate in the best interests of Girl Scouting and will, on a case-by-case basis, work with councils that do not meet the jurisdictional requirements to develop plans for jurisdictional changes as necessary and in accordance with the law.

## PROCEDURES FOR CHANGING A GIRL SCOUT COUNCIL JURISDICTION[7]

In all matters concerning jurisdictional lines, the National Board of Directors has the authority to make the final decision, either during the term of a charter or upon issuance of a new charter.

**SECTION I**
When two or more Girl Scout councils agree to combine jurisdictions to create a new council:

**1.** Each council's board of directors must approve the decision to engage in the jurisdictional change, which must be carried out in compliance with the council's bylaws and the laws of the state in which the council is incorporated.

**2.** The councils develop a plan and timeline for carrying out the proposed changes in jurisdiction.

---

7. All actions taken must be consistent with state law.

**3.** Each council's board of directors must vote on the plan of merger, consolidation, or other corporate reorganization and distribution of assets, and refer it to the council's membership for a vote according to the laws of the state of incorporation.

**4.** Following the completion of the process to establish the new council, an Application for a Charter for a New Girl Scout Council is submitted to Girl Scouts of the USA for action by the National Board of Directors.

**5.** Following approval of the National Board of Directors, Girl Scouts of the USA processes the application, makes the necessary changes in the official records, and notifies each council chair of the board and CEO of the approval of changes in jurisdiction. The councils notify their membership of the changes in jurisdiction.

**SECTION II**
When two or more Girl Scout councils agree to transfer a part of one council jurisdiction to another council:

**1.** Each council's board of directors must approve the jurisdictional change.

**2.** An Application for Change in Girl Scout Council Jurisdiction is completed by each council and sent to Girl Scouts of the USA.

**3.** Girl Scouts of the USA records the changes in jurisdiction in the official records. Notification of the decision related to the changes of jurisdiction is sent to board chairs of the councils involved. The councils shall notify their membership of the changes in jurisdictions.

***Note:*** This process may be initiated by a single Girl Scout council, by several Girl Scout councils together, or by an individual community within a Girl Scout council. If an individual community within a Girl Scout council wishes to be removed from the council's jurisdiction and added to that of another council, the community initiates the request by sending it, in writing, to its own council board chair.

**SECTION III**
The following steps are taken if or when agreement cannot be reached between the boards of directors of the Girl Scout councils to combine or transfer jurisdiction:

**1.** A board chair of at least one affected council must notify Girl Scouts of the USA that their boards are unable to reach agreement on the combination or transfer of jurisdiction.

**2.** A national team, including a National Operational Volunteer, will invite all affected councils to provide information on how the requested change will impact the delivery of Girl Scout program. Community leaders from the affected councils also may be invited to provide their reaction to the requested change. A summary of the data collected will be shared with each council board involved in the process.

**3.** Using the data provided from council and community sources, the national team will develop a recommendation for jurisdictional boundaries and forward it to the affected councils. The national team completes an Application for Change in Girl Scout Council Jurisdiction pursuant to the recommendations.

**4.** After the Application for Change in Girl Scout Council Jurisdiction is completed, the CEO of Girl Scouts of the USA reviews the application and recommends action to the National Board of Directors.

**5.** Following action by the National Board of Directors, Girl Scouts of the USA records the changes in jurisdiction in the official records of Girl Scouts of the USA. The action of the National Board of Directors shall be considered final. Notification is sent to each affected council board chair. The councils shall notify their membership of the change in jurisdiction.

## PROCEDURE FOR CHANGING A GIRL SCOUT COUNCIL NAME

To select or change its name, a council should follow the procedure outlined below (Girl Scouts of the USA will provide guidelines for a council to select or change its name):

**1.** The council submits a proposed name (and up to two alternates) to Girl Scouts of the USA for review.

**2.** Girl Scouts of the USA notifies the council that the name(s) are consistent with the guidelines. The council starts proper legal proceedings to effect the change in name in the state in which the council is incorporated.

**3.** When the council receives permission or approval from its state of incorporation to use the new corporate name, the council notifies Girl Scouts of the USA that the corporate name has been approved by the state on a specified date and sends the amended articles of incorporation to Girl Scouts of the USA.

# CRITERIA AND STANDARDS
## FOR AN EFFECTIVE GIRL SCOUT COUNCIL

The criteria and standards for an effective Girl Scout council are established by the National Board of Directors to delineate the way in which Girl Scout councils are expected to fulfill their charter requirements. Essential to the charter criteria and standards is the expectation that all Girl Scout councils fully support and promote the Girl Scout mission of building girls of courage, confidence, and character who make the world a better place. Leadership development is how we achieve our mission and is critical to the advancement and stewardship of the Girl Scout brand.

The criteria cover broad areas of a council's responsibility. Standards are developed to support and further define each criterion. They are the foundation on which the work of the council should be built. Measures and benchmarks have been developed to gauge performance and are reviewed regularly.

## CRITERION I:  MISSION DELIVERY

**A chartered Girl Scout council maximizes delivery of the Girl Scout mission by engaging and supporting volunteers and others to provide a nationally consistent quality leadership experience that achieves positive girl outcomes and reaches increasing numbers of girls.**

**STANDARD 1**
Girl program throughout the council demonstrates the outcomes of the Girl Scout Leadership Experience and the Girl Scout Promise and Law in action.

**STANDARD 2**
Based on a thorough understanding of the populations within its jurisdiction and consistent with its strategic priorities, the council attracts and retains an increasing number of girl members representing all segments of its population and geographic areas.

**STANDARD 3**
Using the National Program Portfolio, with enrichments that meet the needs and interests of girls in the jurisdiction, the council provides program delivery options through which girls participate in the Girl Scout Leadership Experience.

**STANDARD 4**
Through a comprehensive volunteer management system the council attracts, develops/trains, and retains diverse volunteers who support the Girl Scout Mission and deliver program to girls.

**STANDARD 5**
The health, safety, and security of participants is protected in all program delivery, including program delivery using electronic means.

## CRITERION II: GOVERNANCE AND ADMINISTRATION

**A chartered Girl Scout council advances the movement through strategic governance and leadership that employ effective systems and structures to deliver the Girl Scout mission.**

**STANDARD 1**
The council utilizes an integrated strategy development and management planning system to maximize its capacity to deliver on the Girl Scout mission.

**STANDARD 2**
The council actively seeks to strengthen the stakeholder involvement and interaction to ensure that the membership is involved in influencing major policy decisions and helping to set strategic direction.

**STANDARD 3**
The council has a board of directors and board development committee that is elected or appointed in a manner consistent with the bylaws, has the experience and skills necessary to provide leadership and direction to the council, and reflects the diversity of the jurisdiction.

**STANDARD 4**
The council board of directors ensures compliance with policies, standards, and procedures as related to its stewardship responsibilities.

**STANDARD 5**
The council fulfills its corporate obligations as required by local, state, and federal law, and through the rights and obligations defined in the Girl Scout council charter agreement.

**STANDARD 6**
The council's human resources policies and practices attract, develop, and retain employed staff reflecting all areas of its jurisdiction and all segments of its population.

**STANDARD 7**
The council utilizes a movement-wide common technology platform with respect to membership, volunteer management, delivery systems and data analytics and reporting to better serve Girl Scout volunteers and members and enhance the Girl Scout brand.

## CRITERION III:  RESOURCE DEVELOPMENT AND COMMUNITY ENGAGEMENT

**A chartered Girl Scout council advances organizational impact by growing resources, effectively promoting a**

**unified national brand and standing up for girls on issues that affect their well-being.**

**STANDARD 1**
The council builds a culture of philanthropy by accepting and carrying out their responsibility to increase funds raised to support the council's work, and they do so using methods in keeping with Girl Scout policies and standards.

**STANDARD 2**
The council board and management demonstrate financial leadership to provide for the perpetuation of Girl Scouting within its jurisdiction.

**STANDARD 3**
The council, utilizing national brand strategies and associated guidelines, promotes and protects a nationally consistent Girl Scout Brand to educate and engage diverse audiences in support of the Girl Scout Mission.

**STANDARD 4**
The council advocates individually, regionally, and as part of a national movement on issues that affect girls' well-being.

# CONGRESSIONAL CHARTER
## OF GIRL SCOUTS OF THE UNITED STATES OF AMERICA

Girl Scouts was first incorporated in 1915 under the corporate laws of the District of Columbia. A Congressional Charter was conferred upon Girl Scouts of the United States of America in 1950 by a special act of Congress. In 1998, Congress revised the language of all congressional charters, including the charter conferred upon Girl Scouts of the United States of America in 1950. The purpose was to ensure uniformity rather than make substantial changes in the content. Legislation was introduced and legislation HR. 1085/S.2264 was approved by Congress and signed into Public Law 105-225 on August 12, 1998.

## CHAPTER 803—
### GIRL SCOUTS OF THE UNITED STATES OF AMERICA

Sec.
80301. Organization.
80302. Purposes.
80303. Governing body.
80304. Powers.
80305. Exclusive right to emblems, badges, marks, and words.
80306. Restrictions.
80307. Annual report.

## § 80301. ORGANIZATION

**(a) Federal charter.—**Girl Scouts of the United States of America (in this chapter, the "corporation") is a body corporate and politic of the District of Columbia.

**(b) Domicile.—**The domicile of the corporation is the District of Columbia.

**(c) Perpetual existence.—**Except as otherwise provided, the corporation has perpetual existence.

## § 80302. PURPOSES

The purposes of the corporation are—

**(1)** to promote the qualities of truth, loyalty, helpfulness, friendliness, courtesy, purity, kindness, obedience, cheerfulness, thriftiness, and kindred virtues among girls, as a preparation for their responsibilities in the home and for service to the community;

**(2)** to direct and coordinate the Girl Scout movement in the United States and territories and possessions of the United States; and

**(3)** to fix and maintain standards for the movement that will inspire the rising generation with the highest ideals of character, patriotism, conduct, and attainment.

## § 80303. GOVERNING BODY

**(a) National Council.—**

**(1)** There shall be a National Council of Girl Scouts. The number, qualifications, and term of office of members of the Council are as provided in the constitution of the corporation, except that members of the Council must be citizens of the United States.

**(2)** The Council may adopt and amend a constitution and bylaws and elect a board of directors, officers, and agents.

**(3)** The constitution may prescribe the number of members of the Council necessary for a quorum. That number may be less than a majority of the entire Council.

**(4)** Meetings of the Council shall be held as provided in the constitution to hold elections and receive reports of the officers and board of directors. Special meetings may be called as provided in the constitution.

**(b) Board of directors.—**

**(1)** To the extent provided in the constitution and bylaws, the board of directors shall have the powers of the Council and manage the activities of the corporation between meetings of the Council. The number, qualifications, and term of office of directors are as provided in the constitution.

**(2)** The constitution may prescribe the number of directors necessary for a quorum. That number shall be at least 20 or two-fifths of the entire board.

**(c) Executive and other committees.—The bylaws may provide for—**

**(1)** an executive committee to carry out the powers of the board of directors between meetings of the board; and

**(2)** other committees to operate under the general supervision of the board of directors.

**(d) Location of meetings and records.—**The Council and the board of directors may hold meetings and keep the seal and records of the corporation in or outside the District of Columbia.

## § 80304. POWERS

**The corporation may—**

**(1)** adopt and amend a constitution, bylaws, and regulations, including regulations for the election of associates and successors;

**(2)** adopt and alter a seal;

**(3)** have offices and conduct its activities in the District of Columbia and in the States, territories, and possessions of the United States;

**(4)** acquire, own, lease, encumber, and transfer property, and use any income from the property, as necessary to carry out the purposes of the corporation;

**(5)** sue and be sued within the jurisdiction of the United States; and

**(6)** do any other act necessary to carry out this chapter and the purposes of the corporation.

## § 80305. EXCLUSIVE RIGHT TO EMBLEMS, BADGES, MARKS, AND WORDS

The corporation has the exclusive right to use all emblems and badges, descriptive or designating marks, and words or phrases the corporation adopts, including the badge of the Girl Scouts, Incorporated, referred to in the Act of August 12, 1937 (ch. 590, 50 Stat. 623), and to authorize their use, during the life of the corporation, in connection with the manufacture, advertisement, and sale of equipment and merchandise. This section does not affect any vested rights.

## § 80306. RESTRICTIONS

**(a) Profit.—**The corporation may not operate for profit.

**(b) Political activities.—**The corporation shall be nonpolitical and nonsectarian.

## § 80307. ANNUAL REPORT

Not later than April 1 of each year, the corporation shall submit a report to Congress on the activities of the corporation during the prior fiscal year. The report shall be printed each year, with accompanying illustrations, as a separate House document of the session of the Congress to which the report is submitted.**

---

**Note: Chapter 803, Girl Scouts of the United States of America, Section 80307. This requirement was terminated effective May 15, 2000. See Pub.L. 104-66, § 3003, set out as a note under 31, U.S.C.A. 1113, and H.R. Doc. No. 103-7, at 200.

# EXHIBIT
# B



To:         Board Chairs and CEOs

From:       Kathy Hopinkah Hannan, National President

Date;       May 22, 2017

Subject:    April 2017 National Board Meeting Highlights

_____

The National Board held its regular meeting on April 26—27, 2017 at Edith Macy Conference Center and engaged in a rich discussion on key items impacting our Movement and Girl Scouts of the USA (GSUSA). As fellow leaders within our Movement, I want to share with you some of the highlights of those discussions and our decisions.

**WAGGGS World Conference**

I am excited to share with you that GSUSA has placed a bid to host the 2020 WAGGGS World Conference. If selected, GSUSA will host the World Conference in connection with our 2020 convention in Orlando, Florida.

**National Council Session**

I look forward to our gathering in Columbus, Ohio this fall for the 54th National Council Session (NCS) on October 4—6, 2017 as part of G.I.R.L. 2017 (convention). The board discussed the exciting opportunities for engagement and fellowship that this event will bring and spent time working through various aspects of the discussion topic and the three proposals that will appear on the agenda. As a reminder, in February, I shared an Early Alert with you that outlined the NCS agenda.

In addition, the National Board Development Committee (NBDC) is continuing its thoughtful work to identify National Board and National Board Development Committee member nominees, who will be recommended to serve GSUSA and the Movement for the next triennium. We thank all of you who have nominated or supported a candidate and for your understanding as the NBDC works to finalize the slate for the National Council's consideration. The time and effort put into the nominations and appointment process is a testament to both the quality of the candidates put forward, as well as the seriousness with which the NBDC operates in identifying national leadership.

**Financial Stewardship**

We reviewed the GSUSA operating results for the fiscal year to date. GSUSA net income is positive. We expect to meet our net income and cash flow targets for the year. GSUSA's form 990 for 2016 will be filed and available online shortly.

**420 Fifth Avenue**

As you know, renovations are underway at GSUSA's national office at 420 Fifth Avenue. The board continues to monitor the progress of the construction, which remains on time and on budget. GSUSA is also creating an experience for visitors in our ground floor space at 420 Fifth Avenue that will integrate our cultural assets and our retail store, serving as the ultimate destination for members of our Movement. A soft opening for this new space is planned to take place early in fiscal year 2018.

**New Membership Categories and Chartering Update**

As an extension of the work of the earlier Membership Task Force, a group of representatives from eight councils and GSUSA examined potential membership categories and processes and developed recommendations, including new membership categories, which are geared towards increasing membership and engaging families.

Based on their excellent work, the board approved the following:

- An extended year membership option, which extends annual membership for up to 17 months for new girl members at a cost of $35. The extended membership year will begin on or after May 1 and continue through September 30 of the following year. This category will be offered beginning in May 2018 for the 2019 membership year.
- A pilot program to test a family/multi-girl membership for $100 for all adult and girl members of the same household. This will be piloted in three to five councils in membership year 2019.

The board then reviewed the work of the Charter Refinement Team made up of three board chairs and three CEOs from Girl Scout councils, as well as GSUSA staff. The charter revitalization process undertaken by this team built on the work of the Network Alignment Team and the Council Health Dashboard Team, both of which involved numerous council representatives, in order to examine the charter process and more fully incorporate unifying elements of our Movement: national program, consistent brand, and common operating procedures that include a common technology platform.

Following on the Blue Book revisions the board approved in January—which related to a unified national program and consistent brand—at the April meeting, the board approved a further revision to reflect the third unifying element. Criterion III of the Criteria and Standards for an Effective Girl Scout Council was updated to include a new standard that councils utilize a Movement-wide common technology platform with respect to membership, volunteer management, delivery systems, and data analytics and reporting to better serve Girl Scout members and enhance the Girl Scout brand. The Security of Membership Data policy was changed to be consistent with that new standard.

A revised Blue Book that incorporates the above changes will be issued shortly.

**National Board Forums**

Finally, during each meeting, the board engages in a deeper evaluation of various aspects of the Movement's work during our forums. Our first forum explored new ideas for Girl Scout strategic initiatives, including preserving and maximizing our cultural assets and ways to engage and connect our extensive alumnae network. In our second forum, the board reviewed new

2

ways to make the Girl Scout Cookie Program even more successful for the good of our Movement, especially the girls we serve.

# EXHIBIT C

# GIRL SCOUTS OF THE USA
## Membership Management Systems Use Agreement

This agreement ("Agreement") is made on _____, 20___ (the "Effective Date"), between (i) Girl Scouts of the USA ("GSUSA"), a federally chartered not-for-profit corporation having its principal place of business at 420 5th Avenue, New York, New York 10018, and (ii) _____ ("Council"), a not-for-profit organization and chartered council of GSUSA, having its principal place of business at _____.

This Agreement identifies the common understanding and agreement between the parties relating to application services provided by GSUSA to the Council. For each application, an additional Schedule (defined below) will be required to indicate any application specific agreements between the parties.

GSUSA may provide various technology products to Councils for use in conducting their business. These products may be GSUSA developed or may be purchased or licensed from third parties with the intent of providing them to Councils. It is the intent of GSUSA to provide such services for the advancement of the Girl Scouts mission.

In recognition of all the above, the parties, intending to be legally bound hereby, agree as follows:

1.  **Services provided by GSUSA**.

(a)     For the term of this Agreement, GSUSA shall provide Council with various services as described in an executed schedule attached hereto that references and incorporates the terms of this Agreement (each, a "Schedule" and such services, the "Services"). Unless otherwise stated, GSUSA shall retain all rights, title and interest in the provided Services.

(b)     As part of the Services, the Council will be granted access through a remote hosted computing environment to certain software applications, modules and systems specifically identified in a Schedule (the "Systems"). GSUSA hereby grants the Council, and the Council hereby accepts from GSUSA, during the term of this Agreement and subject to compliance by the Council with the terms and conditions hereof, a non-exclusive, non-transferable, non-sublicensable right and license to permit its Authorized Users (defined below) to access and use the Systems solely for the Council's internal business purposes as a Girl Scout chartered council.

(c)     The Council acknowledges that the components of the Systems are subject to copyrights and other proprietary rights owned by GSUSA and/or its licensors. The Council is prohibited from copying or permitting anyone else to copy the Systems or any module or other portion thereof. The Council is further prohibited from (i) using the Systems to process any data other than the Council's own data, (ii) allowing any third party to benefit from the use or functionality of the Systems, either directly or through a service bureau or similar arrangement, and (iii) modifying, decompiling, reverse engineering, adapting, or creating derivative works based on the Systems.

(d)     Each Schedule describes the number of the Council's employees, contractors, and/or volunteers that are permitted to access and use a System (the "Authorized Users"), as well as any additional restrictions or qualifications for an individual to be an Authorized User. The Council and the Authorized Users are responsible for maintaining the confidentiality of their usernames and passwords, and the Council shall be liable for any consequences that may result from their disclosure, including but not limited to any resulting unauthorized use of the Systems and integrity of the Council's data that can be accessed using the Systems. The Council agrees to immediately notify GSUSA if it becomes aware of any loss or theft or unauthorized use of any such usernames and passwords.

(e)     GSUSA will provide support documents, training materials and other technical and/or user documentation in hardcopy or electronic format on an application-specific support web site or an extranet site such as the Online Council Network. GSUSA grants the Council a non-exclusive, non-transferable license to use such documentation solely for purposes of support and operating the Systems.

Case 3:21-cv-00433   Document 1-1   Filed 06/03/21   Page 63 of 166 PageID #: 69

(f)     GSUSA will either provide on its own or make available to the Council though a third party, in person and/or online training to help the Council to effectively utilize the Systems.

(g)     GSUSA will make its best efforts to provide these Services to the Council.  The Council acknowledges that GSUSA will provide some Services on its own behalf and some Services will be provided through third party vendors.

(h)     The Council agrees to comply with all applicable laws, regulations and other rules promulgated by governing authorities with respect to its use of the Services and the Systems.

## 2.     Term and Termination

(a)     The initial term of this Agreement shall commence upon the Effective Date and shall remain in effect until the first day of January.  Following the expiration of the initial term, this Agreement will automatically renew every two (2) years on the first day of January for subsequent two (2) year terms, unless written notice of the intent to not renew this Agreement is provided by either party at least ninety (90) days prior to the expiration of the then-current term.

(b)     Termination of this Agreement shall automatically terminate all attached Schedules. Individual Schedules may contain their own Term and Termination paragraphs and may be terminated independently of this Agreement.

(c)     This Agreement will terminate immediately and automatically in the event that Council becomes disaffiliated as a chartered council of GSUSA.

(d)     In addition, either party may immediately terminate this Agreement if it has "Cause" to do so.  For the purpose of this Agreement, "Cause" is defined as being applicable if (i) the other party materially breaches this Agreement and the breach is not remedied within 30 days after the party wishing to terminate gives the breaching party written notice of the breach; (ii) a final judicial, regulatory or administrative ruling or order is made in which the party to be terminated has been found guilty of criminal or unethical behavior in the conduct of its business; or (iii) the other party makes an assignment for the benefit of its creditors, files a voluntary petition under any bankruptcy or insolvency law, becomes the subject of an involuntary petition under any bankruptcy or insolvency law that is not dismissed within 60 days, or a trustee or receiver is appointed under any bankruptcy or insolvency law for the other party or its property.  Under no circumstances shall any loss or interruption of hosting services or access to the Systems due to scheduled maintenance or repair, or any other cause beyond the control of GSUSA, be considered a material breach or cause for termination.

(e)     In addition, GSUSA reserves the right to terminate a particular Service immediately in the event the Service or a component thereof is provided by a third party vendor and GSUSA's relationship with such vendor terminates.  GSUSA will use its best efforts to provide as much advance notice as possible and work with the Council to minimize any disruptions from such a termination.

(f)     Upon termination or expiration of this Agreement, all licensed rights hereunder shall terminate and the Council and its Authorized Users shall no longer have the ability to access or use the Systems.

(g)     The respective rights and obligation of the parties under Sections 1(c), 4, 8, and 10 - 22 shall survive the termination or expiration of this Agreement.

## 3.     Fees and Payments.

(a)     Council agrees to pay any fees due GSUSA as described in the relevant Schedule.  All invoices are payable within thirty (30) days of the invoice date.  Access to the Systems will be limited to read-only mode if Council is more than 90 days in arrears.  Full access will be reestablished, with no data loss, upon bringing the account current.  The Council acknowledges that GSUSA may revise its fees in the Schedules upon each renewal of the applicable Schedule.  If GSUSA desires to update the fees for any Schedule for any renewal term, it shall provide the Council with the revised fees at least ninety (90) days

prior to the end of the Schedule's current term. Unless otherwise agreed by the parties in writing, such updated fees shall automatically replace the fees set forth in the applicable Schedule. GSUSA agrees to limit fee increases to the greater of (i) the increase in the consumer price index for all urban consumers published by the U.S. Department of Labor during the period since the last fee increase, or (ii) amounts attributable to increased costs incurred by GSUSA to provide the Services, including increases in fees charged to GSUSA by its third party vendors.

4.    **Ownership / Confidential Information**.

(a)    As between the parties, all right, title and interest in and to the Systems, related documentation and training materials, any deliverables created pursuant to the Services and any and all modifications to the foregoing, which are prepared by or for GSUSA shall not pass to the Council, but shall be the exclusive property of GSUSA and its licensors. The Council agrees not to remove or modify any copyright, trademark or other notices found in the Systems or any other materials provided hereunder.

(b)    The Council agrees to notify GSUSA immediately of the unauthorized possession, use, or knowledge of any component of the Systems to which the Council is given access under this Agreement and of other information made available to the Council under this Agreement, by any person or organization not authorized by this Agreement to have such possession, use or knowledge. The Council will promptly furnish full details of such possession, use or knowledge to GSUSA, will assist in preventing the recurrence of such possession, use or knowledge, and will cooperate with GSUSA in any litigation against third parties deemed necessary by GSUSA to protect its proprietary rights. In addition, GSUSA or its third party vendor may cancel an individual's username and password without notice in the event of a suspected breach of the scope of the licensed rights hereunder. The Council's compliance with this section shall not be construed in any way as a waiver of any right by GSUSA to recover damages or obtain other relief against the Council for any act or omission which may have resulted in the unauthorized possession, use or disclosure.

(c)    In view of the fact that this Agreement will bring GSUSA and Council into close contact with confidential information not readily available to the public, the parties agree that they will not without authorization use any such information for direct or indirect benefit of any third party or disclose to an unauthorized person, firm or corporation any information, documents or materials acquired by the other party through the services performed under this Agreement.

(d)    Upon termination of this Agreement by either party, Council will not take any manuals, drawings, financial information, specifications, computer software, documents or other papers, or any tools, formulae, equipment or materials it was provided access to pursuant to this Agreement, except with the prior written consent of GSUSA. Upon termination of this Agreement, Council will return and deliver to GSUSA any and all of the foregoing, including copies and summaries.

(e)    Each party shall treat the proprietary or confidential information of the other as strictly confidential and shall treat this information with at least the same degree of care it uses with respect to its own strictly confidential information. Disclosure to any third party of proprietary information is prohibited except to those third parties (i) operating under non-disclosure provisions no less restrictive than those provided by this section, and (ii) who have a justified business or legal interest in the information. In addition, in the case of Council data, written permission from the Council or passage of a resolution by the Council Board of Directors allowing for the disclosure is required prior to disclosure to a third party, provided that Council hereby permits GSUSA's third party vendors to access and use Council data to the extent required to provide any of the Services. The confidentiality restrictions in this Section 4 shall not apply to information which (i) is or becomes generally known to the public through no act or omission of the receiving party, (ii) was in the receiving party's possession prior to the disclosure hereunder without an obligation of confidentiality, (iii) is disclosed to the receiving party by a third party not under an obligation of confidentiality, or (iv) was independently developed by the receiving party.

(f)    Council's confidentiality, nondisclosure and non-use obligations set forth in this Section 4 shall also extend to confidential or proprietary information owned or provided to Council by GSUSA's third party vendors.

(g)     GSUSA agrees to take reasonable physical, technical, procedural, and legal steps to help assure the security and privacy of Council information stored in any System provided under terms of any Schedule.  The Systems are designed to prevent each Girl Scout council using the provided System(s) from viewing the data records of other Girl Scout councils.

(h)     Notwithstanding anything to the contrary in this Section 4, GSUSA is hereby granted use of the Council's data for the following purposes: (i) generation of aggregate statistical and analytical reports for the benefit of the movement; (ii) as required by the Girl Scouts chartering process or other movement-wide mandate; (iii) creation of backup copies of data for recovery in case of catastrophic system failure or routine file repair; (iv) troubleshooting of the relevant system and problem isolation and resolution within the system itself; and, (v) in response to Council requests for consultation by GSUSA.  In the case of (v) the data used for consultation purposes shall be limited to that of the requesting Council only.  No other uses are valid without prior written permission from Council which defines the specific terms and conditions of such uses.

## 5.     **Data Retention and Protection**.

(a)     GSUSA shall not intentionally purge and shall instruct its third party vendors not to purge Council data without consent of the Council.  Any future versions of software provided by GSUSA shall make reasonable accommodation for the ability to archive older data in a format that can be accessed via upgraded software.  Council agrees to indemnify and hold harmless GSUSA from any and all claims or lawsuits arising out of GSUSA's purging and destruction of data at the Council's request.  Upon termination of a Schedule, GSUSA shall return relevant application data to the Council in electronic form and following such return, GSUSA shall have the right to purge such data from its systems.

(b)     GSUSA reserves the right to retain any Council data or other information in order to comply with legal or audit purposes.

(c)     GSUSA will make commercially reasonable efforts (and will require any vendor to do same) to properly secure, back up, and protect Council data from intrusion. Sensitive data will be encrypted when using the public Internet between the Council and hosting sites.

## 6.     **Auditing**.

(a)     GSUSA will make available relevant independent audit reports related to internal hosting of applications by GSUSA. Where third party hosting or other services are utilized, GSUSA will have the right to conduct periodic commercially reasonable audits of vendors providing such services.

(b)     Council agrees to develop and enforce best practices polices and procedures related to security, privacy, and technical infrastructure. Council agrees to produce audited statements or to consent to periodic audits to ensure compliance with these policies.  In addition, GSUSA reserves the right to periodically conduct audits of Council upon reasonable advance written notice to verify compliance with the terms of this Agreement.

## 7.     **Acceptable Use**.

(a)     Council agrees to comply with and where required, execute any Acceptable Use Policies (AUP) required by the application vendor or the hosting vendor in order to gain and maintain access to hosted services. Council acknowledges that a violation of an AUP may require a suspension of Services until the violation is remedied.

(b)     In addition, from time to time, GSUSA may provide Council a set of recommended practices to implement with Authorized Users in order to enhance data security and protect the confidentiality of data stored and accessed through the Systems.  The Council agrees to use its best efforts to promptly incorporate these or comparable best practices into the Council's policies and procedures.

Case 3:21-cv-00433   Document 1-1   Filed 06/03/21   Page 66 of 166 PageID #: 72

**8.  Disclaimer of Warranties**

(a)  GSUSA AND ITS LICENSORS PROVIDE THE SERVICES AND SYSTEMS ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED. GSUSA AND ITS LICENSORS MAKE NO WARRANTIES THAT USE OF THE SERVICES AND SYSTEMS WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE AND EXPRESSLY DISCLAIM THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, DATA ACCURACY AND NON-INFRINGEMENT.

**9.  Technical Capability.**

(a)  Council agrees to provide sufficient technical and non-technical resources to properly implement, operate, and support the provided services. Council agrees to designate appropriate points of contact as required by GSUSA or third party vendors.

(b)  Council agrees to comply with minimum technology requirements in order to use the provided Services. Council will be responsible for all Council-owned hardware (e.g. computers, networks, and infrastructure) and services (e.g. telecommunications or ISP contracts) required to access the provided Services.

**10.  Limitation of Liability**

(a)  IN NO EVENT SHALL GSUSA, ITS VENDORS AND LICENSORS, OR COUNCIL BE LIABLE FOR LOSS OF PROFITS OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES INCURRED BY ANOTHER PARTY AND ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER BASED ON BREACH OF CONTRACT OR TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  THE TOTAL AGGREGATE LIABILITY OF GSUSA UNDER THIS AGREEMENT SHALL IN NO EVENT EXCEED THE TOTAL AMOUNTS ACTUALLY PAID TO GSUSA BY COUNCIL HEREUNDER.

(b)  The parties acknowledge that they have reached agreement on the fees set forth in this Agreement in reliance on the disclaimers of warranty and limitations and exclusions of liability set forth in this Agreement and that the same form an essential basis of the bargain between the parties.

**11.  Assignment**

(a)  Neither this Agreement nor any rights granted hereby may be assigned, sublicensed or otherwise transferred by Council without the prior written consent of GSUSA.  Any attempt by Council to assign any rights, duties or obligations without such consent shall be void and without force or effect.

**12.  Indemnification**

(a)  Council agrees to indemnify and hold GSUSA and its licensors, and their subsidiaries, affiliates, officers, agents, partners, and employees, harmless from any claim, action, demand, loss or damages (including reasonable attorneys' fees) arising out of or related to Council's or its Authorized Users' use of the Services and the Systems in violation of the terms of this Agreement.

**13.  Non-Waiver**

(a)  No failure of either party to exercise any power reserved to it hereunder shall constitute a waiver of either party's right to demand exact compliance with the terms hereof.

**14.  Severability**

(a)  If any provision of this Agreement is for any reason found to be unenforceable, the remainder of this Agreement will continue in full force and effect.

**15.** **Notice.**

(a)    All notices hereunder shall be in writing and sent by mail to GSUSA or the Council at the address set forth herein or to such other address as either of the parties may from time to time provide.

**16.** **Relationship of Parties**

(a)    GSUSA and Council will be and shall act as independent contractors, and neither party is authorized to act as an agent or partner of, or joint venturer with, the other party for any purpose.  Neither party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other party.

**17.** **Amendments.**

(a)    No amendment or variation of the terms and conditions of this Agreement shall be valid unless in writing and signed by the parties.

**18.** **Headings and Captions.**

(a)    The headings and other captions in this Agreement are for convenience of reference only and shall not be used in interpreting, construing or enforcing any of the provisions of this Agreement.

**19.** **Force Majeure**

(a)    A party shall be excused from performing its obligations under this Agreement if its performance is delayed or prevented by any event beyond the party's reasonable control and without the fault or negligence of the party seeking to excuse performance, including, without limitation, acts of God, fire, explosion, weather, disease, war, insurrection, civil strife, riots, terrorism, unforeseeable government action, or power failure, provided that performance shall be excused only to the extent of, and during, the disability and the party takes reasonable efforts to remove the disability.

**20.** **Governing Law.**

(a)    This Agreement shall be governed in accordance with the laws of the State of New York, excluding that body of law pertaining to conflict of laws.  The parties hereto consent to the exclusive jurisdiction of the courts of New York and agree that venue of any action arising under this Agreement shall be in New York, New York.

**21.** **Counterparts.**

(a)    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

**22.**     <u>Entire Agreement; Binding Effect</u>.

(a)     This Agreement (including all Schedules) constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all previous representations, agreements, or understandings, whether verbal or written, between the parties hereto. It shall bind and inure to the benefit of both parties, their respective successors, and legal representatives.

**IN WITNESS WHEREOF**, the parties hereto have executed and signed this Agreement on the date indicated below.

**Girl Scouts of the USA**

By: _____

Name: _____

Title: _____

Date: _____

**Council**

By: _____

Name: _____

Title: _____

Date: _____

**Schedule 5**
**Web Platform**

This Schedule 5 dated as of _____ __, _____ is issued under and subject to all of the terms and conditions of the Membership Management Systems Use Agreement ("Agreement") dated as of _____, between Girl Scouts of the USA ("GSUSA") and _____ ("Council") for use of the web platform offering described in this Schedule 5 ("Web Platform"). In the event of a conflict or inconsistency between the Agreement and this Schedule 5, the terms and conditions of this Schedule 5 shall control.

### A.  Description of Web Platform Offering:

The Web Platform is a content management platform that includes web content management and digital asset management. It will allow Council to create, manage and optimize customer experiences across every channel. It provides publishing tools for non-information technology Council marketing staff to allow them to publish content and assets from a centralized location.

### B.  Participation Agreement:

1.  Council represents and warrants that it has and will maintain a current participation agreement ("Participation Agreement") with Adobe Systems Incorporated ("Adobe") and that Council has provided a copy of this Participation Agreement to GSUSA.  The Participation Agreement shall be in the form provided by GSUSA. Council agrees to be bound by and comply with the terms and conditions of the then-current Enterprise License Terms between GSUSA and Adobe ("ELT"), a copy of which either has been provided to Council or is available on the Pearl Community extranet at the following site: "_GSUSA – Council Technology Agreements_". GSUSA shall notify Council of any material adverse change to this Schedule 5 caused by the ELT either by posting such modified Schedule 5 on the Pearl Community extranet or by email. If Council is obligated to provide notice to Adobe under the terms of the ELT, then Council shall also simultaneously provide a copy of such notice to GSUSA, with an additional copy to GSUSA's Office of the General Counsel.

### C.  Scope of Use; Authorized Users:

1.  In order to permit a third-party contractor to access and use the Web Platform, Council shall provide GSUSA with written notice prior to such use and comply with the terms and conditions regarding third-party contractors set forth in Exhibit 1, Section 4 and Exhibit 3, Section 2.3 of the ELT.

2.  Council shall comply with all applicable laws, including those related to privacy. Council further agrees that it will only post, and its web pages will only contain, appropriate content in accordance with the Girl Scout Promise and Girl Scout Law and in compliance with the Blue Book.

3.  Council shall not store "Sensitive Personal Data" (as defined below) in any Adobe repository. Additionally, Council shall not use the Web Platform to collect, process or store medical or health information.  "Sensitive Personal Data" is given the meaning under relevant privacy or data protection laws relating to this term or any similar term (such as "sensitive personal information") used in the laws, or where no such laws apply, means financial information (including financial account information), sexual preferences, medical or health information, and personal information of children protected under any child protection laws (such as the personal information defined under the US Children's Online Privacy Protection Act).

4.  Prior to Go-Live, Council shall provide GSUSA in writing a list with each named individual for whom Council will pay to be an Authorized User of the Web Platform, which list shall include (at minimum) the name, email

Page 1

address, and title of each Authorized User.  Council shall keep its list of Authorized Users current, and upon GSUSA's request, shall provide GSUSA with such list.

5.  Council shall designate at least one and up to two administrators who will have the ability and be responsible for the provision and allocation of licenses to Council staff.

6.  Council shall only use one login ID per license, and Council shall not allow the use of the same login ID by two or more individuals.  Council shall not, and shall ensure that its Authorized Users do not, share any password or user identification. Login IDs may only be reassigned to a new individual replacing one who no longer requires ongoing use of the service or content.

7.  Council shall follow GSUSA brand guidelines, which may be updated from time-to-time, and currently can be found at: http://brand.girlscouts.org.  Council acknowledges and agrees that all right, title and interest in and to the GSUSA-provided trademarks, GSUSA-provided service marks, and GSUSA-provided program collateral posted on the Web Platform or otherwise provided by GSUSA for use with the Web Platform, including all related logos, designs, imagery and content (collectively, the "Material") are proprietary to GSUSA and/or its licensors.  GSUSA grants Council a limited, revocable, non-exclusive, non-sublicensable, right to use the Material on Council's website created and stored on the Web Platform during the term of this Schedule 5.

8.  Council must comply with all applicable laws, third-party terms, and GSUSA policies with respect to any links to third-party sites.  GSUSA has the right, at any time, to remove or require the removal (or non-inclusion) of a third-party link, and upon notice from GSUSA, Council shall promptly remove such link.

9.  Council shall only host pages using the web templates provided with the Web Platform.

10. Council represents and warrants that, except for Material, it has the full legal right, power, and authority, and has obtained all necessary releases, consents, and permissions and other rights to the materials and content displayed, stored, processed, transmitted, or used in connection with the Web Platform ("Council Content"), including without limitation all parental consents.  Council further represents and warrants that Council Content will not infringe or violate the rights of any third party.

11. For the avoidance of doubt, the ELT is confidential information and is subject to the confidentiality obligations set forth in the Agreement and in the ELT.

**D.  Fees:**

1.  Please see the attached Exhibit A.

2.  The fees shall be paid in accordance with Section 3 of the Agreement.  Notwithstanding anything to the contrary in Section 3 of the Agreement, GSUSA shall have the right to revise the fees for this Schedule 5  by providing written notice to Council at least one hundred twenty (120)  days' prior to the expiration of the then current term of this Schedule.  GSUSA agrees to limit fee increases to the greater of (i) the increase in the consumer price index for all urban consumers published by the U.S. Department of Labor during the period since the last fee increase or (ii) amounts attributable to increased costs incurred by GSUSA to provide the Services, including increases in fees charged to GSUSA by its third-party vendors.

3.  In the event GSUSA terminates this Schedule 5 for Council's material breach in accordance with Section E below, all fees to be paid by Council shall become immediately due.

**E. Term and Termination:**

1. The initial term of this Schedule 5 shall commence upon execution by both parties below and shall continue in effect until the end of the then current membership year. Following the expiration of the initial term, this Schedule 5 will automatically renew for subsequent twelve (12) month terms, unless written notice of the intent to not renew this Schedule 5 is provided by Council at least ninety (90) days prior to the expiration of the then-current term or by GSUSA at least one hundred and eighty (180) days prior to the expiration of the then current term.

2. Either party may terminate this Schedule 5 if the other party materially breaches any of its representations, warranties, obligations, or agreements hereunder, and fails to cure such breach within thirty (30) days following receipt of written notice thereof.

3. Upon termination or expiration of this Schedule 5, (i) the license and associated rights granted to Council under this Agreement will immediately terminate; (ii) Council must, at its expense remove and delete all copies of the Web Platform and remove all references and links to the Web Platform from the Council websites; and (iii) Council will have fifteen (15) days after termination to retrieve all data and content stored within the Web Platform.

**F. Additional Terms:**

1. Council shall have a privacy policy on its website created and stored on the Web Platform ("Privacy Policy"), and Council shall comply with and act in accordance with its Privacy Policy. The Privacy Policy shall be conspicuously displayed on the website and shall (i) disclose Council's privacy practices; (ii) identify the collection (via cookies, web beacons, and similar technologies, where applicable) and use of information gathered in connection with the Web Platform; (iii) offer individuals an opportunity to opt out of (or opt-in if applicable law requires) the collection or use of data gathered in connection with the Web Platform; and (iv) comply with all applicable laws and regulations.

2. Council shall implement a process through which infringing, abusive, or otherwise unlawful content can be reported to Council and removed in accordance with applicable laws, regulations, rules, guidelines, and codes. If Council knows of a violation regarding any content that is uploaded to the Web Platform, Council must promptly notify Adobe and GSUSA in writing. Council (i) retains complete control over its website and all content and data; and (ii) remains fully and solely responsible for ensuring that its website, use of the Web Platform, and all content and data fully comply with all applicable laws, regulations, rules, guidelines, and codes and do not infringe any person's or entity's rights.

3. Council agrees to indemnify and hold harmless GSUSA for any claim, action, demand, loss or damages (including reasonable attorneys' fees) that arises out of the acts or omissions of Council, its employees, contractors, agents, members, volunteers or vendors with respect to the Web Platform or its content, data or website.

4. The terms and conditions contained in this Schedule 5 in no way limit Council's obligations set forth in the Participation Agreement and ELT. Any breach by Council of the Participation Agreement or ELT shall be deemed a breach of this Schedule 5.

5. Council shall maintain Network Security/Privacy Liability Insurance in the amount of not less than $1,000,000 and shall provide GSUSA with a certificate of insurance evidencing such coverage.

6. Council shall maintain and post on its website industry-standard terms of use.

7. The first two and the last sentences of Section 5(a) of the Agreement shall not apply to this Schedule 5. Please see the ELT for terms regarding the purging, deletion, and return of Council's data.

8. The last sentence of Section 6(a) shall not apply to this Schedule 5. For purposes of this Schedule 5, upon Council's request, GSUSA will provide Council relevant independent audit reports of Adobe's hosting services, if available.

9. Notwithstanding anything to the contrary in the Agreement, Council agrees that GSUSA may use data collected on or related to the Web Platform for GSUSA's business purposes in accordance with the Blue Book and applicable policies.

10. GSUSA shall have the right to modify the Web Platform and the functionality therein at any time upon notice to Council. Additionally, GSUSA shall have the right to add to, modify or delete any provision of this Schedule 5. GSUSA shall notify Council of any material adverse change to this Schedule 5 by providing Council thirty (30) days' prior written notice of such changes by email. Upon the effectiveness of any addition, modification or deletion, Council's continued use of the Web Platform shall constitute Council's consent to such addition, modification or deletion, and agreement to continue to be bound by this Schedule 5. If GSUSA modifies this Schedule 5 and such modification has a material adverse impact on Council's ability to use the Web Platform, Council may, within the thirty (30) day period described above, terminate, without penalty, this Schedule 5.

**G.  Technical Requirements:**

1. Council agrees to conform to minimum client PC standards for purposes of managing their web instance and authoring content. Technical client requirements are provided online by Adobe and may be updated periodically. Current requirements are found at https://helpx.adobe.com/experience-manager/6-3/sites/deploying/using/technical-requirements.html#SupportedClientPlatforms.

2. Council recognizes that bandwidth and reliable Internet connectivity are required to manage and author content on the Web Platform. Council will, at its own expense, provide sufficient connectivity to maintain satisfactory performance for Council staff.

**H.  Support:**

1. Council will designate and train a staff member(s) who will provide first level support to Council staff and any Council-affiliated volunteers and contractors and who will communicate any issues to GSUSA staff.

2. GSUSA will provide second and third (through Adobe) level support and escalation to the designated staff member(s). Council is not permitted to contact Adobe directly without authorization from GSUSA.

3. GSUSA will staff a helpdesk to serve as telephone support to Council's designated staff member(s). Support hours will be normal GSUSA business days, from 8AM to 6PM EST. Council may contact GSUSA during these hours by calling (800) 779-0595. An emergency telephone number and/or email will be provided for support outside normal support hours.

4. Councils may utilize the CEP Support Website (CEPsupport.girlscouts.org) to obtain electronic support, submit trouble tickets, and monitor problem status.

5. Council acknowledges and agrees that in the event of any suspected or actual loss, misuse or unauthorized access to or acquisition or disclosure of confidential or personal data (hereafter, "Incident"), GSUSA may exercise its right in its sole discretion to develop and manage a national and cross-Council uniform response (the "Response") to be followed by Council, which may include without limitation Council undertaking actions as directed by GSUSA related to any expert investigations and notifications to affected persons or entities. In

Page 4

the course of managing such Response, GSUSA may coordinate any investigation, remediation, communications, reporting, notifications, public relations, incident management, regulatory or litigation response and strategy relating to such Incident. Council agrees to cooperate with GSUSA in formulating and undertaking the Response and to make available to GSUSA in a timely manner appropriate details of the Incident and to assist with any related investigation or remediation as GSUSA may direct.

6. GSUSA shall use good faith efforts to provide support services in accordance with the CES Service Desk Service Level Agreement ("SLA"), which will be found on Pearl or other extranet site. GSUSA reserves the right to modify the SLA from time to time.

**I. System Availability:**

1. GSUSA and its vendors, including Adobe, will endeavor to make the Web Platform available for Council's use. Council acknowledges that vendors are ultimately responsible for system availability and that GSUSA cannot commit to nor be liable for system availability.

2. Notwithstanding anything to the contrary herein, GSUSA and Adobe shall have the right to suspend access to the Web Platform at any time without liability, including without limitation for maintenance, update, or upgrade purposes.


**Girl Scouts of the USA**                              **Council**

By: _____                  By: _____

Name: _____                  Name: _____

Title: _____                  Title: _____

**Exhibit A to Schedule 5**

**Web Platform Fees**

| Item | Notes | Fee |
|---|---|---|
| **Website Migration** | One-time fee | $15,000 |
| **Adobe Author License** | User/Year (prorated) | $500 |
| **Annual Hosting** | Up to 100 pages | $8,000 |
| | Between 101-200 pages | $10,000 |
| | Between 201-300 pages | $12,000 |
| | Between 301-400 pages | $15,000 |
| | Each additional 100 pages over 400 | $4,000 |

1. For purposes of this Schedule, a "Year" shall mean the twelve (12) month period starting October 1 ending on and including September 30.

2. All Adobe Author licenses are licensed by Council for the full Year but may be reallocated among Council staff during the Year as required, provided such reallocation is in accordance with the terms of this Agreement, including but not limited to Sections B and C.

3. Council may add licenses at any time during a Year but may not subtract licenses. Licenses required for go live and any licenses added in the middle of a Year will be pro-rated based on the month established and Council will pay for the entire month in which the license was added and the remaining months in the Year. Council will notify GSUSA at least 30 days prior to start of a Year of anticipated license counts for the upcoming Year.

4. GSUSA will periodically audit Council license and hosting usage and Council will be invoiced for all licenses (existing and new) and pages in use at time of audit in accordance with this Schedule. Notwithstanding GSUSA's right to audit, at any time upon GSUSA's request, Council shall provide GSUSA with a written report of the number of licenses it is using.

5. GSUSA shall send invoices to Council quarterly on or about the 15th day of each quarter. Payment is required within 30 days of invoice date.

6. Adobe Author license fees and Annual Hosting fees are invoiced in advance for the entire Year. Website Migration fees are invoiced upon go-live.

**Schedule 6**
**gsPlatform**
**(formerly entitled Customer Engagement Platform)**

**This Schedule 6 dated as of _____ __, _____ is issued under and subject to all of the terms and conditions of the Membership Management Systems Use Agreement ("Agreement") dated as of _____, between Girl Scouts of the USA ("GSUSA") and _____ ("Council") for use of gsPlatform as described in this Schedule 6 ("gsPlatform"). In the event of a conflict or inconsistency between the Agreement and this Schedule 6, the terms and conditions of this Schedule 6 shall control.**

**A. Description of gsPlatform**

gsPlatform is a component of the Movement-wide common technology platform and provides membership and volunteer management capabilities based on various software providers.

Among other capabilities, the system is intended to support the following Council functions:

- Member registration and renewal
- Volunteer recruitment
- Opportunity catalog management
- Enterprise Commerce
- Case management
- Reporting

**B. Participation and Vendor Agreements:**

1. gsPlatform is built from or integrated with various third-party systems. Use of the third-party systems may be governed by separate copyright and license provisions, which are identified in this Schedule 6. All third-party systems are bundled with gsPlatform and licensed to Council solely for use with gsPlatform as permitted by the terms.

2. Salesforce. Council represents and warrants that it has and will maintain a current participation agreement ("Participation Agreement") with salesforce.org ("Salesforce") and that Council has provided a copy of this Participation Agreement to GSUSA. The Participation Agreement shall be in the form provided by GSUSA. Council agrees to be bound by and comply with the terms and conditions of the then-current Master Subscription Agreement between GSUSA and Salesforce ("Salesforce MSA"), a copy of which either has been provided to Council or is available on gsConnect extranet at the following site: *GSUSA – gsPlatform Council Agreements*. GSUSA shall notify Council of any material adverse change to this Schedule 6 caused by the Salesforce MSA either by posting such modified Schedule 6 on gsConnect extranet *GSUSA – gsPlatform Council Agreements* or by email. If Council is obligated to provide notice to Salesforce under the terms of the Salesforce MSA, then Council shall first provide or simultaneously also provide a copy of such notice to GSUSA.

3. Council agrees to comply with the terms and conditions of the then-current Master Subscription Agreement between GSUSA and roundCorner, Inc. ("roundCorner MSA"), a copy of which either has been provided to Council or is available on the gsConnect extranet at the following site: "*GSUSA – gsPlatform Council Agreements*". GSUSA shall notify Council of any material adverse change to this Schedule 6 caused by the roundCorner MSA either by posting such modified Schedule 6 on the gsConnect extranet or by email. If Council is obligated to provide notice to roundCorner under the terms of the roundCorner MSA, then Council

Page 1

shall provide such notice to GSUSA. GSUSA will provide notice when it has fully migrated from Volunteer Systems 1.0 to Volunteer Systems 2.0, GSUSA will not be using roundCorner for Volunteer Systems 2.0, and once Council has fully migrated to Volunteer Systems 2.0 and is no longer using Volunteer Systems 1.0, the roundCorner MSA is no longer applicable.

4. <u>Merchant Processing Services</u>. Council acknowledges and agrees that when Volunteer Systems 2.0 is launched, Council is required to use FiServ to provide merchant processing services when using the gsPlatform. Council represents and warrants that it has and will maintain a current participation agreement ("Participation Agreement") with FiServ (as successor-in-interest to First Data Merchant Services LLC, Citicorp Credit Services Inc., and Wells Fargo Bank N.A ("Servicers") for merchant processing services and has established any necessary accounts for use with transactions on gsPlatform. Council has provided a copy of this Participation Agreement to GSUSA. Council agrees to be bound by and comply with the terms and conditions of the then-current Master Services Agreement and Addenda between GSUSA and Servicers ("Servicers MSA"), a copy of which either has been provided to Council or is available on the gsConnect extranet at: https://girlscoutsconnect.sharepoint.com/sites/TechConnect/SitePages/GSUSA-Platform-Council-Agreements.aspx. GSUSA shall notify Council of any material adverse change to this Schedule 6 caused by the MSA either by posting such modified Schedule 6 on gsConnect or by email. If Council is obligated to provide notice to Servicers under the terms of the Servicers MSA, then Council shall also provide a copy of such notice to GSUSA.

5. All vendor services agreements or master services agreements referred to in this Schedule 6 are collectively defined as the "Vendor MSAs". Council agrees to comply with the terms and conditions of all then-current Vendor MSAs.

**C. Scope of Use; Authorized Users:**

1. Upon execution of this Schedule 6, Council shall provide GSUSA in writing a list with each named individual for whom Council will pay to be an Authorized User of gsPlatform, which list shall include (at a minimum) the name, email address, and title of each Authorized User. Council shall keep its list of Authorized Users current, and upon GSUSA's request, shall provide GSUSA with such list. An Authorized User will be able to access gsPlatform for administration as required solely for official business of the Girl Scout Movement related to the applicable Authorized User's role.

2. Council shall designate at least one and up to two administrators who will have the ability and be responsible for using the universal directory system chosen by GSUSA for the provisioning and allocation of licenses to Council staff.

3. Council shall only use one login ID per license, and Council shall not allow the use of the same login ID by two or more individuals. Council shall not, and shall ensure that its Authorized Users do not, share any password or user identification. Login IDs may only be reassigned to a new individual replacing one who no longer requires ongoing use of the service or content. Use by non-Council staff is not permitted.

**D. Fees:**

1. Please see the attached Exhibit A.

2. The fees shall be paid in accordance with Section 3 of the Agreement. Notwithstanding anything to the contrary in Section 3 of the Agreement, GSUSA shall have the right to revise the fees for this Schedule 6 by providing written notice to Council at least one hundred twenty (120) days' prior to the expiration of the then current term of this Schedule. GSUSA agrees to limit fee increases to the greater of (i) the increase in the consumer price index for all urban consumers published by the U.S. Department of Labor during the period

Page 2

since the last fee increase or (ii) amounts attributable to increased costs incurred by GSUSA to provide the Services, including increases in fees charged to GSUSA by its third-party vendors.

3.  In the event GSUSA terminates this Schedule 6 for Council's material breach in accordance with Section E below, all fees to be paid by Council shall become immediately due.

## E.  Term and Termination:

1.  The initial term of this Schedule 6 shall commence upon execution by both parties below and shall continue in effect until the end of the then current membership year. Following the expiration of the initial term, this Schedule 6 will automatically renew for subsequent twelve (12) month terms, unless written notice of the intent to not renew this Schedule 6 is provided by Council at least ninety (90) days prior to the expiration of the then-current term or by GSUSA at least one hundred and eighty (180) days prior to the expiration of the then current term.

2.  Either party may terminate this Schedule 6 if the other party materially breaches any of its representations, warranties, obligations, or agreements hereunder, and fails to cure such breach within thirty (30) days following receipt of written notice thereof.

3.  Upon termination or expiration of this Schedule 6, (i) any licenses and associated rights granted to Council under this Agreement will immediately terminate; (ii) Council must cease all access to and use of gsPlatform; and (iii) Council will have fifteen (15) days after termination to retrieve all data and content stored within gsPlatform.

## F.  Additional Terms:

1.  Council represents and warrants that its use of gsPlatform and all associated transactions comply with all applicable laws, rules, and regulations.  GSUSA represents and warrants that its operation of the gsPlatform complies with all applicable laws, rules and regulations, assuming that all Councils and their users comply with all applicable laws, rules and regulations.  For the avoidance of doubt, Council shall be responsible for all use of gsPlatform and all associated transactions, including without limitation all sales, deliveries, etc. and all use of gsPlatform by Authorized Users and any unauthorized users.  Council shall use commercially reasonable efforts to prevent unauthorized access to or use of gsPlatform and shall notify GSUSA and Salesforce promptly of any such unauthorized access or use.

2.  Council agrees to indemnify and hold harmless GSUSA for any claim, action, demand, loss or damages (including reasonable attorneys' fees) that arises out of the acts or omissions of Council, its employees, contractors, agents, members, volunteers or vendors with respect to gsPlatform. All transactions by end users on gsPlatform shall be between the end user and Council.  Council uses gsPlatform at its own risk. GSUSA shall have no liability for Council's use of gsPlatform and shall have no responsibility for any activities or transactions thereon or other uses thereof.

3.  For the avoidance of doubt, the Vendor MSAs and Order Forms are confidential information and are subject to the confidentiality obligations set forth in the Agreement and in the Vendor MSAs.

4.  The terms and conditions contained in this Schedule 6 in no way limit Council's obligations set forth in the Participation Agreement and Vendor MSAs.  Any breach by Council of the Participation Agreement or any of the Vendor MSAs shall be deemed a breach of this Schedule 6.

5.  The first two and the last sentences of Section 5(a) of the Agreement shall not apply to this Schedule 6.

Page 3

6. The last sentence of Section 6(a) of the Agreement shall not apply to this Schedule 6. For purposes of this Schedule 6, upon Council's request, GSUSA will provide Council relevant independent audit reports of Salesforce's hosting services, if available.

7. Notwithstanding anything to the contrary in the Agreement, Council agrees that GSUSA may use data collected on or related to gsPlatform for GSUSA's business purposes in accordance with the Blue Book and applicable policies.

8. GSUSA shall have the right to modify gsPlatform and the functionality therein at any time upon notice to Council. Additionally, GSUSA shall have the right to add to, modify or delete any provision of this Schedule 6. GSUSA shall notify Council of any material adverse change to this Schedule 6 by providing Council thirty (30) days' prior written notice of such changes by email. Upon the effectiveness of any addition, modification or deletion, Council's continued use of gsPlatform shall constitute Council's consent to such addition, modification or deletion, and agreement to continue to be bound by this Schedule 6. If GSUSA modifies this Schedule 6 and such modification has a material adverse impact on Council's ability to use gsPlatform, Council may, within the thirty (30) day period described above, terminate, without penalty, this Schedule 6.

9. Council shall maintain Network Security/Privacy Liability Insurance in the amount of not less than $1,000,000 and shall provide GSUSA with a certificate of insurance evidencing such coverage. GSUSA shall maintain Network Security/Privacy Liability Insurance in the amount of not less than $10,000,000.

**G.  Technical Requirements:**

1.   gsPlatform is an integrated system of applications delivered via the Internet by various vendors and is designed to run in common web browsers. GSUSA does not warrant the compatibility of these applications with Council technology and it is the responsibility of Council to understand requirements and provide compatible technology to use gsPlatform. Current technical requirements may be found here.

2.   Council recognizes that bandwidth and reliable Internet connectivity are required to manage and operate gsPlatform. Council will, at its own expense, provide sufficient connectivity and redundancy to maintain satisfactory performance for Council staff.

**H.  Support:**

1. Council will designate and train a staff member(s) who will provide first level support to Council staff and any Council-affiliated volunteers and contractors and who will communicate any issues to GSUSA staff.

2. GSUSA will provide second and third (through third-party vendors) level support and escalation to the designated staff member(s). Council is not permitted to contact any third-party vendor directly without authorization from GSUSA.

3. GSUSA will staff a helpdesk to serve as telephone support to Council's designated staff member(s). Support hours will be normal GSUSA business days, from 8AM to 6PM EST. Council may contact GSUSA during these hours by calling (800) 779-0595. An emergency telephone number and/or email will be provided for support outside normal support hours. Council may also submit trouble tickets to cessupport@girlscouts.org.

4. Council acknowledges and agrees that in the event of any suspected or actual loss, misuse or unauthorized access to or acquisition or disclosure of confidential or personal data (hereafter, "Incident"), GSUSA may exercise its right in its sole discretion to develop and manage a national and cross-Council uniform response (the "Response") to be followed by Council, which may include without limitation Council undertaking actions as directed by GSUSA related to any expert investigations and notifications to affected persons or entities. In the course of managing such Response, GSUSA may coordinate any investigation, remediation,

Page 4

communications, reporting, notifications, public relations, incident management, regulatory or litigation response and strategy relating to such Incident. Council agrees to cooperate with GSUSA in formulating and undertaking the Response and to make available to GSUSA in a timely manner appropriate details of the Incident and to assist with any related investigation or remediation as GSUSA may direct.

5. GSUSA shall use good faith efforts to provide support services in accordance with the CES Service Desk Service Level Agreement ("SLA"), which is available on gsConnect at: *GSUSA – gsPlatform Council Agreements*". GSUSA reserves the right to modify the SLA from time to time.

## I. System Availability:

1. GSUSA and its vendors will endeavor to make gsPlatform available for Council's use. Council acknowledges that vendors are ultimately responsible for system availability and that GSUSA cannot commit to nor be liable for system availability.

2. Notwithstanding anything to the contrary herein, GSUSA and its third-party vendors shall have the right to suspend access to gsPlatform at any time without liability, including without limitation for maintenance, update, or upgrade purposes.

**Girl Scouts of the USA**                    **Council**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

## Exhibit A to Schedule 6

**Salesforce Fees**

| Item | Notes | Fee |
|------|-------|-----|
| **Full Use License** | Each Council staff member who uses the full Sales Cloud capability will require a license for the Year. Payable in advance. | $706 |
| **Limited Use License** | Each Council staff member who uses limited Sales Cloud capability will require a license for the Year. Payable in advance. | $71 |

**Marketing Cloud Fees**

| Item | Notes | Fee |
|------|-------|-----|
| **Initial Setup** | A one-time fee for setup of the platform due at go live. Payable upon go-live. | $3,200 |
| **Usage Fee** | Fee that supports the annual hosting of the platform for the Year. Payable in advance. | $2,000 |
| **Marketing Cloud License** | Each Council staff member who uses Marketing Cloud will require a license for the Year. Payable in advance. | $275 |
| **Email Usage** | Council pays for each email sent through the platform. Payable in arrears. | .0003 |

1. For purposes of this Schedule, a "Year" shall mean the twelve (12) month period starting October 1 ending on and including September 30.

2. All Salesforce and Marketing Cloud licenses are licensed by Council for the full Year but may be reallocated among Council staff during the Year as required, provided such reallocation is in accordance with the terms of this Agreement, including but not limited to Sections B and C.

3. Council may add licenses at any time during a Year but may not subtract licenses. Licenses required for go live and any licenses added in the middle of a Year will be pro-rated based on the month established and Council will pay for the entire month in which the license was added and the remaining months in the Year. Council will notify GSUSA at least 30 days prior to start of a Year of anticipated license counts for the upcoming Year.

4. GSUSA will periodically audit Council license usage and Council will be invoiced for all licenses (existing and new) in use at time of audit in accordance with this Schedule. Notwithstanding GSUSA's right to audit, at any time upon GSUSA's request, Council shall provide GSUSA with a written report of the number of licenses it is using.

5. GSUSA shall send invoices to Council quarterly on or about the 15th day of each quarter. Payment is required within 30 days of invoice date.

6. Salesforce Full Use and Limited Use license fees are invoiced one-quarter of the full Year amount each quarter. Marketing Cloud license fees are invoiced for the entire Year. Email Usage is invoiced quarterly based on the volume of emails sent by Council in the prior quarter. Marketing Cloud Initial Setup fees are invoiced upon go-live. Marketing Cloud Usage fees are invoiced annually in advance.

10/1/2020

**Schedule 7**
**Volunteer Toolkit**


This Schedule 7 dated as of _____ __, _____ is issued under and subject to all of the terms and conditions of the Membership Management Systems Use Agreement ("Agreement") dated as of _____, between Girl Scouts of the USA ("GSUSA") and _____ ("Council") for use of the volunteer toolkit offering described in this Schedule 7 ("Volunteer Toolkit").  In the event of a conflict or inconsistency between the Agreement and this Schedule 7, the terms and conditions of this Schedule 7 shall control.


**A.  Description of Volunteer Toolkit Platform Offering:**

The Volunteer Toolkit is designed to provide programmatic and other support to assist volunteers in providing a quality experience to Girl Scouts. The Volunteer Toolkit includes digital program guides, learning and other resources for volunteers.


**B.  Volunteer Toolkit Platform Agreements:**

1.  Council represents and warrants that it has and will maintain a current signed: (i) Schedule 5 Web Platform Agreement ("Schedule 5") with GSUSA and (ii) Schedule 6 Customer Engagement Platform Agreement ("Schedule 6") with GSUSA.


**C.  Scope of Use; Authorized Users:**

1.  Authorized Users are those who have been identified and paid for as Authorized Users under Schedule 5 (Web Platform).   Council shall keep its list of Authorized Users current, and upon GSUSA's request, shall provide GSUSA with such list.

2.  Council shall only use one login ID per license, and Council shall not allow the use of the same login ID by two or more individuals.  Council shall not, and shall ensure that its Authorized Users do not, share any password or user identification. Login IDs may only be reassigned to a new individual replacing one who no longer requires ongoing use of the service or content.


**D.  Fees:**

1.  Please see the attached Exhibit A.

2.  The fees shall be paid in accordance with Section 3 of the Agreement. Notwithstanding anything to the contrary in Section 3 of the Agreement; GSUSA shall have the right to revise the fees for this Schedule 7 by providing written notice to Council at least one hundred twenty (120) days prior to the expiration of the then current term of this Schedule.  GSUSA agrees to limit fee increases to the greater of (i) the increase in the consumer price index for all urban consumers published by the U.S. Department of Labor during the period since the last fee increase or (ii) amounts attributable to increased costs incurred by GSUSA to provide the Services, including increases in fees charged to GSUSA by its third-party vendors.

3.  In the event GSUSA terminates this Schedule 7 for Council's material breach in accordance with Section E below and fees are imposed, all fees to be paid by Council shall become immediately due.

Case 3:21-cv-00433   Document 1-1   Filed 06/03/21   Page 83 of 166 PageID #: 89

**E.  Term and Termination:**

1.  The initial term of this Schedule 7 shall commence upon execution by both parties below and shall continue in effect until the end of the then current membership year. Following the expiration of the initial term, this Schedule 7 will automatically renew for subsequent twelve (12) month terms, unless written notice of the intent to not renew this Schedule 7 is provided by Council at least ninety (90) days prior to the expiration of the then-current term or by GSUSA at least one hundred and eighty (180) days prior to the expiration of the then current term.

2.  If Council's Schedule 5 and/or Schedule 6 with GSUSA expires or terminates, then this Schedule 7 Agreement automatically terminates.

3.  Either party may terminate this Schedule 7 if the other party materially breaches any of its representations, warranties, obligations, or agreements hereunder, and fails to cure such breach within thirty (30) days following receipt of written notice thereof.

4.  Upon expiration or termination of this Schedule 7, (i) the license and associated rights granted to Council under this Agreement will immediately terminate; (ii) Council must, at its expense remove and delete all copies of the Volunteer Toolkit and remove all references and links to the Volunteer Toolkit from the Council websites; and (iii) Council will have fifteen (15) days after termination to retrieve all data and content stored within the Volunteer Toolkit.

**F.  Additional Terms:**

1.  Council agrees to indemnify and hold harmless GSUSA for any claim, action, demand, loss or damages (including reasonable attorneys' fees) that arises out of the acts or omissions of Council, its employees, contractors, agents, members, volunteers or vendors with respect to Volunteer Toolkit or its content or data.

2.  Council shall comply with all applicable laws, including those related to privacy. Council further agrees that it will only post, and its council posted volunteer toolkit content will only contain, appropriate content in accordance with the Girl Scout Promise and Girl Scout Law and in compliance with the Blue Book.

3.  Council must comply with all applicable laws, third-party terms, and GSUSA policies with respect to any links to third-party sites.  GSUSA has the right, at any time, to remove or require the removal (or non-inclusion) of a third-party link, and upon notice from GSUSA, Council shall promptly remove such link.

4.  The terms and conditions contained in this Schedule 7 in no way limit Council's obligations set forth in the applicable Schedule 5 or Schedule 6.  Any breach by Council of Schedule 5 and/or Schedule 6 shall be deemed a breach of this Schedule 7.

5.  Council shall follow GSUSA brand guidelines, which may be updated from time-to-time, and currently can be found at: http://brand.girlscouts.org.  Council acknowledges and agrees that all right, title and interest in and to the GSUSA-provided trademarks, GSUSA-provided service marks, and GSUSA-provided program for use with Volunteer Toolkit, including all related logos, designs, imagery and content (collectively, the "Material") are proprietary to GSUSA and/or its licensors.  GSUSA grants Council a limited, revocable, non-exclusive, non-sublicensable, right to use the Material on Volunteer Toolkit created and stored on the system provided by GSUSA during the term of this Schedule 7. All materials in Volunteer Toolkit are proprietary to GSUSA and may be used, reproduced and distributed exclusively by GSUSA staff, councils, Girl Scout volunteers, service units and/or troops solely in connection with Girl Scouting.  They are not for commercial use.

6. Council represents and warrants that, except for the Material, it has the full legal right, power, and authority, and has obtained all necessary releases, consents and permissions and other rights to the materials and content displayed, stored, processed, transmitted, or used in connection with the volunteer Toolkit ("Council Content"), including without limitation all parental consents. Council further represents and warrants that Council Content will not infringe or violate the rights of any third party.

7. GSUSA shall have the right to modify the Volunteer Toolkit and the functionality therein at any time upon notice to Council.  Additionally, GSUSA shall have the right to add to, modify or delete any provision of this Schedule 7.  GSUSA shall notify Council of any material adverse change to this Schedule 7 by providing Council thirty (30) days' prior written notice of such changes by email.  Upon the effectiveness of any addition, modification or deletion, Council's continued use of the Volunteer Toolkit shall constitute Council's consent to such addition, modification or deletion, and agreement to continue to be bound by this Schedule 7.  If GSUSA modifies this Schedule 7 and such modification has a material adverse impact on Council's ability to use the Volunteer Toolkit, Council may, within the thirty (30) day period described above, terminate, without penalty, this Schedule 7.

## G.  Support:

1. Council will designate and train a staff member(s) who will provide first level support to Council staff and any Council-affiliated volunteers and contractors and who will communicate any issues to GSUSA staff.

2. GSUSA will provide second and third (through third-party vendors) level support and escalation to the designated staff member(s). Council is not permitted to contact any applicable vendor directly without authorization from GSUSA.

3. GSUSA will staff a helpdesk to serve as telephone support to Council's designated staff member(s). Support hours will be normal GSUSA business days from 8AM to 6PM EST. Council may contact GSUSA during these hours by calling (800) 779-0595. An emergency telephone number and/or email will be provided for support outside normal support hours.

4. Councils may utilize the CEP Support Website (CEPsupport.girlscouts.org) to obtain electronic support, submit trouble tickets, and monitor problem status.

5. GSUSA shall use good faith efforts to provide support services in accordance with the CES Service Desk Service Level Agreement ("SLA"), which will be found on Pearl or other extranet site. GSUSA reserves the right to modify the SLA from time to time.

## H.  System Availability:

1. GSUSA and its vendors will endeavor to make the Volunteer Toolkit available for Council's use.  Council acknowledges that vendors are ultimately responsible for system availability and that GSUSA cannot commit to nor be liable for system availability.

2. Notwithstanding anything to the contrary herein, GSUSA and the applicable vendors shall have the right to suspend access to the Volunteer Toolkit at any time without liability, including without limitation for maintenance, update, or upgrade purposes.

11/20/18

3.  Council acknowledges and agrees that in the event of any suspected or actual loss, misuse or unauthorized access to or acquisition or disclosure of confidential or personal data (hereafter, "Incident"), GSUSA may exercise its right in its sole discretion to develop and manage a national and cross-Council uniform response (the "Response") to be followed by Council, which may include without limitation Council undertaking actions as directed by GSUSA related to any expert investigations and notifications to affected persons or entities.  In the course of managing such Response, GSUSA may coordinate any investigation, remediation, communications, reporting, notifications, public relations, incident management, regulatory or litigation response and strategy relating to such Incident. Council agrees to cooperate with GSUSA in formulating and undertaking the Response and to make available to GSUSA in a timely manner appropriate details of the Incident and to assist with any related investigation or remediation as GSUSA may direct.

**Girl Scouts of the USA**                              **Council**

By: _____                 By: _____

Name: _____                 Name: _____

Title: _____                 Title: _____

**Exhibit A to Schedule 7**

**Volunteer Toolkit Fees**

| Item | Notes | Fee |
|------|-------|-----|
| **Volunteer Toolkit** | Must be on Web Platform | $0 |

1. For purpose of this Schedule, a "Year" shall mean the twelve (12) month period starting October 1 ending on and including September 30.

# EXHIBIT D

# RESOLUTIONS
## OF THE BOARD OF DIRECTORS OF
## GIRL SCOUTS OF MIDDLE TENNESSEE, INC.

The undersigned officer of the Board of Directors (the "Board") of Girl Scouts of Middle Tennessee, Inc. ("GSMT") hereby certifies that the following resolutions were adopted unanimously at a duly called special meeting of the Board on April 26, 2021, at which a quorum was present in person, by video conference or telephonically:

**WHEREAS**, the Executive Committee of the Board has recommended to the Board that the full Board reaffirm certain resolutions adopted by the Executive Committee on July 9, 2019, based upon the Executive Committee's findings with regard to the terms of the technology agreements, consisting of the Membership Management Systems Use Agreement (the "MMSUA") and Schedules 5, 6, and 7, being required of Girl Scout councils by Girl Scouts of the USA ("GSUSA") as follows:

a. GSMT must be able to predict and control its technology costs in future years. GSUSA's technology agreements permit fee increases based on increased costs to GSUSA without any limit. GSMT is unwilling to give GSUSA a perpetual blank check to pass on to GSMT costs that GSUSA decides to incur. Additionally, should there be any new equipment requirements, GSMT needs advance notice so that it can plan from a budgetary perspective and otherwise for the impact of having to acquire or upgrade its existing equipment; GSUSA is not required to provide this commonly required notice to GSMT under the terms of the GSUSA technology agreements.

b. GSMT must maintain control of its website and not be limited to hosting website pages on templates provided by GSUSA that do not allow registration for programs and camps. As GSUSA is aware, GSMT invested in developing its own custom software that it utilizes successfully to allow girls, parents, and volunteers/troop leaders to register for GSMT's programs and make reservations at the properties (camp facilities) it operates. By entering into GSUSA's technology agreements, GSMT would not be permitted to host website pages necessary to provide these functions for its constituents. GSUSA's technology platform is devoid of any solution for program registration and property reservation. GSUSA requiring GSMT to abandon this important functionality is not reasonable and directly conflicts with GSMT's ability to fulfill its mission.

c. GSMT must maintain control over its staffing and resource allocation. GSUSA's technology agreements require councils to provide "sufficient" technical and non-technical resources to properly implement, operate, and support the technology services "as required by GSUSA or third party vendors." GSMT cannot agree to give GSUSA or a third-party vendor open-ended authority for its staffing and resource allocation.

d. GSMT cannot adopt a technology platform that is central to fulfilling its mission from a provider that (i) only offers the platform on an "as is" and "as available" basis, (ii) has disclaimed all warranties of any kind, (iii) would require GSMT to agree that "GSUSA cannot commit to nor be liable for system availability," and (iv) would reserve the right unilaterally to modify the functionality of the systems at any time. GSMT reasonably requires greater functionality, operability, availability and service level assurances. GSUSA's attempt to require

GSMT to utilize a technology platform (and pay unspecified fees for it) while providing no assurances or indemnification to GSMT (and, instead, limiting the liability of GSUSA and requiring that GSMT indemnify GSUSA) related to software that would underpin the operations of GSMT is commercially unreasonable.

e.	GSMT cannot give GSUSA unilateral free reign to change the terms of the technology agreements in the future. Each of Schedule 5, 6, and 7 of the technology agreements provides: "GSUSA shall have the right to add to, modify or delete any provision of this Schedule," and only requires GSUSA to provide GSMT notice of "material adverse changes" to the schedule. Setting aside whether this is legally enforceable, it is commercially unreasonable. GSMT must reserve its rights to control its legal obligations.

f.	GSMT cannot agree that the GSUSA Blue Book of Basic Documents (the "Blue Book") and unspecified GSUSA policies, which may be amended unilaterally by GSUSA, are the agreed-upon authority to set standards for compliance with respect to the technology platforms and data use. Accordingly, without reference to static terms or other resolution, GSMT cannot agree to permit GSUSA to use data collected on or related to the member registration and volunteer recruitment platform "in accordance with the Blue Book and applicable [GSUSA] policies," as they may exist with future unknown amendments.

g.	GSMT's ability to terminate the technology agreements must not be illusory. Currently, GSUSA is threatening to revoke GSMT's charter (its license to be a Girl Scout council) because GSMT has not signed GSUSA's technology agreements and onboarded to GSUSA's technology platform. If a council were in breach of the technology agreements or decided to exercise its right to terminate the technology agreements under the terms currently provided, would GSUSA then immediately revoke its charter? Being a chartered Girl Scout council is something GSMT values and desires to protect from being contingent on its agreement to or fulfillment of commercially unreasonable technology agreements.

h.	GSMT cannot agree to the exclusive jurisdiction of the courts of New York and agree that venue of any action arising under the MMSUA shall be in New York, New York. As a Tennessee nonprofit located and operating in Middle Tennessee and executing on its mission to serve girls in Middle Tennessee, GSMT must remain entitled to seek relief from a court located in Tennessee should it desire to do so.

**NOW, THEREFORE, BE IT RESOLVED THAT:**

1.	The Board re-affirms the prior decisions and Resolution dated July 9, 2019, of the Executive Committee not to enter into contracts with the Girl Scouts of the USA ("GSUSA") for what GSUSA refers to as its common technology platform (or, as it has been referred to in the past, its Customer Engagement Initiative or "CEI").

2.	The terms of the technology agreements that GSUSA has presented and been unwilling to negotiate further are commercially unreasonable insofar as their effects on GSMT and its operations and are not in the best interests of GSMT and its broad constituency of girls, volunteers and community supporters.

3.     Since at least as early as the summer of 2017, GSMT has expressed to GSUSA its concerns about the terms of the technology agreements and the limitations to the functionality of the associated technology platforms.  Agreement to the terms of the technology agreements and onboarding to the associated technology platforms would expose GSMT to unwarranted costs, unreasonable levels of financial and legal liability, and likely business interruption.  For example, under the technology agreements, GSMT has no meaningful way to object to additional terms and fee increases and is obligated to provide and dedicate staff with sufficient technical abilities to implement, operate and support an indefinite number of technology platforms.

4.     GSMT has made good faith efforts to engage in discussions with GSUSA about the terms of the technology agreements and to explore whether mutually agreeable alternatives exist. GSMT has proposed an Addendum and Amendment to the MMSUA that would be sufficient to resolve its concerns.  GSMT has also proposed alternative means to accomplish the stated goals of GSUSA.  GSUSA has rejected all of GSMT's proposals.

5.     GSMT's board members have fiduciary duties to GSMT, a nonprofit corporation organized and operating under the Tennessee Nonprofit Corporation Act, Tenn. Code Ann. § 48-51-101, *et seq.*  The Board must exercise independent judgment to act in the best interest of GSMT and to act as stewards of the assets of GSMT.  The terms of the technology agreements would, essentially, allow GSUSA to usurp the Board's authority on certain matters and would be invasive as to budgetary commitments and operations of GSMT.

6.     GSMT is committed to operating a high performing Girl Scout council as it has for more than 100 years and shall continue to work with GSUSA in an effort to try to resolve the issues surrounding GSUSA's common technology platform initiative.

Sallie B. Bailey    April 27, 2021

Sallie B. Bailey
Chair of the Board of Directors
Girl Scouts of Middle Tennessee, Inc.
4823-9699-7976

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

GIRL SCOUTS OF THE USA,

                            Plaintiff,

        v.

FARTHEST NORTH GIRL SCOUT
COUNCIL,

                           Defendant.

_____

Civil Action No. _____

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff Girl Scouts of the USA ("GSUSA") files this suit against Defendant Farthest North Girl Scout Council ("Farthest North"), and alleges:

**SUMMARY OF THE ACTION**

1.      In 1912, Juliette Gordon Low founded the Girl Scouts in the United States, an organization that has now served millions of girls across the nation and world with premier leadership and character-building programming.  The organization was subsequently incorporated in 1915 and over time, the Girl Scout Movement ("Movement") grew to include multiple Girl Scout troops and councils, culminating in the U.S. Congress chartering Girl Scouts of the USA by statute in 1950.  *See* 36 U.S.C.A. § 80301 *et seq.* (the "Act").  Since 1950, GSUSA has grown to be an organization with over two million members globally each year focused on building girls of courage, confidence, and character who make the world a better place (the "Mission").  Members

from across the country pay dues that are transmitted to GSUSA in New York in order to become members of the Girl Scout Movement and to participate in its girl-led, girl-serving programming.

2.     GSUSA has the exclusive right to use the Girl Scout mark and all emblems, badges, descriptive or designating marks, and words or phrases, adopted by GSUSA, including the Girl Scout badge, and to authorize their use.  The United States Patent and Trademark Office ("USPTO") has recognized the congressional protections afforded to GSUSA that grant it the exclusive right to use and register the Girl Scout mark in every class of goods and services recognized by the USPTO.

3.     GSUSA authorizes organizations known as local councils in different geographic territories to accomplish its Mission.  Local councils are granted permission to be associated with GSUSA and the Girl Scout Movement through charters—*i.e.*, a binding contract between the GSUSA and each local council.

4.     A charter grants a local council the right to develop, manage, and maintain Girl Scouting in a specific geographic jurisdiction and conveys the rights to:  (1) be identified with the Girl Scout Movement in the United States; (2) use the words "Girl Scouts" as part of the designation of the council; (3) use Girl Scout insignia in connection with its Girl Scouting program; (4) use the trademark "Girl Scouts" on products and merchandise used for the operations of the organization; (5) develop, manage, and maintain Girl Scouting throughout the jurisdiction of the council; and (6) receive services from GSUSA, among other rights.

5.     In exchange, each local council agrees to act in furtherance of the Mission by, among other things:  (a) subscribing to the purpose, adhering to the policies, and being guided by the standards of the GSUSA; (b) developing, managing, and maintaining Girl Scouting throughout the areas of its jurisdiction, in such manner and subject to such limitations as prescribed in the

2

Constitution, Bylaws, and policies of GSUSA;[1] (c) maximizing delivery of the Girl Scout Mission by engaging and supporting volunteers and others to provide a nationally consistent quality leadership experience that achieves positive outcomes and reaches increasing numbers of girls; and (d) advancing the Girl Scout Movement through strategic governance and leadership that employ effective systems and structures to deliver the Mission, and effectively promoting a unified and consistent national brand.  The conditions for a Girl Scout council charter require that councils must operate in accordance with and follow the policies and standards published by GSUSA from time to time.

6.      In April 2017, after extensive collaboration with local councils across the country, GSUSA amended the Blue Book criteria and standards for a Girl Scout council to require all local councils to "utilize a movement-wide common technology platform with respect to membership, volunteer management, delivery systems and data analytics and reporting to better serve Girl Scout volunteers and members and enhance the Girl Scout brand." *See* Exhibit A (Blue Book, Criteria and Standards for an Effective Girl Scout Council, Criteria II, Standard 7).

7.      A common technology platform for all local councils is critical to fulfilling GSUSA's Mission.  Among other things, it enables GSUSA to streamline operations, ensure the consistent delivery of experiences to girls and volunteers, enable modern digital capabilities and ensure quality control over the Girl Scout brand.  Through the common technology platform, Girl Scout volunteers, members, and parents can access information pertaining to their Girl Scout experience in a convenient and consistent manner; volunteers can access a Volunteer Toolkit and online learning platform that assist with troop resources, training materials, and free digital

---

[1] GSUSA's governing documents and policies are published in a compilation known as the Blue Book of Basic Documents ("Blue Book"). *See* Exhibit A.

3

program content at any time convenient to the volunteer; prospective members can register online; and GSUSA can have one centralized platform from which to receive data, reducing data processing fees and challenges associated with managing the Girl Scout brand across the country. This common technology platform is a critical part of ensuring the consistent and uniform worldwide operation of the vast Girl Scout network in conformity with its Mission. It is also critical to protecting GSUSA's members and volunteers. The common technology platform has enhanced data security tools that ensure the protection of personal identifiable information for its members and volunteers, most of whom are minors.

8.      To date, almost every one of GSUSA's 111 local councils, as well as USA Girl Scouts Overseas, uses GSUSA's common technology platform.[2]

9.      Despite every opportunity to do so, Farthest North refuses to implement the common technology platform as required by its Charter and the Blue Book. Additionally, Farthest North has also engaged in a repeated practice of failing to comply with various other Charter and Blue Book obligations.

10.      Starting in 2017, GSUSA has taken great efforts to encourage Farthest North to comply with its Charter by implementing the common technology platform. GSUSA offered logistical and financial assistance to Farthest North—offering to cover all initial on-boarding costs, to reduce annual costs of the platform, and to reduce the number of features and licenses Farthest North would have to adopt to account for any unique circumstances of Farthest North. Despite these offers and its charter obligations, Farthest North adopted a board resolution specifically repudiating and refusing to adopt the common technology platform. GSUSA conducted various

---

[2] The only other local council that is not in compliance with this obligation is currently undergoing a Viability Review to endeavor to migrate the council to the common technology platform, similar to the process that was undertaken with Farthest North.

4

reviews of Farthest North's performance as a council, had telephonic and in-person meetings, issued findings, and developed a corrective action plan, all of which were eschewed by Farthest North.

11.    In addition to refusing to use the common technology platform, Farthest North has also repeatedly failed to act in the best interest of Girl Scouting by, among other things, refusing to implement required national Girl Scout programming and brand materials, disincentivizing national members from providing feedback on the Girl Scout experience through a customer survey, refusing to pay for processing its membership information through an alternative means because it has rejected the common technology platform, knowingly and purposely placing a national partnership for cookie booth sales in jeopardy, participating in an unauthorized online cookie sale that violates GSUSA policies, and refusing to provide business and financial documents as required by the Blue Book.  These deficiencies hinder GSUSA's ability to ensure compliance with its Mission, jeopardize its brand and reputation, and present potential liability issues.

12.    Farthest North's current Charter expires on June 30, 2021.  Due to Farthest North's continuing breaches of its charter obligations and other obligations under the Blue Book, its failure to abide by the Criteria and Standards for an Effective Girl Scout Council, refusal to comply with the corrective action plan directed by GSUSA, and its course of conduct not in the best interest of Girl Scouting, GSUSA does not intend to issue Farthest North a new charter after June 30, 2021. GSUSA has provided Farthest North with a notice of reason for non-issuance, as required by the Blue Book.

13.    Farthest North has indicated that it objects to and will challenge the expiration of its Charter and GSUSA's decision not to re-issue it and that it does not intend to implement the

common technology platform or otherwise comply with the corrective action plan that was provided to it.

14.     GSUSA brings this action under the Declaratory Judgment Act, 28 US Code § 2201 *et seq.*, and Federal Rule of Civil Procedure 57, to obtain relief from uncertainty and to fully and finally confirm in response to Farthest North's challenges and open recalcitrance that GSUSA is within its legal and contractual rights in not issuing Farthest North a Charter and to avoid the accrual of potential damages or liability as a result of non-issuance of Farthest North's Charter.

15.     Accordingly, GSUSA seeks a declaration that (1) Farthest North has breached its obligations as a local council under its Charter and the Blue Book by refusing to utilize GSUSA's common technology platform, engaging in conduct not in the best interest of Girl Scouting, refusing to comply with policies, credential standards, and directives issued by GSUSA, and/or refusing to comply with the Viability Review corrective action plan; (2) GSUSA has the right not to issue a Charter to Farthest North and Farthest North's challenges thereto are without merit; and (3) upon the expiration of its current Charter, Farthest North will no longer be a chartered Girl Scout council and must cease identifying itself with the Girl Scout Movement, including by ceasing to use the words "Girl Scouts" as part of the designation of the council, ceasing to use Girl Scout program material, insignia, or Girl Scout trademarks, and ceasing fundraising in association with the Girl Scouts or GSUSA.

## PARTIES

16.     Plaintiff GSUSA is a congressionally chartered nonprofit corporation that is a body corporate and politic of the District of Columbia, with its principal place of business located at 420 Fifth Avenue, New York, NY 10018.  GSUSA's congressional Charter provides that "the domicile of [GSUSA] is the District of Columbia." *See* 36 U.S.C. § 80301(b).

17.    Defendant Farthest North is a nonprofit corporation organized in the State of Alaska with a principal place of business located at 431 Old Steese Hwy Ste 100, Fairbanks, AK 99701.

## JURISDICTION AND VENUE

18.    This Court has original jurisdiction over GSUSA's claims pursuant to 28 U.S.C. §§ 1332 and 2201 because (a) there is an actual controversy between the parties; (b) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (c) there is complete diversity between parties as the matter is between citizens of different states.

19.    There is actual controversy between the parties as there is a current dispute between the parties about GSUSA's decisions regarding Farthest North's charter.  Farthest North has refused to comply with its charter obligations and GSUSA's policies, procedures and directives and has protested (and continues to protest) joining GSUSA's required common technology platform and remedying its additional deficiencies.  As recently as February 5, 2021, Farthest North reiterated in writing to GSUSA that it has not changed its positions concerning the items required by GSUSA to fulfill its charter obligations.  A declaration by the Court will serve a useful purpose in clarifying or settling the legal issues involved, will finalize the controversy and offer relief from uncertainty, and will help avoid the accrual of potential damages and additional litigation.

20.    In actions brought under the Declaratory Judgment Act, the amount in controversy for diversity jurisdiction purposes is calculated by the "value of the object of the litigation"—*i.e.*, the value of the right being protected.  Here, the amount in controversy exceeds $75,000 because GSUSA seeks to:  (1) protect the Girl Scout brand (alone valued in excess of $600 million), its goodwill, and its intellectual property—which Farthest North will no longer be permitted to use in the event of non-issuance—the value of which exceeds $75,000; (2) protect the value of the

7

common technology platform, including but not limited to the benefits it provides GSUSA as a national organization, the value of which exceeds $75,000; (3) protect the investments that GSUSA has made in its common technology platform, the value of which exceeds $75,000; (4) avoid the additional costs associated with Farthest North's continued refusal to use the common technology platform, including but not limited to costs of processing Farthest North's membership transmittal data through an alternative means, and the legal, financial, and other resources needed to work through charter issues with Farthest North, the combined value of which exceeds $75,000; and (5) prevent costly litigation and potential liability involving claims by Farthest North, the value of which exceeds $75,000.

21.     There is complete diversity between parties as the matter is between citizens of different states.  Farthest North is a citizen of Alaska, and GSUSA is domiciled in the District of Columbia with its principal place of business in New York.

22.     Pursuant to N.Y. CPLR 302(a)(1), personal jurisdiction over Farthest North is proper in this case, because, among other reasons, Farthest North: (1) has an ongoing contractual relationship with GSUSA, which is headquartered within New York, in this Judicial District, creating continuing obligations between itself and GSUSA; (2) is required to adhere to the Girl Scouts Constitution, Bylaws, and policies administered by GSUSA in New York; (3) routinely sends charter applications and filings to GSUSA in New York and makes payments sent to, accounted for and deposited in New York, (4) routinely collects and sends membership dues for GSUSA's members which are sent to, accounted for and deposited in New York through GSUSA's office in New York (5) was subject to a Viability Review directed and overseen by GSUSA in New York, to which the current dispute relates; (6) receives, pursuant to the Charter agreement, numerous services from GSUSA in New York, including but not limited to educational

programing, training and support materials for Farthest North's volunteers, and services and support to Farthest North that help it deliver programing to its members; and (7) sent its CEO to New York in at least 2019 to meet with GSUSA and other local councils regarding how to effectively administer Girl Scouts programming including the programming directly at issue in this action.

23.     Venue is proper in this jurisdiction because a substantial part of the events giving rise to this action occurred, or a substantial part of the property that is the subject of the action is situated, in New York.  Namely, GSUSA administers Farthest North's Charter agreement, as well as all Charter agreements, and all national policies from New York, in this Judicial District, which allows Farthest North the right to use Girl Scout insignia and trademarks, among other rights.

**FACTUAL BASIS OF THE CLAIM**

*GSUSA and Girl Scouting Mission*

24.     In 1912 Juliette Gordon Low founded the Girl Scouts in the United States based on the theories of inclusiveness, self-reliance, and service.

25.     The organization was first incorporated in 1915 and over time, the Movement grew to include multiple local Girl Scout councils, culminating in the U.S. Congress chartering the GSUSA in 1950.

26.     Since 1950, the Girl Scouts have grown to be an organization with over 110 local councils and about two million members globally focused on building girls of courage, confidence, and character who make the world a better place.

27.     GSUSA's Girl Scout program seeks to prepare girls for a lifetime of leadership, success, and adventure through engaging, challenging, and fun activities, including but not limited to earning badges, going on trips, participating in the Girl Scout Cookie Program, experiencing

9

outdoor activities, exploring STEM subjects, achieving their Gold Award, and doing community service projects.

28.     In connection with its Mission, GSUSA has continuously used and maintained multiple highly valuable registered trademarks, including but not limited to federally registered

trademarks for the term: "GIRL SCOUTS", the trefoil mark, and logos **Girl Scouts**,  . Additionally, 36 U.S.C. § 80305 specifically codifies that GSUSA has the exclusive right to use all emblems, badges, marks, and words adopted by the corporation during the life of the corporation in connection with the manufacture, advertisement, and sale of equipment and merchandise.

29.     The Girl Scout intellectual property is well known throughout the United States and has valuable goodwill as recognized by various trade publications and third-party reports and rankings that measure brand values.  Its trademarks are globally recognized and famous and are valued in the millions of dollars.

30.     GSUSA has also been recognized and honored by U.S. Presidents throughout history, including President George H.W. Bush, and President Barack Obama, who awarded the Presidential Medal of Freedom to Juliette Gordon Low posthumously for her work in founding the Girl Scouts.

31.     Pursuant to its congressional Charter, GSUSA directs and coordinates the Girl Scout Movement in the United States and its territories and possessions, and fixes and maintains standards for the Girl Scout Movement.

32.     GSUSA authorizes organizations known as local councils in different geographic territories to accomplish its Mission.

33.     Local councils are separately incorporated chartered organizations that GSUSA authorizes to use the Girl Scout name and mark and to carry out the Girl Scout program locally. Local councils are authorized to develop, manage, and maintain Girl Scouting in accordance with the terms of their Charters.

34.     Each charter constitutes a binding contract between the local council (such as Farthest North) and GSUSA.

35.     Girl Scout local councils are obligated to adhere to the national policies, standards and directives contained in the Blue Book.

36.     In furtherance of the Girl Scouts' uniform and consistent Mission, through its charter, each local council agrees to the following, among other things:

      a.  Subscribe to the purpose, adhere to the policies, and be guided by the charter criteria and standards of GSUSA.

      b.  Develop, manage, and maintain Girl Scouting throughout the area of its jurisdiction, in such manner and subject to such limitations as prescribed in the Constitution, Bylaws, and policies of GSUSA.

      c.  Participate in the activities and business of GSUSA.

      d.  Provide periodic documents to GSUSA, including annual financial audits and Form 990 and board minutes.

      e.  Participate in an annual review process with GSUSA and implement any agreed upon follow-up.

37. Each local council also agrees to the following charter criteria:

      a.  To maximize the delivery of the Girl Scout mission by engaging and supporting volunteers and others to provide a nationally consistent, quality leadership

experience that achieves positive girl outcomes and reaches increasing numbers of girls;

b.  To advance the Girl Scout Movement through strategic governance and leadership that employ effective systems and structures to deliver the Girl Scout Mission; and

c.  To advance organizational impact by growing resources, effectively promoting a unified national brand, and standing up for girls on issues that affect their well-being.

38.  In each charter, including Farthest North's Charter, local councils understand and agree, among other things, that:

a.  In carrying out the terms and other obligations of the charter, they will act in accordance with the Constitution and Bylaws of GSUSA and that the rights and responsibilities granted in the charter are limited by the aforesaid Constitution and Bylaws;

b.  By agreeing to adhere to the policies of GSUSA, they understand and agree to operate as a council in accordance with and to be limited by policies so identified, published, and distributed to councils by GSUSA, accepting them as binding on the council, on all its members, officers, employees, and those affiliating with it; and

c.  By agreeing to be guided by the standards of GSUSA, they understand that as councils they have committed themselves and those affiliating with them to follow and be guided by the standards published from time to time by GSUSA.

39.  One of these standards is the obligation to use the GSUSA common technology platform.  Each charter, including Farthest North's Charter, requires the local council to "utilize[] a movement-wide common technology platform with respect to membership, volunteer

12

management, delivery systems and data analytics and reporting to better serve Girl Scout volunteers and members and to enhance the Girl Scout brand." *See* Exhibit A, at *29 (Standard 7, Criterion II, of Criteria and Standards for an Effective Girl Scout Council).

40.     Implementation and use of the common technology platform are critical to fulfillment of the Mission because, among other things, it assists with delivering Girl Scouting services to volunteers and members, provides greater tools to Girl Scout volunteers, and provides better, consistent, coordinated and uniform delivery systems, data analytics, and reporting. Additionally, the common technology platform provides the Volunteer Toolkit to support troop leaders by making program resources and training available to members irrespective of geographic location.   The Volunteer Toolkit allows volunteers to access more troop resources, training materials, and free digital program content at any time convenient to the volunteer.  It enables GSUSA to deliver nationally consistent and uniform girl programming and volunteer training tools.  It also protects the Girl Scouts intellectual property by ensuring that Girl Scout materials are accessible only to authorized individuals and are used in a manner consistent with authorized uses thereof.

41.     The common technology platform is also vital to the Mission as it allows GSUSA to streamline operations among local councils nationwide to ensure a consistent brand experience for Girl Scout members throughout the United States.  The common technology platform provides GSUSA with real-time data and information concerning the business operations of Girl Scouts, including data and information on membership, financials, local councils, and compliance requirements, to ensure that GSUSA is effectively managing the nationwide organization.  It is an essential tool for any modern national organization in today's world and is critical to GSUSA's

13

fulfillment of its Mission through the consistent and uniform treatment and administrative handling of its chartered councils and of Girl Scout members throughout the country.

42.     The common technology platform, maintained through sophisticated national top tier vendors, ensures compliance with privacy laws and provides enhanced security for member and volunteer data.  The platform, which is compliant with Payment Card Industry Data Security Standards (PCI compliant), protects member and volunteer personal identifiable information as well as sensitive payment information through its multifactor authentication tools and other data security features.  These features are important for any national organization that possesses personal or payment information—however they are particularly critical for an organization like GSUSA, with a membership made up of mostly minors.  The common technology platform also allows GSUSA to efficiently implement any new state or federal requirements concerning the management of consumer privacy or data as GSUSA can implement system changes which coordinate compliance.  Farthest North's website does not appear to even have a privacy policy.

43.     For these reasons and more, the common technology platform is an essential part of carrying out the Mission.

44.     In exchange for complying with its charter and Blue Book requirements, including each local council's agreement to use the common technology platform, GSUSA grants a local council the right to develop, manage, and maintain Girl Scouting in a specific geographic jurisdiction for up to four years at a time and conveys the rights to:  (1) be identified with the Girl Scout Movement in the United States, (2) use the words "Girl Scouts" as part of the designation of the council; (3) use Girl Scout insignia in connection with its Girl Scouting program; (4) use the trademark "Girl Scouts" on products and merchandise used for the operations of the

organization; (5) develop, manage, and maintain Girl Scouting throughout the jurisdiction of the council; and (6) receive services from GSUSA, among other rights.

45.     Under each charter agreement, a council expressly agrees that the charter may be revoked or terminated by GSUSA under the provisions of its Constitution, and that the rights conferred by the charter cease to exist upon such termination or revocation.

46.     Pursuant to the Constitution of GSUSA, "the [GSUSA] National Board of Directors, in its sole discretion, shall have the power to issue … credentials [including council charters] subject to the requirements established by the National Council, and to revoke them when, in its opinion, the terms and conditions thereof or requirements therefore are being violated or when the best interests of Girl Scouting are not being furthered."

### GSUSA Procedures for Reviewing Charters

47.     The Blue Book establishes a procedure for reviewing charters issued to local councils.

48.     As part of that procedure, each council must complete an Annual Review and submit required documents for information to GSUSA for GSUSA to evaluate the council's performance.  Generally, if there are no issues with the council's performance that require additional review and the council meets all GSUSA policies and standards, GSUSA re-issues a council's charter for an additional period, up to four years.  The length of the charter may vary based on the council's performance.

49.     A Viability Review may be initiated by GSUSA if there is evidence or reason to believe that one or more of the following circumstances exist:  (1) action that threatens to undermine the Mission and/or damage the Girl Scout brand, (2) risk of financial failure or failure to meet financial obligations, (3) corporate malfeasance, (4) disregard for Mission-critical GSUSA

15

policies, priorities, and goals or other direction given by the National Board or CEO, (5) governance system in violation of US law, council bylaws, and/or GSUSA policies; and is not consistent, visible, or effective, (6) performance against national benchmarks and council goals continues to be consistently and critically below standard after an On-Site Review has been conducted, or (7) any act or omission, or a course of conduct that, in the opinion of the GSUSA National Board, is not in the best interests of Girl Scouting.

50.     If a Viability Review is initiated, GSUSA advises the council that a review is to take place, an appropriate review team including local and national GSUSA personnel is selected, and the review team prescribes an action plan to the council including findings with the expectation that the council is to take immediate corrective action.

51.     GSUSA then monitors the execution of the prescribed corrective action plan to ensure the council's progress.

52.     Monitoring actions can include monthly meetings with the council, placement of a monitor with the council to provide on-the-ground support, immediate targeted on-site support at the council, and the council providing documentation to GSUSA in a timeframe prescribed.

### *GSUSA Procedures for Non-Issuance of Charters*

53.     If GSUSA determines a charter should not be issued, or that a charter should be revoked, the Blue Book similarly establishes a procedure.

54.     The GSUSA National Board of Directors can act on the recommendations of the CEO of GSUSA if any of the following circumstances occurs in a council:

      a.   Deficiency in respect to its resources, finances, personnel, administrators, manner of supervising the program, effectiveness in its attempt to reach and serve all girls within its jurisdiction or otherwise, such that, in the opinion of

16

the National Board of Directors, it appears that such council is unable adequately to develop, manage, or maintain Girl Scouting within its jurisdiction; or

b.  Any act or omission, or any course of conduct that in the opinion of the National Board of Directors, is not in the best interests of Girl Scouting; or

c.  Failure to comply with any policy, credential standard, or directive issued or established by or under the authority of the National Board of Directors; or

d.  Violation of any term, condition, or requirement of its charter.

55.  If charter revocation or non-issuance is contemplated by GSUSA, notice of reason will be provided to the council along with a reasonable time period for response, and the council can review and discuss the issue(s) with a team representing the National Board.

56.  After the meeting with the council, the National Board "will in its sole discretion, take action that it deems appropriate including revocation or non-issuance" of the charter, and will communicate the action to the council. *See* Exhibit A, at \*27 (Credentials, GSUSA Constitution Art. VIIII, Procedures for Non-Issuance or Revocation of Charters No. 3).

57.  Once the GSUSA National Board decides to not issue a charter or to revoke a charter, its decision "shall be final" under the Blue Book.

### *Farthest North's Failure to Abide by the Viability Report Corrective Action Plan and the Parties' Dispute*

58.  For several years, Farthest North has engaged in a pattern of disregarding its contractual Charter and Blue Book obligations and acting in a manner that is not in the best interests of Girl Scouting.

59.  In 2017, GSUSA issued Farthest North a one-year Charter for the period of January 2018 through December 31, 2018 ("2018 Charter") in order to provide time for Farthest North to

17

work together with GSUSA on its Charter deficiencies, including its failure to move toward adoption of the Girl Scouts common technology platform.[3]

60.     The GSUSA Board issued a Charter letter to Farthest North on November 15, 2017 that accompanied its one-year Charter agreement, stating:

> This letter is to inform you that Girl Scouts Farthest North Council (Farthest North) has been issued a one-year charter, beginning January 1, 2018, and ending December 31, 2018.  A one year charter period is intended to provide time for Farthest North to work together with GSUSA to move toward adoption of the Girl Scouts common technology platform through the Customer Engagement Initiative (CEI), as almost every other council has done.  Criterion II Standard 7 found on page 33 of the Blue Book of Basic Documents (2017) provides that a council must utilize "a movement-wide common technology platform with respect to membership, volunteer management, delivery systems and data analytics and reporting to better serve Girl Scout volunteers and members and enhance the Girl Scout brand."  Farthest North has not consistently participated in the activities and business of Girl Scouts and has not advanced the Movement through strategic governance and leadership; the council's current refusal to join CEI is consistent with this pattern.
>
> GSUSA has made significant efforts to work with Farthest North toward engagement in the business of Girl Scouts and the advancement of the Movement through effective leadership.  GSUSA has also worked with Farthest North on adoption of the Movement's common technology platform, an essential element to an effective Girl Scouts' Movement and preservation of the Movement's long-developed reputation for integrity and uniform quality, that was recommended by the Network Alignment Team.   There have been several Movement-wide presentations and extensive information on CEI that has been disseminated over the past 3 years.  GSUSA has also worked directly with Farthest North, including dialogue with the Farthest North CEO to answer questions and provide data and information regarding CEI.

61.     Farthest North voiced disagreement with GSUSA's position but signed its Charter agreement and accepted the one-year Charter for 2018.

62.     During 2018, Farthest North refused to implement and utilize the common technology platform.

---

[3] GSUSA's common technology platform has also been referred to as "CEI" as it was implemented as part of an organizational initiative known as the Customer Engagement Initiative.

63.     Given the importance of the common technology platform, GSUSA and Farthest North had multiple conversations since at least 2018 concerning how GSUSA could assist and accommodate Farthest North in adopting the technology platform.  GSUSA offered to cover all initial on-boarding costs, reduce annual costs of the platform, and reduce the number of features and licenses Farthest North would have to adopt to account for any unique circumstances of Farthest North.

64.     Despite GSUSA's offers of assistance, Farthest North refused to adopt the common technology platform, and on June 11, 2018 adopted a Board resolution expressly repudiating and resolving not to adopt the platform.

65.     Refusal to join the common technology platform is part of a broader pattern of Farthest North's failure to consistently participate in the activities and business of Girl Scouts and advance the Girl Scout Movement through strategic governance and leadership.

66.     In October 23, 2018, because Farthest North continued to be noncompliant, it was again given a one-year Charter for 2019, and a Viability Review was commenced.  GSUSA continued to detail the deficiencies of the council, stating:

> As GSUSA has raised with Farthest North multiple times, Farthest North has not complied with Criterion II, Standard 7 of the Criteria and Standards for an Effective Girl Scout Council, as it has not adopted or committed to adopt the Customer Engagement Initiative (CEI), the required movement-wide common technology platform with respect to membership, volunteer management, delivery systems, and data analytics and reporting that better serves volunteers and members and enhances the Girl Scout brand. CEI grew out of the interactive Girl Scout CEO/COO Summit in 2013, was built out collaboratively since that time, and is part of the operating model recommended by the joint council/GSUSA Network Alignment Team.  CEI is essential to an effective Girl Scout Movement and preservation of the Movement's long-developed reputation for integrity and uniform quality.  It is the foundation for Girl Scout membership tracking, future delivery of Girl Scout programming, necessary data analytics, and contemporary business processes.  Accordingly, it is one of the standards that the National Board of Directors has adopted that Girl Scout councils must comply with in order to fulfill their charter requirements.

Given the importance of CEI, GSUSA and Farthest North have had multiple conversations during the prior charter period and during this charter period about CEI and how GSUSA can assist and accommodate Farthest North in adopting it. GSUSA has sought to accommodate your council's uniquely small size by offering to cover all initial on-boarding costs, substantially reduce annual costs of the platform, and reduce the number of features and licenses your council would need to adopt. We have also held several discussions with you to answer any questions, provide information, and offer assistance and accommodation. Unfortunately, despite these efforts, on June 11, 2018, the Board of Directors of Farthest North adopted a resolution expressly resolving not to adopt CEI.

The refusal to join CEI is part of a broader pattern of Farthest North's failure to consistently participate in the activities and business of Girl Scouts and advance the Movement through strategic governance and leadership. Rather, Farthest North has engaged in a course of conduct over several years that is not in the best interests of Girl Scouting, undermines the Girl Scout mission, and damages the brand. For example, Farthest North has actively disincentivized national members from providing feedback on the Girl Scout experience through the Voice of the Customer survey. Trends in the Voice of the Customer survey also showed concerns about girl and customer satisfaction. Farthest North has refused to pay required membership processing fees to enable GSUSA to receive and process data outside of the CEI systems, despite receiving repeated notices from GSUSA. Farthest North also does not meet the jurisdictional requirements for a Girl Scout council. It has also refused to serve certain regions even within its jurisdiction and denied a request by the adjacent council to serve one of those regions.

67.     Again, Farthest North voiced its disagreement but signed its one-year Charter agreement.

68.     On May 6, 2019, GSUSA wrote to Farthest North setting forth the scope and process for the Viability Review in accordance with the Blue Book.

69.     In 2019, GSUSA conducted a Charter Viability Review of Farthest North.

70.     On September 9, 2019, the Viability Review findings and corrective action plan were delivered to Farthest North, which contained, among other things, six central concerns along with the action plan Farthest North was to take in relation to each concern.

20

71.     GSUSA then issued Farthest North an additional one-year Charter for the January 1, 2020 through December 31, 2020 term ("2020 Charter") to give Farthest North an opportunity to correct all deficiencies set forth in the corrective action plan dated September 9, 2019.

72.     Farthest North voiced its disagreement but executed the 2020 Charter.

73.     Over the course of 2020, GSUSA attempted multiple calls and meetings to review Farthest North's progress toward the plan.  Farthest North refused to comply with the deadlines and action plan directives.

74.     On November 5, 2020, GSUSA provided Farthest North with a Viability Review Action Plan Final Report ("Final Report"), which contained findings and conclusions for each concern identified in the corrective action plan based upon Farthest North's activities during 2020.

75.     The Final Report found Farthest North: (1) failed to adopt the movement-wide common technology platform in accordance with the action plan; (2) failed to pay required processing fees to enable GSUSA to receive and process data outside of the common technology platform in accordance with the action plan; (3) failed to transmit full contact information to GSUSA for its members in accordance with the action plan; (4) only partially met the requirements demonstrating it was willing and able to effectively serve its jurisdiction; (5) only partially met the requirements for consistently participating in the activities and business of Girl Scouts; and (6) failed to demonstrate an adequate course of conduct in the best interest of Girl Scouts.

76.     Farthest North's deficiencies continued, and it failed or refused to meet the overwhelming majority of the milestones laid out in the Viability Review's corrective action plan. It also refused to provide financial reports and documents required for its Annual Review.

77.     In November 2020, GSUSA then issued Farthest North a six-month Charter, which expires on June 30, 2021, to provide Farthest North with a final opportunity to complete the

corrective action plan and to comply with its Charter requirements, including adopting the

common technology platform ("2021 Charter").  *See* Exhibit B (attaching 2021 Charter).

78.     In its November 19, 2021 letter, GSUSA stated:

This letter is to inform you that Girl Scouts Farthest North Council (Farthest North) has been issued a six-month charter, beginning January 1, 2021, and ending June 30, 2021, to provide Farthest North a final opportunity to complete its Corrective Action Plan and to comply with charter requirements. We previously provided you the Viability Review Corrective Action Plan Final Report dated as of October 30, 2020. As the report indicates, Farthest North has failed to meet the great majority of the required steps of the Corrective Action Plan. These failures include Farthest North's active refusal to adopt the CEI platform.

In addition, Farthest North is in violation of its charter requirements. Among other things, Farthest North has refused to provide financial reports and documents required for its Annual Review process. However, in light of the challenges posed by COVID-19, and to give Farthest North one last chance to come into compliance, the GSUSA National Board is issuing Farthest North a six-month charter subject to completion of the chartering process. This six-month charter is granted without waiver of the obligation that Farthest North comply with the Viability Review Corrective Action Plan and all Criteria and Standards for an Effective Girl Scout council, including Criterion II, Standard 7, and GSUSA's right to enforce the Standards for a Girl Scout Council Jurisdiction. GSUSA will continue to require completion of the council health dashboard surveys, participation in the Girl Scout Voices Count surveys and regular submission of the documents listed in the Charter Agreement.

GSUSA is committed to supporting your efforts to deliver on our mission of building girls of courage, confidence and character who make the world a better place. Our hope is that Farthest North will use the six-month charter to take immediate and meaningful steps to complete the Corrective Action Plan and to come into compliance with charter requirements. If that does not occur, GSUSA will take all such steps as it deems appropriate.

79.     As it has done in prior years, Farthest North executed the six-month Charter "under

protest."  By executing the six-month Charter, like the ones that came before it, Farthest North

agreed to, among other things:

a.   Subscribe to the purpose, adhere to the policies, and be guided by the charter

criteria and standards of GSUSA;

22

b. Develop, manage, and maintain Girl Scouting throughout the area of its jurisdiction as prescribed in the Constitution, Bylaws, and policies of GSUSA;

c. Follow and be guided by the standards of GSUSA; and

d. Utilize a movement-wide common technology platform with respect to membership, volunteer management, delivery systems, and data analytics and reporting to better serve Girl Scout volunteers and members and enhance the Girl Scout brand, which is one of the standards set by GSUSA for Girl Scout councils.

80. Despite GSUSA issuing the six-month Charter, Farthest North has not made any progress toward compliance with the Viability Review corrective action plan and continues to refuse to adopt the common technology platform as required.

81. Farthest North has engaged in a course of conduct over several years that is not in the best interests of Girl Scouting, that undermines the Girl Scout Mission, and that damages the Girl Scout brand.

82. In addition to its refusal to implement the common technology platform as required, Farthest North also disincentivized national members from providing feedback on the Girl Scout experience through a survey of national members, failed to participate fully in the Annual Review process, knowingly and purposely placed in jeopardy a national partnership for cookie booth sales for the Girl Scout Cookie Program, and participated in an unauthorized online cookie sale that violates GSUSA policies, among other things. Farthest North has further refused to pay processing fees to enable GSUSA to receive and process membership dues outside of the common technology platform, or to provide complete membership registration information. Farthest North also does not meet the minimum jurisdictional standards for a Girl Scout council.

83.     GSUSA has received complaints from Girl Scout volunteers regarding Farthest North for years.

84.     The GSUSA National Board of Directors found that Farthest North's demonstrated continued unwillingness to abide by the terms of its Charter and its actions and failures to act:

    a.  Demonstrated deficiency in respect to its resources, finances, personnel, administrators, manner of supervising the program, and effectiveness in its attempt to reach and serve all girls within its jurisdiction or otherwise, such that, in the opinion of the National Board of Directors, it appears that such council is unable adequately to develop, manage, or maintain Girl Scouting within its jurisdiction;

    b.  Constituted a course of conduct that, in the opinion of the National Board of Directors, is not in the best interests of Girl Scouting;

    c.  Evidenced that Farthest North has failed to comply with a policy, credential standard, or directive issued or established by or under the authority of the National Board of Directors; and

    d.  Constituted a violation of the terms, conditions, and requirements of its Charter.

85.     As a result, the GSUSA Board voted to provide a notice of nonissue of charter to Farthest North in accordance with the Blue Book process.

86.     GSUSA provided Farthest North with a notice of reason of non-issuance.  Farthest North can submit a response to the notice of reason, and GSUSA has provided a date and time on which Farthest North can meet with the National Board to discuss the notice of reason and the issues.  Following the meeting, provided that Farthest North continues to refuse to comply with its obligation to utilize the common technology platform and does not correct all other deficiencies,

24

GSUSA will notify Farthest North that its Charter will expire on June 30, 2021 and a new Charter will not be issued.

87.     Farthest North has indicated that it will challenge GSUSA's decision not to issue it a new Charter.

88.     All conditions precedent to the maintenance of this action have been satisfied, performed or otherwise discharged.

**COUNT I**

**(DECLARATORY JUDGMENT)**

89.     GSUSA incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

90.     A current dispute with sufficient immediacy and reality exists between the parties concerning their obligations under the 2021 Charter and documents incorporated by reference therein and the Blue Book.

91.     GSUSA has provided Farthest North with the requisite notice of reason of non-issuance of its Charter based on Farthest North's continued violations of the terms, conditions, and requirements of its Charter and the Blue Book, its deficiencies with respect to its manner of operating the program, its course of conduct not in the best interest of Girl Scouting, and its failure to comply with the policies, standards, and directives of the GSUSA Board.  Once Farthest North's Charter lapses, it will no longer be permitted to identify itself with the Girl Scout Movement and GSUSA, use the words "Girl Scouts" as part of the designation of the council, use Girl Scout program material and insignia, use the Girl Scout trademarks, or conduct any fundraising in association with the Girl Scouts or GSUSA.

92.     Farthest North continues to refuse to implement the common technology platform or fulfill its other Charter obligations and has indicated that it will object to any non-issuance of its Charter.

93.     Accordingly, GSUSA seeks a declaration by this Court to settle the legal issues, fully and finally resolve the controversy, and help avoid the accrual of potential damages and additional litigation.

## PRAYER FOR RELIEF

WHEREFORE, GSUSA prays that, upon a final determination by this Court, judgment be entered in its favor as follows on Count I of its Complaint:

A.     A declaration that (1) Farthest North has breached its obligations as a local council under its Charter and the Blue Book by refusing to utilize GSUSA's common technology platform, engaging in conduct not in the best interest of Girl Scouting, refusing to comply with policies, credential standards, and directives issued by GSUSA, and/or refusing to comply with the Viability Review corrective action plan; (2) GSUSA has the right not to issue a Charter to Farthest North and Farthest North's challenges thereto are without merit; and (3) upon the expiration of its current Charter, Farthest North will no longer be a chartered Girl Scout council and must cease identifying itself with the Girl Scout Movement, including by ceasing to use the words "Girl Scouts" as part of the designation of the council, ceasing to use Girl Scout program material, insignia, or Girl Scout trademarks, and ceasing fundraising in association with the Girl Scouts or GSUSA; and

B.     An order granting GSUSA such other and further relief as the Court deems just and appropriate.

26

Respectfully submitted,

Dated:      April 20, 2021                          /s/ J. Douglas Baldridge

VENABLE LLP
J. Douglas Baldridge
Benjamin E. Horowitz *(pro hac vice motion
forthcoming*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Tel: 202-344-4000
Fax: 202-344-8300
JBaldridge@venable.com
behorowitz@Venable.com

Maria R. Sinatra
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
Tel.: 212-307-5500
Fax: 212-307-5598
mrsinatra@venable.com

*Attorneys for Girl Scouts of the USA*

# EXHIBIT
# F



December 4, 2020

Celeste Patterson
Agenia Clark
Girl Scouts of Middle Tennessee
4522 Granny White Pike
Nashville, TN 37204-4139

Dear Celeste and Agenia,

**Girl Scouts of the USA**
420 Fifth Avenue
New York, NY 10018-2798
212-852-8000
girlscouts.org

This letter is to inform you that Girl Scouts of Middle Tennessee (Middle Tennessee) has been issued a one-year charter, beginning January 1, 2021, and ending December 31, 2021. Further, as explained below, the Executive Committee of the National Board has directed the commencement of a Viability Review with respect to Middle Tennessee.

As GSUSA has raised with Middle Tennessee multiple times, Middle Tennessee has not complied with Standard 7 of Criterion II, a critical part of the Criteria and Standards for an Effective Girl Scout Council, as it has not adopted or committed to adopt the Customer Engagement Initiative (CEI), the movement-wide common technology platform with respect to membership, volunteer management, delivery systems, and data analytics and reporting that better serves volunteers and members and enhances the Girl Scout brand.

CEI is essential to an effective Girl Scout Movement and preservation of the Movement's long-developed reputation for integrity and uniform quality. It is the foundation for Girl Scout membership tracking, future delivery of Girl Scout programming, necessary data analytics, and contemporary business processes. Accordingly, it is one of the standards that the National Board of Directors has adopted that Girl Scout councils must comply with in order to fulfill their charter requirements.

Given the importance of CEI, during the past three years, GSUSA and Middle Tennessee have had many discussions about CEI and its benefits for the Movement. A one-year charter period was granted for the last three years to provide Middle Tennessee time to move toward adoption of CEI. GSUSA has made significant efforts to address any questions or concerns of Middle Tennessee regarding CEI and to work with Middle Tennessee toward adoption, including working directly with Middle Tennessee to provide significant information about CEI in addition to the information provided as a matter of course to all councils, traveling to Nashville several times to meet with council leadership, and making several changes to the CEI legal agreements based on Middle Tennessee's input. GSUSA provided Middle Tennessee an updated detailed plan for CEI migration and onboarding in 2020 that aligned with the migration of 109 other councils. Yet, Middle Tennessee did not act on the plan. In November 2020, Middle Tennessee's CEO and Board Chair held a virtual face-to-face discussion with GSUSA's CEO and Board Chair in an effort to work through this matter.

Additionally, Middle Tennessee has failed to pay the required membership dues. Since February 24, 2020, the Council has been submitting $12 per member for membership dues, an underpayment of the required $25 membership dues, which is a violation of the charter obligation to forward membership dues to GSUSA in a timely manner (Blue Book of Basic Documents pp. 25, 26).

Middle Tennessee also continues to refuse to pay required membership processing fees to enable GSUSA to efficiently receive and process data outside of the CEI systems and refuses to transmit full contact information to GSUSA regarding members.

Middle Tennessee's actions threaten to undermine the mission or damage the Girl Scout brand; show disregard for mission-critical GSUSA policies, priorities, and goals or other direction given by the National Board or CEO; and constitute a course of conduct that is not in the best interests of Girl Scouting.



**Girl Scouts of the USA**
420 Fifth Avenue
New York, NY 10018-2798
212-852-8000
girlscouts.org

For these reasons, the Executive Committee has directed a Viability Review with respect to Middle Tennessee. A one-year charter is being granted so that GSUSA and Middle Tennessee can continue discussions with respect to CEI and to work through the Viability Review and a corrective action plan process with respect to all deficiencies. GSUSA will be in touch with you to discuss the timeline for the Viability Review once the new charter period has begun.

Going forward, the chartering process will continue to include completion of the council health dashboard surveys, participation in the Girl Scout Voices Count Survey and regular submission of the documents listed on the enclosed charter agreement. Completion and return of the charter agreement, enumerating the benefits and expectations conferred by the charter is the final step in the chartering process. Please note that there is no charter fee for this charter renewal. To receive your new charter documents before the end of the year, complete the charter agreement sent via DocuSign no later than December 15, 2020.

Should you have questions about this letter, completion of the charter agreement, or the chartering process, do not hesitate to contact Lynelle McKay via email at lmckay@girlscouts.org or by phone at 212-852-5096.

GSUSA is committed to supporting your efforts to deliver on our mission of building girls of courage, confidence and character who make the world a better place. On behalf of the National Board, I extend sincere appreciation for all that you do for girls, the Movement, and your community.

Sincerely,

Ráchel Roché Walton
National Secretary

cc:  Karen Layng, National Board President
     Judith Batty, Interim Chief Executive Officer
     Lynelle McKay, Chief Customer Officer
     Office of the National Board of Directors

**Girl Scouting builds girls of courage, confidence, and character, who make the world a better place.**



# GIRL SCOUT COUNCIL CHARTER AGREEMENT

Girl Scouts of the USA

420 Fifth Avenue

New York, NY 10018-2798

| Pursuant to the authority of the Board of Directors of Girl Scouts of the United States of America, reaffirmation and issuance of the charter document will not occur until the council completes this agreement. | For Use of Girl Scouts of the USA | | |
|---|---|---|---|
| | Board Action September 2020 | Issued December 4, 2020 | Term **one year** |

Charter Period: **1/1/2021 to 12/31/2021**  |  Council Code **382**

The **Girl Scouts of Middle Tennessee, Inc.**                    State of    **Tennessee**

(Official Name of Council)

hereinafter referred to as the Council, now having jurisdiction over the area described in the official record of the council's jurisdiction on file with the Girl Scouts of the United States of America and holding a charter for this jurisdiction, hereby agrees to accept a charter for the same jurisdiction, subject to change at the discretion of GSUSA, for the term prescribed by the National Board of Directors.

## IN AGREEING TO ACCEPT A CHARTER, THE COUNCIL WILL:

1. Subscribe to the purpose, adhere to the policies, and be guided by the charter criteria and standards of Girl Scouts of the United States of America.

   Charter Criteria:

   A chartered Girl Scout Council maximizes delivery of the Girl Scout mission by engaging and supporting volunteers and others to provide a nationally consistent quality leadership experience that achieves positive girl outcomes and reaches increasing numbers of girls.

   A chartered Girl Scout Council advances the movement through strategic governance and leadership that employ effective systems and structures to deliver the Girl Scout mission.

   A chartered Girl Scout Council advances organizational impact by growing resources, effectively promoting a unified national brand and standing up for girls on issues that affect their well-being.

2. Develop, manage, and maintain Girl Scouting throughout the area of its jurisdiction, in such manner and subject to such limitations as prescribed in the Constitution, Bylaws, and policies of Girl Scouts of the United States of America.

3. Participate in the activities and business of Girl Scouts of the United States of America.

4. Make reports of its work to Girl Scouts of the United States of America, have at all times a registered board of directors, and make sure that all persons affiliating with the Council meet individual membership requirements.

5. Comply with federal, state and local laws as well as Girl Scouts of the United States of America policies.

6. Regularly review and file with Girl Scouts of the United States of America, By-laws, articles of incorporation and board adopted strategic priorities.

7. Provide the following documents to Girl Scouts of the United States of America:

| | |
|---|---|
| Financial Audit and Management Letter | Annually |
| Form 990 | Annually |
| Current Board member list | When there is a change |
| Board minutes/board packets | After each board meeting |
| Name of CEO and Board Chair | When there is a change |
| Headquarters address | When there is a change |

8. Forward membership dues to Girl Scouts of the United States of America in a timely manner. (Within 2 months of receipt.)

9. Participate in an annual review process with Girl Scouts of the United States of America and implement any agreed upon follow-up.

**SUBJECT TO THE LIMITATIONS HEREIN CONTAINED, THE CHARTER, WHEN ISSUED, WILL CONFER FOR THE DURATION OF ITS TERM THE FOLLOWING RIGHTS:**

1. The right to be identified with the Girl Scout Movement in the United States of America, which is directed and coordinated by Girl Scouts of the United States of America, a member of the World Association of Girl Guides and Girl Scouts.

2. The right to use the words "Girl Scouts" as part of the designation of the Council (whether or not incorporated).

3. The right to use Girl Scout program and the right to use Girl Scout insignia in connection with that program.

4. The right to use the trademark "Girl Scouts" and the service mark, as defined in Girl Scouts of the United States of America's *Graphic Guidelines*, on products or merchandise obtained and used for the day-to-day operations of the Council, including stationery, office supplies, items with council and camp names and symbols, brochures, newsletters and such items as Girl Scouts of the United States of America may hereafter designate. Any other use of marks or insignia owned by Girl Scouts of the United States of America on products or merchandise must be approved by Girl Scouts of the United States of America. This includes but is not limited to merchandise to be sold by the Council. This right is nonexclusive and nontransferable.

5. The rights to develop, manage, and maintain Girl Scouting throughout the area of the jurisdiction of the Council.

6. The right to receive services from Girl Scouts of the United States of America.

7. The right to respond to requests for proposals (RFPs) that are sent out from time to time by Girl Scouts of the United States of America.

8. The right to raise funds in the name of Girl Scouts within the council's jurisdiction.

9. The right, through delegates elected to the National Council of Girl Scouts of the United States of America, to participate in the business of Girl Scouts of the United States of America.

We understand and agree that in carrying out the terms and other obligations of the charter, we will act in accordance with the Constitution and Bylaws of Girl Scouts of the United States of America and that the rights and responsibilities granted in the charter are limited by the aforesaid Constitution and Bylaws.

We also understand and agree that the rights and responsibilities granted by the charter cannot be delegated nor can the jurisdiction for which the charter is sought be changed without the written authorization of Girl Scouts of the United States of America.

By agreeing to adhere to the policies of Girl Scouts of the United States of America, we understand and agree to operate as a council in accordance with and to be limited by policies so identified, published, and

distributed to councils by Girl Scouts of the United States of America, accepting them as binding on the Council, on all its members, officers, employees, and those affiliating with it.

By agreeing to be guided by the standards of Girl Scouts of the United States of America, we understand that as a council we have committed ourselves and those affiliating with us to follow and be guided by the standards published from time to time by Girl Scouts of the United States of America.

We understand and agree that it is the Council's responsibility to see that each person affiliating with it meets at all times the individual membership requirements established by Girl Scouts of the United States of America, and to register with Girl Scouts of the United States of America all girls and adults participating in Girl Scouting within its jurisdiction, whether in pathways or in any other capacity, except those adults working in a temporary advisory or consultative capacity.

We understand and agree that the charter if accepted may be revoked or terminated by Girl Scouts of the United States of America under the provisions of its Constitution, that the rights conferred by the charter cease to exist upon termination or revocation of the charter, and that upon revocation or termination of the charter, the Council can no longer and, therefore, will not exercise any of the rights granted to it therein.

We understand and agree that the Council's articles of incorporation and bylaws, which are attached, are a part of this agreement.  Furthermore, we agree that any changes or amendments to these documents will be filed with Girl Scouts of the United States of America in a timely manner.

## Girl Scouts of Middle Tennessee, Inc.

Name of Council


Signature of Council Chair of the Board                              Date of Signature


Signature of Council Chief Executive Officer                         Date of Signature

**Girl Scouts of Middle Tennessee, Inc.**

Concil Code: 382

15-Nov-20

Zip Codes:

| | | | | | | |
|---|---|---|---|---|---|---|
| 37010 | 37060 | 37127 | 37187 | 37245 | 38459 | 38557 |
| 37011 | 37061 | 37128 | 37188 | 37246 | 38460 | 38558 |
| 37012 | 37062 | 37129 | 37189 | 37247 | 38461 | 38559 |
| 37013 | 37063 | 37130 | 37190 | 37248 | 38462 | 38560 |
| 37014 | 37064 | 37131 | 37191 | 37249 | 38463 | 38562 |
| 37015 | 37065 | 37132 | 37201 | 37250 | 38464 | 38563 |
| 37016 | 37066 | 37133 | 37202 | 37306 | 38468 | 38564 |
| 37018 | 37067 | 37134 | 37203 | 37318 | 38469 | 38565 |
| 37019 | 37068 | 37135 | 37204 | 37324 | 38471 | 38567 |
| 37020 | 37069 | 37136 | 37205 | 37328 | 38472 | 38568 |
| 37022 | 37070 | 37137 | 37206 | 37330 | 38473 | 38569 |
| 37023 | 37071 | 37138 | 37207 | 37334 | 38474 | 38570 |
| 37024 | 37072 | 37140 | 37208 | 37335 | 38476 | 38571 |
| 37025 | 37073 | 37141 | 37209 | 37342 | 38477 | 38572 |
| 37026 | 37074 | 37142 | 37210 | 37345 | 38478 | 38573 |
| 37027 | 37075 | 37143 | 37211 | 37348 | 38481 | 38574 |
| 37028 | 37076 | 37144 | 37212 | 37349 | 38482 | 38575 |
| 37029 | 37077 | 37145 | 37213 | 37352 | 38483 | 38577 |
| 37030 | 37078 | 37146 | 37214 | 37355 | 38485 | 38578 |
| 37031 | 37079 | 37148 | 37215 | 37357 | 38486 | 38579 |
| 37032 | 37080 | 37149 | 37216 | 37359 | 38487 | 38580 |
| 37033 | 37082 | 37150 | 37217 | 37360 | 38488 | 38581 |
| 37034 | 37083 | 37151 | 37218 | 37375 | 38501 | 38582 |
| 37035 | 37085 | 37152 | 37219 | 37376 | 38502 | 38583 |
| 37036 | 37086 | 37153 | 37220 | 37378 | 38503 | 38587 |
| 37037 | 37087 | 37160 | 37221 | 37382 | 38504 | 38588 |
| 37040 | 37088 | 37161 | 37222 | 37383 | 38505 | 38589 |
| 37041 | 37089 | 37162 | 37224 | 37388 | 38506 | 39107 |
| 37042 | 37090 | 37165 | 37227 | 37389 | 38541 | 42223 |
| 37043 | 37091 | 37166 | 37228 | 37394 | 38542 | |
| 37044 | 37095 | 37167 | 37229 | 37398 | 38543 | |
| 37046 | 37096 | 37171 | 37230 | 38401 | 38544 | |
| 37047 | 37097 | 37172 | 37232 | 38402 | 38545 | |
| 37048 | 37098 | 37174 | 37234 | 38425 | 38547 | |
| 37049 | 37101 | 37175 | 37235 | 38449 | 38548 | |
| 37050 | 37110 | 37178 | 37236 | 38450 | 38549 | |
| 37051 | 37111 | 37179 | 37237 | 38451 | 38550 | |
| 37052 | 37115 | 37180 | 37238 | 38452 | 38551 | |
| 37055 | 37116 | 37181 | 37240 | 38453 | 38552 | |
| 37056 | 37118 | 37183 | 37241 | 38454 | 38553 | |
| 37057 | 37119 | 37184 | 37242 | 38455 | 38554 | |
| 37058 | 37121 | 37185 | 37243 | 38456 | 38555 | |
| 37059 | 37122 | 37186 | 37244 | 38457 | 38556 | |

# EXHIBIT
# G



**Girl Scouts of Middle Tennessee**
4522 Granny White Pike
Nashville, TN 37204
(615) 383-0490
(800) 395-5318
gsmidtn.org

December 11, 2020

Ráchel Roché Walton
National Secretary
Girl Scouts of the USA
420 Fifth Avenue
New York, NY 10018-2798

Dear Ms. Walton:

On behalf of the Girl Scouts of Middle Tennessee, Inc. ("Middle Tennessee"), please find enclosed the executed Girl Scout Council Charter Agreement for 2021.

As we have indicated in connection with previous renewals of our Charter, acceptance of the 2021 Charter by Middle Tennessee does not constitute an agreement with or admission of the assertions contained in the December 4, 2020 letter accompanying the Charter Agreement or the acceptance of any additional terms contained or implied therein.

Middle Tennessee is proud of its ongoing efforts to support the mission and the reputation of the Girl Scout brand. For FY21, our membership is currently 10,197 girls, supported by 4,170 volunteers. We have met the first threshold of the council's membership goals for FY21. Additionally, we have seen amazing reception to the council's virtual program offerings and virtual troop programs. One of our proudest efforts has been with Girl Scout Kickstart Kits. This boxed program provides troop leaders with all of the materials and supplies for their first four troop meetings and four badges. The response has been exceptional and more than 19,600 packaged programs are included in these kits. So far this FY21, 457 girls have been actively participating in Middle Tennessee's equestrian programs, all of which have been delivered following CDC and State safety guidelines.

Middle Tennessee's strong delivery of the Girl Scout mission continues to positively impact our jurisdiction and create goodwill for the Girl Scout brand here. This Council's performance remained strong in 2020, despite a global pandemic,



**Girl Scouts of Middle Tennessee**
4522 Granny White Pike
Nashville, TN 37204
(615) 383-0490
(800) 395-5318
gsmidtn.org

tornadoes that ripped through our Council's footprint in March of this year, and other disruptors impacting Girl Scout councils generally. Middle Tennessee remains committed to performing as a model Girl Scout council, as it has for more than 100 years.

On June 8, 2020, to address the social unrest that was plaguing our country and our community, Middle Tennessee hosted "A Stand for Solidarity," on the lawn of the council's Central Office. With community leaders, board members and Girl Scouts representing the jurisdiction, for 8 minutes and 46 seconds, Middle Tennessee was a focal point for the community representing a commitment for racial and social justice for our girls and our community.

It is unclear whether your letter is notice that the National Board has taken action to initiate a Viability Review pursuant to the first numbered paragraph under the heading "Procedures for a Charter Viability Review" in the Credentials section of the Blue Book of Basic Documents, or whether it reflects a predicate action by the Executive Committee. We request clarification on whether the GSUSA Board has taken action to initiate a Viability Review and any documentation reflecting this action so that we may advise our Board of Directors accurately.

In any event, in light of the indicators of Middle Tennessee's successes as a Girl Scout council, we disagree that a Viability Review is warranted or a prudent use of the time and resources of either Middle Tennessee or GSUSA.

Sincerely,

Celeste Patterson
Board Chair

Agenia Clark
President and CEO

cc:     Karen Layng, National Board President
        Judith Batty, Interim Chief Executive Officer
        Lynelle McKay, Chief Customer Officer
        Office of the National Board of Directors

DocuSign Envelope ID: E259A18A-FDF5-4441-9A9D-FB4D85446B18



# GIRL SCOUT COUNCIL CHARTER AGREEMENT

Girl Scouts of the USA

420 Fifth Avenue

New York, NY 10018-2798

| Pursuant to the authority of the Board of Directors of Girl Scouts of the United States of America, reaffirmation and issuance of the charter document will not occur until the council completes this agreement. | For Use of Girl Scouts of the USA | | |
|---|---|---|---|
| | Board Action September 2020 | Issued December 4, 2020 | Term one year |

| Charter Period: 1/1/2021 to 12/31/2021 | Council Code **382** |
|---|---|

The **Girl Scouts of Middle Tennessee, Inc.**          State of     **Tennessee**

(Official Name of Council)

hereinafter referred to as the Council, now having jurisdiction over the area described in the official record of the council's jurisdiction on file with the Girl Scouts of the United States of America and holding a charter for this jurisdiction, hereby agrees to accept a charter for the same jurisdiction, subject to change at the discretion of GSUSA, for the term prescribed by the National Board of Directors.

**IN AGREEING TO ACCEPT A CHARTER, THE COUNCIL WILL:**

1. Subscribe to the purpose, adhere to the policies, and be guided by the charter criteria and standards of Girl Scouts of the United States of America.

   Charter Criteria:

   A chartered Girl Scout Council maximizes delivery of the Girl Scout mission by engaging and supporting volunteers and others to provide a nationally consistent quality leadership experience that achieves positive girl outcomes and reaches increasing numbers of girls.

   A chartered Girl Scout Council advances the movement through strategic governance and leadership that employ effective systems and structures to deliver the Girl Scout mission.

   A chartered Girl Scout Council advances organizational impact by growing resources, effectively promoting a unified national brand and standing up for girls on issues that affect their well-being.

2. Develop, manage, and maintain Girl Scouting throughout the area of its jurisdiction, in such manner and subject to such limitations as prescribed in the Constitution, Bylaws, and policies of Girl Scouts of the United States of America.

3. Participate in the activities and business of Girl Scouts of the United States of America.

4. Make reports of its work to Girl Scouts of the United States of America, have at all times a registered board of directors, and make sure that all persons affiliating with the Council meet individual membership requirements.

5. Comply with federal, state and local laws as well as Girl Scouts of the United States of America policies.

6. Regularly review and file with Girl Scouts of the United States of America, By-laws, articles of incorporation and board adopted strategic priorities.

DocuSign Envelope ID: E259A18A-FDF5-4441-9A9D-FB4D85446B18

7. Provide the following documents to Girl Scouts of the United States of America:

| | |
|---|---|
| Financial Audit and Management Letter | Annually |
| Form 990 | Annually |
| Current Board member list | When there is a change |
| Board minutes/board packets | After each board meeting |
| Name of CEO and Board Chair | When there is a change |
| Headquarters address | When there is a change |

8. Forward membership dues to Girl Scouts of the United States of America in a timely manner. (Within 2 months of receipt.)

9. Participate in an annual review process with Girl Scouts of the United States of America and implement any agreed upon follow-up.

**SUBJECT TO THE LIMITATIONS HEREIN CONTAINED, THE CHARTER, WHEN ISSUED, WILL CONFER FOR THE DURATION OF ITS TERM THE FOLLOWING RIGHTS:**

1. The right to be identified with the Girl Scout Movement in the United States of America, which is directed and coordinated by Girl Scouts of the United States of America, a member of the World Association of Girl Guides and Girl Scouts.

2. The right to use the words "Girl Scouts" as part of the designation of the Council (whether or not incorporated).

3. The right to use Girl Scout program and the right to use Girl Scout insignia in connection with that program.

4. The right to use the trademark "Girl Scouts" and the service mark, as defined in Girl Scouts of the United States of America's *Graphic Guidelines*, on products or merchandise obtained and used for the day-to-day operations of the Council, including stationery, office supplies, items with council and camp names and symbols, brochures, newsletters and such items as Girl Scouts of the United States of America may hereafter designate. Any other use of marks or insignia owned by Girl Scouts of the United States of America on products or merchandise must be approved by Girl Scouts of the United States of America. This includes but is not limited to merchandise to be sold by the Council. This right is nonexclusive and nontransferable.

5. The rights to develop, manage, and maintain Girl Scouting throughout the area of the jurisdiction of the Council.

6. The right to receive services from Girl Scouts of the United States of America.

7. The right to respond to requests for proposals (RFPs) that are sent out from time to time by Girl Scouts of the United States of America.

8. The right to raise funds in the name of Girl Scouts within the council's jurisdiction.

9. The right, through delegates elected to the National Council of Girl Scouts of the United States of America, to participate in the business of Girl Scouts of the United States of America.

We understand and agree that in carrying out the terms and other obligations of the charter, we will act in accordance with the Constitution and Bylaws of Girl Scouts of the United States of America and that the rights and responsibilities granted in the charter are limited by the aforesaid Constitution and Bylaws.

We also understand and agree that the rights and responsibilities granted by the charter cannot be delegated nor can the jurisdiction for which the charter is sought be changed without the written authorization of Girl Scouts of the United States of America.

By agreeing to adhere to the policies of Girl Scouts of the United States of America, we understand and agree to operate as a council in accordance with and to be limited by policies so identified, published, and

DocuSign Envelope ID: E259A18A-FDF5-4441-9A9D-FB4D85446B18

distributed to councils by Girl Scouts of the United States of America, accepting them as binding on the Council, on all its members, officers, employees, and those affiliating with it.

By agreeing to be guided by the standards of Girl Scouts of the United States of America, we understand that as a council we have committed ourselves and those affiliating with us to follow and be guided by the standards published from time to time by Girl Scouts of the United States of America.

We understand and agree that it is the Council's responsibility to see that each person affiliating with it meets at all times the individual membership requirements established by Girl Scouts of the United States of America, and to register with Girl Scouts of the United States of America all girls and adults participating in Girl Scouting within its jurisdiction, whether in pathways or in any other capacity, except those adults working in a temporary advisory or consultative capacity.

We understand and agree that the charter if accepted may be revoked or terminated by Girl Scouts of the United States of America under the provisions of its Constitution, that the rights conferred by the charter cease to exist upon termination or revocation of the charter, and that upon revocation or termination of the charter, the Council can no longer and, therefore, will not exercise any of the rights granted to it therein.

We understand and agree that the Council's articles of incorporation and bylaws, which are attached, are a part of this agreement. Furthermore, we agree that any changes or amendments to these documents will be filed with Girl Scouts of the United States of America in a timely manner.

## Girl Scouts of Middle Tennessee, Inc.

Name of Council

Signature of Council Chair of the Board | Date of Signature

| | 12/11/2020 |

Signature of Council Chief Executive Officer | Date of Signature

# EXHIBIT H



**Girl Scouts of Middle Tennessee**
4522 Granny White Pike
Nashville, TN 37204
(615) 383-0490
(800) 395-5318
gsmidtn.org

**March 16, 2021**

**TO:**        Judith Batty, Interim CEO, Girl Scouts USA

**FROM:**    Agenia Clark, CEO, Middle Tennessee

**RE:**        Scenarios for Girl Scouts of Middle Tennessee, Inc.

Judith,

In response to your request during our phone conversation on February 5, 2021, the Girl Scouts of Middle Tennessee, Inc. ("GSMIDTN") has outlined below two informational scenarios that we believe would advance the objectives of Girl Scouts of the United States of America ("GSUSA") and GSMIDTN and resolve the current impasse related to technology platforms.

During the weeks that have followed our conversation, there have been several developments that impact our next discussion regarding these two scenarios presented:

- GSMIDTN has been in conversations with two Girl Scout councils regarding the failures of VS2.0. One council is seeking a solution as they describe themselves as "drowning" under VS2.0. Another council described VS2.0 as "worse than" the prior version.
- By email February 26, 2021, from GSUSA's Chief Revenue Officer, we have been informed that we are in a Viability Review, despite previous assurances from our council consultant that we were not in a Viability Review.
- GSUSA has demanded that GSMIDTN take down its online cookie sales site, claiming that online product sales, including cookies, must be carried out on GSUSA approved internet platforms. GSMIDTN has engaged counsel to respond to this demand.

Notwithstanding each of these new developments, GSMIDTN is still willing to work with GSUSA, as we always have. These scenarios are in addition to at least four prior solutions advanced by GSMIDTN since at least as early as 2017, prior to your taking the Interim CEO role. Each of our prior proposals has been rejected by GSUSA.

Please note that these scenarios provide a conceptual framework but do not attempt to address all points that would need to be addressed in a binding written agreement. Neither this letter nor any communications related to these topics should be construed as constituting a legal offer or as creating binding obligations on behalf of GSMIDTN or GSUSA.

The chart below outlines two scenarios:

**Girl Scouting builds girls of courage, confidence, and character, who make the world a better place.**



**Girl Scouts of Middle Tennessee**
4522 Granny White Pike
Nashville, TN 37204
(615) 383-0490
(800) 395-5318
gsmidtn.org

| | Scenario One | Scenario Two |
|---|---|---|
| **Charter** | Three year | Same as Scenario One |
| **MMSUA** | GSUSA signs subject to the Addendum and Amendment, attached as **Exhibit A** | GSUSA does not sign. GSUSA will permit GSMIDTN to develop an API at GSMIDTN's cost to transmit membership data to GSUSA |
| **CouncilAlignMENT** | GSUSA will agree not to interfere with GSMIDTN's use of CouncilAlignMENT. | GSMIDTN will operate as a "beta" site and will partner with GSUSA and other councils to establish achievable software functionality milestones that can be nationally deployed; GSUSA and GSMIDTN can explore options associated with deploying CouncilAlignMENT or certain portions of it to other councils, filling functionality gaps in the Movement; **Exhibit B** outlines functionality of CouncilAlignment |
| **Financial Terms** | (1) GSUSA will void all outstanding invoices related to membership processing fees; (2) GSMIDTN will remit membership dues balances for all individuals who registered following the 2020 National Council Session; (3) GSUSA will remit all past retail shop e-commerce revenue share that has been withheld by GSUSA since 2010 | Same as Scenario One |
| **Confidentiality** | Agreement will require confidentiality and mutual non-disparagement | Same as Scenario One |
| **Board Representation** | GSMIDTN will be allowed to have a representative join the GSUSA National Board as a director | Same as Scenario One |

My Board Chair and I look forward to hearing how you would propose that we proceed.

Regards,

Agenia

**Girl Scouting builds girls of courage, confidence, and character, who make the world a better place.**



**Girl Scouts of Middle Tennessee**
4522 Granny White Pike
Nashville, TN 37204
(615) 383-0490
(615) 395-5318
gsmidtn.org

Kathy Hopinkah Hannan
Board Chair
Girl Scouts USA
420 Fifth Avenue
New York, NY 10018

January 24, 2019

Dear Kathy:

Thank you for the time you have dedicated to dialog with me and Girl Scouts of Middle Tennessee, Inc. ("GSMIDTN") as we continue to work towards a mutually viable solution for GSMIDTN's adoption of the software package known as the Customer Engagement Initiative ("CEI") as we discussed in New York and as suggested in your note to me of January 9, 2019.

I have shared your e-mail with our Executive Committee, which met on Tuesday, January 15, 2019, to discuss this situation in more detail. In order for GSMIDTN to enter into the Membership Management Systems Use Agreement and Schedules 5, 6, and 7 (collectively, the "CEI Agreements"), we propose the enclosed Addendum and Amendment.

I believe that this proposal will allow both of our organizations to proceed in our missions of serving our girls and volunteers.

GSMIDTN eagerly anticipates a visit and dialogue with GSUSA representatives to demonstrate how the CouncilAlignMENT platform functions seamlessly in a council environment and provides the tools that GSUSA is seeking as a solution for activities registration. GSMIDTN remains willing to being a solution partner and can provide already developed tools.

Additionally, we hope to reach an agreement about the data transmission invoices that GSUSA has sent to GSMIDTN.

I'm looking forward to our next conversation and seeing you again.

Best personal regards.

Yours truly,

John H. Bailey
Board Chair

cc:   Sylvia Acevedo        Loren Chumley        Celeste Patterson
      Amy Berkowitz         LeShane Greenhill    Jennifer Rochon
      Agenia Clark          Lynelle McKay        Vicki Smith

**Girl Scouting builds girls of courage, confidence, and character, who make the world a better place.**

# ADDENDUM AND AMENDMENT

This Addendum and Amendment ("Addendum") is effective as of the ___ day of ___, 2019 ("Effective Date") by and between Girl Scouts of the USA, a federally charted not-for-profit corporation having its principal place of business at 420 5th Avenue, New York, New York 10018 ("GSUSA"), and Girl Scouts of Middle Tennessee, a not-for-profit corporation having its principal place of business at ("Council"), and amends and supplements that certain Membership Management Systems Use Agreement and certain specified schedules thereto executed on the same date as this Addendum (the "Agreement"). Capitalized terms used herein shall have the same meaning as set forth in the Agreement.

1. Notwithstanding anything to the contrary in the Agreement, the parties acknowledge and agree that only three (3) of the original schedules to the Agreement shall apply, namely Schedule 5, Web Platform ("Schedule 5"); Schedule 6, Customer Management Platform ("Schedule 6"); and Schedule 7, Volunteer Toolkit ("Schedule 7") (collectively, the "Agreement Schedules"), all of which shall be subject to certain changes as more fully set forth below.

2. Notwithstanding anything to the contrary in the Agreement, the parties acknowledge and agree that Council may choose to employ a specialist for data analysis in connection with the implementation of the programs described in the Agreement Schedules. The terms and conditions of employment of such specialist, including, but not limited to, initial hiring choice, full- or part-time employment, and employment status (i.e. Council employee or independent contractor) shall at all times be at the sole discretion of Council. Further, notwithstanding anything to the contrary in the Agreement or any Schedule, Council shall have no affirmative obligation to add any additional employees, whether full or part time, or to retain independent contractors, unless it deems appropriate in its sole discretion.

3. The parties acknowledge and agree that nothing contained in the Agreement or any Agreement Schedule shall be construed so as to bar Council from operating such programing systems as Council sees fit in tandem with and/or parallel to those programs described in the Agreement Schedules.

4. Notwithstanding anything to the contrary in the Agreement or any Agreement Schedules, in the event that Council creates or commissions custom material in connection with the programs described in the Agreement Schedules, Council shall retain all ownership interest and rights, including all intellectual property rights, in and to such custom material, regardless of whether such custom materials was created by Council, GSUSA, or any third party.

5. Section 1(b) of the Agreement is amended by replacing the phrase "solely for the Council's internal business" with the phrase "for their intended".

6. Section 1(c) of the Agreement is amended by adding the following additional sentence at the end of this subsection: "For the avoidance of doubt, an Authorized User is not a "third party" as that term is used herein.

7. Section 1(d) of the Agreement is amended by adding the following to the definition of Authorized Users: scouts, parents, and/or other individuals based on their association and involvement with the Council.

8. Section 1(e) of the Agreement is amended by adding the following sentence at the end: "GSUSA shall promptly alert Council in the event it is presented with new or additional terms and conditions by its third-party developers or suppliers or in the event it or its developers or suppliers develop newly applicable terms and conditions.

9.    Notwithstanding anything to the contrary in Section 2 of the Agreement or elsewhere in the Agreement, after the first two (2) years from the Effective Date the Agreement shall renew for a series of one-year terms.  Council shall have the right to terminate the Agreement by providing written notice of its intention to terminate at least ninety (90) days' prior to the expiration of the then-current term.  GSUSA shall have the right to terminate the Agreement by providing written notice of its intention to terminate at least one hundred and eighty (180) days' prior to the expiration of the then-current term.

10.    Section 2(d) of the Agreement is amended by adding the following as a new penultimate sentence:  "In addition, in the event that Council is presented with new or additional terms under subsection 1(e) Council shall have the right to terminate this Agreement (or any applicable Schedule) if it does not wish to accept such terms."

11.    Section 2(f) of the Agreement is amended by adding the following phrase at the end: "; provided, however, that this subsection shall be subject to Council's right to retrieve its data as more fully set forth in Section 5(a)."

12.    Notwithstanding anything to the contrary in Section 3(a) of the Agreement, Council's fees shall be due and payable within thirty (30) days of its actual receipt of any invoice.  Council shall have no obligation to pay any portion of an invoice which is subject to a good faith dispute.

13.    The following sentence is added at the end of Section 4(a) of the Agreement: "Notwithstanding the foregoing, in the event Council requests and pays for development of custom materials under this Agreement or under any Schedule, GSUSA hereby grants to Council a world-wide, royalty-free, perpetual, irrevocable license to use such custom materials and shall ensure that it has the rights under any applicable agreement with any third-party provider to grant such license to Council."

14.    Section 4(a) of the Agreement is amended by adding the following phrase at the end of third sentence: "; provided, however, that GSUSA shall use commercially reasonable efforts to notify Council that it is taking such action to allow Council to protect itself guard against erroneous termination of rights, and for similar purposes."

15.    Section 4(d) of the Agreement is amended by adding the following as a new second sentence. "For the avoidance of doubt, the foregoing limitations shall only apply to such materials as have been provided by GSUSA (or its providers) and not to information otherwise in the possession of GSUSA, specifically including but not limited to documents, reports, data, summaries, spreadsheets or other output of the software created by Council while using the Systems for their intended purposes."

16.    Section 5 of the Agreement is amended by adding the following new subsection (d):  "As between the parties, all information and data provided by Council to GSUSA is the exclusive property of Council.  At any time during the term of this Agreement, Council shall have the right to retrieve any or all of its data then in the possession or control of GSUSA or its vendors without regard to the pendency of any dispute between Council and GSUSA and/or its suppliers.  In no event will GSUSA or its suppliers claim any rights with respect to such data or take any action with respect to such data that is inconsistent with the duties of a bailee for hire."

17.    Section 6(b) of the Agreement is replaced with the following sentence:  "Council agrees to properly secure, back up, and protect the System from intrusion or other improper use by any party."

18.    Section 7(a) of the Agreement is amended by adding the following sentence at the end: "Council shall not be required to make use of any System where it has reasonable good-faith objections to proposed Acceptable Use Policies or subsequent changes thereto."

19.  Section 8 of the Agreement is replaced with the following:

(a)      GSUSA and its licensors hereby warrant and represent that: (i) any and all services provided hereunder shall be performed in a prompt and professional manner by qualified personnel; (ii) the Systems shall perform in accordance with their respective Schedules and the documentation provided therewith; (iii) the party providing the System, including all intellectual property contained therein, has the absolute right to sell, provide and license the materials to Council as contemplated herein; (iv) Council's use of the Systems and all underlying components provided by GSUSA or its suppliers shall not infringe or misappropriate the patent, trademark, trade secret, copyright, or other intellectual property right of any third party; (v) they shall comply with the provisions of the Children's Online Privacy Protection Act, where applicable; and (vi) no portion of any System shall include or introduce into Council's equipment any malicious code however described, including but not limited to, a virus, worm, time bomb, Trojan horse, back door, turn off instruction, or ransomware.

(b)      EXCEPT AS SET FORTH HEREIN, GSUSA AND ITS LICENSORS PROVIDE THE SERVICES AND SYSTEMS ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED. GSUSA AND ITS LICENSORS EXPRESSLY DISCLAIM THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

20.  Section 9(a) of the Agreement is amended by adding the following at the end of the first sentence:  "; provided, however, that requirements that dictate the acquisition of equipment, including computers or peripheral devices, or additional telecommunications capabilities will be provided in advance so that Council can prepare on budgetary and other bases for the acquisition."

21  Section 10(a) of the Agreement is amended by replacing the first reference to "GSUSA" in the second sentence with the phrase "EITHER PARTY".  This section is further amended by adding the following sentence at the end:  "THE FOREGOING LIMITATION SHALL NOT APPLY TO ANY INDEMNITY  OBLIGATION  HEREUNDER,  ANY  ACTS  CONSTITUTING  WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, OR ANY BREACH OF EITHER PARTY'S CONFIDENTIALITY OBLIGATIONS."

22.  Section 12 of the Agreement is amended by adding the following new subsections (b) and (c):

(b)  GSUSA agrees to indemnify and hold Council and its Authorized Users, and it or their subsidiaries, affiliates, officers, agents, partners, and employees, harmless from any claim, action, demand, loss or damages (including reasonable attorneys' fees) arising out of or related to this Agreement or GSUSA's breach of its warranties and representations hereunder, specifically including but not limited to any claim that Council's or its Authorized Users' use of the Services and the Systems violates the intellectual property rights of any third party.

(c)  GSUSA and its suppliers shall maintain insurance sufficient to meet its indemnification obligations hereunder.  At a minimum, such insurance shall include: (i) comprehensive general liability insurance, with per occurrence limits and aggregate limits (including any excess or umbrella coverage) of not less than $1 million and $3 million, respectively (ii) such workers' compensation and other employers' liability insurance as may be required by the applicable jurisdiction, and (iii) cyber liability insurance, or functionally similar coverage relating to (a)

errors and omissions liability, (b) network and information security liability, and (c) communications and media liability, with a limit of $1,000,000 per occurrence.

## SCHEDULE 5 — WEB PLATFORM

23.   Notwithstanding anything to the contrary in the Agreement or Schedule 5, Council shall not be required to deploy the Web Platform until it includes the functionality described on <u>Schedule A</u> attached hereto, which functionality is already currently available on Council's current platform.  If such functionality is not achieved on or before January 1, 2021, Council shall have no obligation to enter into Schedule 5 and its decision not to do so shall not have any adverse effect on its Charter, without regard to the terms of the Blue Book or GSUSA policies.

24.   Section C(2) is amended by deleting the second sentence.

25.   Section C3. [OPEN ISSUE — we are currently determining the scope of the data that we currently collect  in order to confirm whether or not it is within the parameters.]

26.   Section C(4) is amended to add the following sentence at the end:  "This information shall be used only in connection with Council's access to and use of the Customer Engagement Platform."

27.   Section C(8) is amended by placing a period after the word "laws" and deleting the remainder of the sentence.

28.   Section D(2) is amended to add the following sentence at the end:  "Such fee increases shall only be applied to Council in the event they are equally applied (i) to all other councils which have executed a schedule (or other form of agreement) covering the subject matter of this Schedule 5, and (ii) upon not less than one hundred twenty (120) days' notice to Council."

29.   Section F(4) is replaced with the following:  "Each party ("Indemnitor") agrees to indemnify and hold harmless the other party for any claim, action, demand, loss or damages (including reasonable attorneys' fees) that arises out of the acts or omissions of Indemnitor, its employees, contractors, agents, members, volunteers or vendors with respect to the Web Platform or its content, data or website."

30.   Section F(6) is amended to add the following sentence: "GSUSA shall maintain Network Security/Privacy Liability Insurance in the amount of not less than $10,000,000."

31.   Section F(10) is amended by adding the following sentence:  "In the event any such use, whether in compliance with such policies or the Blue Book, result in third-party claims against Council, the GSUSA shall indemnify Council as set forth above."

32.   Section H(5) is amended to read as follows: "Council acknowledges and agrees that in the event of any suspected or actual loss, misuse or unauthorized access to or acquisition or disclosure of confidential or personal data (hereafter, "Incident"), GSUSA may exercise its right in its sole discretion to develop and manage a national and cross-Council uniform response (the "Response") including involving such third party technical, legal, auditing, and other resources as it deems appropriate in its sole discretion.  Notwithstanding the foregoing, Council shall have the right to undertake any actions it reasonably believes to be necessary to limit further intrusion, to protect its Authorized Users, to remediate any damages, to defend claims, and to comply with any applicable law or regulation.  Council agrees to cooperate with GSUSA in formulating and undertaking the Response and to make available to GSUSA in a timely manner appropriate details of the Incident."

33. Section I(1) is amended by adding the following sentence: "GSUSA has obtained commitments from its vendors regarding performance and availability of the Web Platform and has provided those standards to Council."

34. Section I(2) is amended by adding the following phrase at the end: "; provided, however, that GSUSA shall provide at least forty-eight (48) hours advance written notice of any such suspension of access that is anticipated to last more than four (4) hours."

## SCHEDULE 6 -- CUSTOMER ENGAGEMENT PLATFORM

35. Section F(7) is amended by adding the following sentence: "In the event any such use, whether in compliance with such policies or the Blue Book, result in third-party claims against Council, the GSUSA shall indemnify Council as set forth above."

36. Section I(1) is amended by adding the following sentence: "GSUSA has obtained commitments from its vendors regarding performance and availability of the Web Platform and has provided those standards to Council."

## SCHEDULE 7 -- VOLUNTEER TOOLKIT

37. Section A is amended by adding the following phrase to the end of the first sentence: "throughout the K-12 Girl Scout program."

38. Section C(1) is amended by adding the following sentence: "This information shall be used only in connection with Council's access to and use of the Customer Engagement Platform."

39. Section D(2) is amended to add the following sentence at the end: "Such fee increases shall only be applied to Council in the event they are equally applied to all other councils which have executed a schedule (or other form of agreement) covering the subject matter of this Schedule 7."

40. Section D(3) is replaced with the following sentence: "In the event GSUSA terminates this Schedule 7 for Council's material breach in accordance with Section E below, all bona fide fees due up until the effective date of termination shall be paid by Council."

41. Section F(1) is replaced with the following: "Each party ("Indemnitor") to indemnify and hold harmless the other party for any claim, action, demand, loss or damages (including reasonable attorneys' fees) that arises out of the acts or omissions of Indemnitor, its employees, contractors, agents, members, volunteers or vendors with respect to Volunteer Toolkit or its content or data."

42. Section F(7) is replaced with the following: "GSUSA shall have the right to modify the Volunteer Toolkit and the functionality therein at any time upon notice to Council. Additionally, GSUSA shall have the right to add to, modify or delete any provision of this Schedule 7. GSUSA shall notify Council of any change to either the Volunteer Toolkit or this Schedule 7 by providing Council thirty (30) days' prior written notice of such changes by email. If GSUSA modifies the Volunteer Toolkit or this Schedule 7 and such modification has a material adverse impact on Council's ability to use the Volunteer Toolkit, as determined by Council in its sole discretion, Council may, upon  thirty (30) days' notice, terminate, without penalty, this Schedule 7."

43. Section H(2) is amended by adding the following phrase at the end: "; provided, however, that GSUSA shall provide at least forty-eight (48) hours advance written notice of any such suspension of access that is anticipated to last more than four (4) hours."

44.   Section H(1) is amended by adding the following sentence:  "GSUSA has obtained commitments from its vendors regarding performance and availability of the Web Platform and has provided those standards to Council."

45.   Section H(3) is replaced with the following:  "Council acknowledges and agrees that in the event of any suspected or actual loss, misuse or unauthorized access to or acquisition or disclosure of confidential or personal data (hereafter, "Incident"), GSUSA may exercise its right in its sole discretion to develop and manage a national and cross-council uniform response (the "Response") including involving such third party technical, legal, auditing, and other resources as it deems appropriate in its sole discretion.   Notwithstanding the foregoing, Council shall have the right to undertake any actions it reasonably believes to be necessary to limit further intrusion, to protect its Authorized Users, to remediate any damages, to defend claims, and to comply with any applicable law or regulation.  Council agrees to cooperate with GSUSA in formulating and undertaking the Response and to make available to GSUSA in a timely manner appropriate details of the Incident."

All other terms of the Agreement shall remain in full force and effect and are incorporated and republished herein by reference.  In the event of any conflict between the terms of the Agreement and this Addendum, the terms of this Addendum shall control. This Addendum may be executed in multiple counterparts and by facsimile signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment and Addendum on the date set forth above.

**GIRL SCOUTS OF THE USA**                    **GIRL SCOUTS OF MIDDLE TENNESSEE**

By:_____                    By:_____
   **[Name]**                                        **[Name]**


   _____                       _____
   **[Title]**                                        **[Title]**

<u>SCHEDULE A</u>

Web Platform Functionality

1. *General Web Platform Usage*. The Web Platform shall allow general audience users of the website to:

> (i) explore webpages and return to previous webpages;

> (ii) register adults and Council members in one online transaction;

> (iii) find a Girl Scouts troop by searching zip code and radius; and

> (iv) create an user account.

Additionally the Web Platform shall allow Council to port and store historical data for at least, but in no event less than, [__15__] years.

2. *Council Data Integration*. The Web Platform shall provide the following functionality for each applicable type of user:

> (i) for service units, the Web Platform shall allow the user to:
> - view troop, Council members', and adults' profiles,
> - run listing reports,
> - run count reports, and
> - send communications;

> (ii) for Council troop leaders, the Web Platform shall allow the user to:
> - view troop rosters,
> - register and pay for activities,
> - track badges and awards,
> - organize yearly planning, and
> - send communications;

> (iii) for parents and girls, the Web Platform shall allow the user to:
> - register and pay for activities,
> - receive announcements,
> - view volunteer opportunities,
> - view meetings and messages, and
> - take surveys;

> (iv) for council members, the Web Platform shall allow the user to:
> - assign user access,
> - set up and manage activities,
> - enter registrations and payments, and
> - send communications.

3. *Council Programs and Events*. The Web Platform shall provide the following functionality for Council program and event management:

> (i) for program and event set-up, the Web Platform shall allow the user to:
> - create an event and set a venue,
> - set capacity and fees,
> - set age groups for attendance,

- manage badge and patch awards,
- create pre-event survey questions, and
- send communications;

(ii) for program and event registration, the Web Platform shall allow parents and troop leaders to:
- register and pay online,
- interact with pre-event survey questions, and
- manage event-related fees;

(iii) for program and event management, the Web Platform shall allow users to:
- manage the event date, attendee list and creation of final attendee list, waiting list, payment reminders, payment history, and audit trail,
- automatically manage assignment of badges, awards, and patches to girls,
- view and manage survey question results, and
- send communications; and

(iv) for program and event data reports, the Web Platform shall allow the user to:
- view and manage fees related to the event, event waiting lists, survey and pre-event question results, and final attendance numbers and lists of attendees, and
- generate year-to-year comparisons of these statistics.

4.   *Council Camps*.   The Web Platform shall provide the following functionality for GSMIDTN camp management:

(i) for initial camp set-up, the Web Platform shall allow the user to:
- create the program and session information,
- input housing units, capacities, fees, and attendee requirements (i.e. age groups),
- input camp planning tools,
- input fee and financial information, including possible discounts, manage badges, awards, and patches information, and
- send communications;

(ii) for camp registration, the Web Platform shall allow parents to:
- register and pay online, and
- manage camp-related fees;

(iii) for camp management, the Web Platform shall allow users to:
- manage the camp date, attendee list and creation of final attendee list, waiting list, payment reminders, payment history, and audit trail,
- automatically manage assignment of badges, awards, and patches to girls, and
- send communications; and

(iv) for camp data reports, the Web Platform shall allow the user to:
- view and manage fees related to the camp (including unpaid balances, deposits, over-payments, and total revenue), camp waiting lists and cancellations, survey and pre-camp question results, and final attendance numbers and lists of attendees, and
- generate year-to-year comparisons of these statistics.

5.   *Council Adult Training Sessions*.   The Web Platform shall provide the following functionality for GSMIDTN adult training session management:

(i) for initial training session set-up, the Web Platform shall allow the user to:
- create the program and session information, capacities, and fees,

- input fee and financial information,
- generate pre-training survey questions, and
- send communications;

(ii) for training session registration, the Web Platform shall allow parents to:
- register and pay online,
- interact with pre-training survey questions, and
- manage training-related fees;

(iii) for training session management, the Web Platform shall allow users to:
- manage the session date, attendee list and creation of final attendee list, waiting list, payment reminders, payment history, and audit trail,
- interact with survey question results, and
- send communications; and

(iv) for training session data reports, the Web Platform shall allow the user to:
- view and manage fees related to the training session (including unpaid balances, over-payments, and total revenue), session waiting lists and cancellations, pre-training survey question results, and final attendance numbers and lists of attendees, and
- generate year-to-year comparisons of these statistics.

6.  *Council Teen Mentoring*.  The Web Platform shall provide the following functionality for GSMIDTN teen mentoring session management:

(i) for initial mentoring session set-up, the Web Platform shall allow the user to:

- create the program and session information, capacities, and fees,
- input fee and financial information, generate pre-mentoring survey questions, and
- send communications;

(ii) for training session registration, the Web Platform shall allow parents to:

- register and pay online,
- interact with pre-mentoring survey questions, and
- manage session-related fees;

(iii) for mentoring session management, the Web Platform shall allow users to:

- manage the session date, attendee list and creation of final attendee list, waiting list, payment reminders, payment history, and audit trail,
- automatically associate awards and service hours with GSMIDTN members, and
- interact with survey question results, and send communications; and

(iv) for mentoring session data reports, the Web Platform shall allow the user to:

- view and manage fees related to the mentoring session (including unpaid balances, over-payments, and total revenue), session waiting lists and cancellations, pre-training survey question results, and final attendance numbers and lists of attendees, and
- generate year-to-year comparisons of these statistics.

7.  *Council Properties*.  The Web Platform shall provide the following functionality for Council properties management:

(i) for initial properties session set-up, the Web Platform shall allow the user to:
- create the program and session information, capacities, and fees,
- input fee and financial information,

- generate survey questions, and
- send communications;

(ii) for training session registration, the Web Platform shall allow parents and troop leaders to:
- register and pay online,
- interact with pre-mentoring survey questions, and
- manage session-related fees;

(iii) for reservation management, the Web Platform shall allow users to:
- manage, add, cancel, or change dates and activities, attendee list and creation of final attendee list, waiting list, adult training requirements, payment reminders, payment history, and audit trail,
- interact with survey question results, and
- send communications; and

(iv) for final mentoring session data reports, the Web Platform shall allow the user to:
- view and manage fees related to the mentoring session (including unpaid balances, over-payments, and total revenue), property usage, waiting lists and cancellations, survey question results, and final attendance numbers and lists of attendees, and
- generate year-to-year comparisons of these statistics.

8.    *Council Alumni*.  The Web Platform shall provide the following functionality for Council alumni users and Council alumni information management:

(i) the Web Platform shall bridge 12th grade members to adults and move lapsed members to adults, and

(ii) the Web Platform shall additionally:
- link member history to the member's adult record,
- track all alumni members,
- create and report on alumni demographics, including colleges attended and declared college majors, and
- send communications via text, voice, and email.

9.    *Council Communications*.   The Web Platform shall provide the following functionality for council staff, service unit leaders, and troop leaders:

(i) such users shall be able to select any individual or group and send communications via internal message, email, text, or voice,

(ii) such users shall be able to send communications to any individual listed on any generated report, and

(iii) such users shall be able to manage module placement and communication integration.

10.    *Council Reports*.  The Web Platform shall enable users to:
- generate standard module reports,
- provide a custom report writer, including lists of individuals, count reports, crosstab reports, and year-to-year statistical comparisons,
- create reports with user-friendly selection of data fields,
- include or exclude features,
- determine output and display sort order for each column in report,
- save any report to any module landing page, and
- share any report with any council user.

**EXHIBIT B**

Girl Scouts of Middle Tennessee

Software Platform *
*"CouncilAlignMENT"*

## PROFILES
- Ability for user to edit profile
- Ease of password reset and username
- Ability to pay for all related events on profile
- All modules are linked to our accounting software and GL
- Pick a troop near your address, school, church, work

## MEMBERSHIP
- Parents/Guardians can pay fees or Troop Leader
- Registration as individual or by a troop leader
- Pay as a troop or individual
- Financial Aid
- Online background check for adults and leaders
- Ability for troop leaders to text, email or voice message members of the troop
- Ability to accept donations to Gift to Girls – Family Campaigns
- Module Reports
- Tracking to goals

## PROGRAMS
- Calendar of programs, by age, etc
- Ability to register as a troop, per girl very flexible
- Waiting lists
- Pay partial/installments or all at once
- Electronic Invoice
- Ability to provide health and other important info
- Pick a t-shirt size
- Ask Event questions
- Reminders other event info

## VOLUNTEER
- Volunteer Playbook
- Track badges, awards for girls and adults
- Track service hours
- Set number of troop openings
- Select meeting site
- Upload forms
- Provide feedback
- Send out communications
- View all members of troop
- background check

## CAMPS/ ACTIVITIES
- All of above
- Retain all camp history
- Ability to qualify with "requirements" to attend
- Camp Staff can pull rosters
- Communicate directly with Parents
- Require a deposit
- Offer discounts such as a holiday or military discount
- Themed camps
- Ability to see all personal info for camper
- Trading Post

## PROPERTY/ ACTIVITIES
- SU or Troop reservations
- Electronic billing, deposit payment
- Block properties for certain times needed
- Property Waiver electronic signing
- Ability to reserve certain units or all of camp
- Reserve activities, such as tree climbing, canoes etc
- Send reminders and other important paperwork
- Volunteers update rosters

## ALUMNI
- Girls automatically flip to alum

## MOBILE APP
- Ability to all of the above via our mobile app

*NOT ALL INCLUSIVE
March 2021

| STATE OF TENNESSEE 20TH JUDICIAL DISTRICT CHANCERY COURT | **SUMMONS** | CASE FILE NUMBER 21-0388-II |
|---|---|---|
| PLAINTIFF GIRL SCOUTS OF MIDDLE TENNESSEE, INC. | | DEFENDANT GIRL SCOUTS OF THE UNITED STATES OF AMERICA |

TO:   (NAME AND ADDRESS OF DEFENDANT)

GIRL SCOUTS OF THE UNITED STATES OF
AMERICA
420 Fifth Avenue
New York, New York  10018

Method of Service:

☑ Certified Mail
☐ Davidson Co. Sheriff
☐ *Comm. Of Insurance
☐ *Secretary of State
☐ *Out of County Sheriff
☐ Private Process Server
☐ Other
                    *Attach Required Fees

List each defendant on a separate summons.

**YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU.  YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW.  IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff or plaintiff if filing Pro Se: (Name, address & telephone number) Laura P. Merritt (BPR #026482) Karolyn Perry (BPR #036900) Waller Lansden Dortch & Davis, LLP 511 Union St., Ste. 2700 Nashville, TN  37219 (615) 244-6380 | FILED, ISSUED & ATTESTED FOR CLERK USE ONLY       04-29-2021 **MARIA M. SALAS, Clerk and Master** By:              1 Public Square                    Suite 308                    Nashville, TN 37201  /s/ Bettie Ross **Deputy Clerk & Master** |

**NOTICE OF DISPOSITION DATE**

The disposition date of this case is twelve months from date of filing.  The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | **Sheriff** |

**\*\*\*Submit one original plus one copy for each defendant to be served.**

⚲ADA Coordinator, Maria M. Salas (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows:  (Name of Party Served) _____

☐ Served _____ ☐ Not Found _____
☐ Not Served _____ ☐ Other _____

| DATE OF RETURN: | By: |
|---|---|
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to

the defendant _____. On the _____ day of _____, 20___, I received the return

receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| **Sworn to and subscribed before me on this _____ day of _____ _____, 20___.**<br>Signature of _____ Notary Public or _____ Deputy Clerk<br><br><br>My Commission Expires: | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
|---|---|

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

 Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment.  If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court.  The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list.  Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them.  If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

 Mail list to:  Clerk & Master
      1 Public Square
      Suite 308
      Nashville TN 37201

Please state file number on list.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

## CERTIFICATION (IF APPLICABLE)

| I, Maria M. Salas, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case. | MARIA M. SALAS, Clerk & Master<br><br>By: */s/ Bettie Ross*<br>            D.C. & M. |
|---|---|

## IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## 20TH JUDICIAL DISTRICT, DAVIDSON COUNTY

## PART II – BUSINESS COURT DOCKET

| | |
|---|---|
| **GIRL SCOUTS OF MIDDLE TENNESSEE, INC.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 21-0388-II** |
| ) | |
| **GIRL SCOUTS OF THE UNITED STATES OF AMERICA** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## REQUEST FOR DESIGNATION TO THE BUSINESS COURT DOCKET

Girl Scouts of Middle Tennessee, Inc., through Counsel or self-represented, requests that the above styled Case filed on April 29, 2021 in the Chancery Court of Davidson County be transferred by the Chief Justice of the Tennessee Supreme Court to the Business Court Docket.

Counsel or self-represented party, in good faith and based on information reasonably available, has completed and filed herewith the attached checklist certifying that the Case meets the eligibility criteria set forth in the Tennessee Supreme Court *Order Establishing the Davidson County Business Court Docket Pilot Project - Phase 2.*

/s/ *Laura P. Merritt*
Counsel or Self-represented Party

---

## FOR BUSINESS COURT DOCKET JUDGE USE ONLY

I ☐ Recommend ☐ Decline to Recommend that this Case is eligible for transfer to the Business Court Docket.

Signature of Business Court Docket Judge                          Date

4817-9198-4359.1

## REQUEST FOR DESIGNATION TO THE BUSINESS COURT DOCKET

## CHECKLIST

In certifying that this case meets the eligibility criteria for transfer to the Business Court Docket, please check below the applicable boxes. To be eligible, the case must fit within items 1 and 2, and one or more subsections of item 3.

☒ 1. This lawsuit was filed on or after May 1, 2017; and

☒ 2. Compensatory damages of at least $250,000 are alleged, or this lawsuit seeks primarily injunctive or declaratory relief; and

3. This lawsuit:

☒ Relates to the governance or internal affairs of businesses (i.e., corporations, limited liability companies, general partnerships, limited liability partnerships, sole proprietorships, professional associations, real estate investment trusts, and joint ventures), including the rights or obligations of shareholders, officers, directors, partners, and members, or the liability or indemnity of officers, directors, managers, trustees or partners.

☒ involves claims of breach of fiduciary duty or statutory violations between businesses arising out of business transactions or relationships.

☐ involves a commercial class action.

☒ arises from technology licensing agreements, including software and biotechnology licensing agreements, or any agreement involving the licensing of any intellectual property right, including patent rights.

☒ involves antitrust, trade secrets, trademark law, or securities-related actions.

☒ involves claims that present sufficiently complex commercial issues that would have significant implications for the larger business community, including but not limited to cases with subject matter that technically would render the case "Excluded" pursuant to Section 2 of the Business Court Docket Eligibility Criteria, as recommended by the Business Court Judge and as determined within the discretion of the Chief Justice.

Form for Davidson County Chancery Court Case

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2021, a true and exact copy of the foregoing was served via U.S. Certified Mail, return receipt requested, upon the following:

Girl Scouts of the United States of America
420 Fifth Avenue
New York, NY 10018

*/s/ Laura P. Merritt* _____

**IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY**

| | | |
|---|---|---|
| **GIRL SCOUTS OF MIDDLE TENNESSEE, INC.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 21-0388-II** |
| **GIRL SCOUTS OF THE UNITED STATES OF AMERICA,** | ) ) ) | |
| **Defendant.** | ) ) | |

## NOTIFICATION OF PROOF OF SERVICE OF PROCESS

Your *Request for Designation* to the Business Court Docket Pilot Project – Phase 2 has

been received by this office.  Proof of service of process on the defendant, however, has not yet

been filed.  When proof of service of process on the defendant in this matter has been filed, please

contact Megan Broadnax at (615) 862-5720 and this Court will proceed to review your *Request*

*for Designation* and submit it to the Chief Justice.

*s/Anne C. Martin*

ANNE C. MARTIN
CHANCELLOR
BUSINESS COURT DOCKET
PILOT PROJECT

cc by U.S. Mail, email, or efiling as applicable to:

Laura P. Merritt, Esq.
Karolyn Perry, Esq.
Waller Lansden Dortch & Davis, LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
laura.merritt@wallerlaw.com
karolyn.perry@wallerlaw.com

Girl Scouts of the United States of America
420 Fifth Avenue
New York, NY 10018

**IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE**
**20TH JUDICIAL DISTRICT, DAVIDSON COUNTY**

| | |
|---|---|
| **GIRL SCOUTS OF MIDDLE TENNESSEE, INC.** )<br><br>**Plaintiff,** )<br><br>v. )<br><br>**GIRL SCOUTS OF THE UNITED STATES OF AMERICA** )<br><br>**Defendant.** ) | **Case No. 21-0388-II** |

**NOTICE OF FILING WAIVER OF SERVICE OF SUMMONS**

Plaintiff Girl Scouts of Middle Tennessee, Inc. gives notice of the filing of the Waiver of

Service of Summons, attached hereto as Exhibit A.

Respectfully submitted,

/s/ Laura P. Merritt
Laura P. Merritt (BPR No. 026482)
Karolyn Perry (BPR No. 036900)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Phone: 615-244-6380
Fax: 615-244-6804
Email: laura.merritt@wallerlaw.com
Email: karolyn.perry@wallerlaw.com

*Attorneys for Plaintiff Girl Scouts of
Middle Tennessee, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon the following counsel via United States Mail, postage prepaid, with a courtesy copy sent via electronic mail, on May 6, 2021:

Benjamin E. Horowitz, Esq.
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001

*Attorney for Defendant Girl Scouts of the United States of America*

/s/ Laura P. Merritt

# EXHIBIT A

# WAIVER OF SERVICE OF SUMMONS

TO: Laura P. Merritt, counsel for Girl Scouts of Middle Tennessee, Inc.

I acknowledge receipt of your request that I waive service of a summons in the action of *Girl Scouts of Middle Tennessee, Inc. v. Girl Scouts of the United States of America*, which is civil action number 21-0388-II in the Chancery Court for Davidson County, Tennessee. I have also received a copy of the complaint in the action, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by Rule 4.

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me (or the party on whose behalf I am acting) if an answer or motion under Rule 12 is not served upon you within 60 days after May 5, 2021.

| 5/5/2021 | /s/ Benjamin E. Horowitz |
|----------|--------------------------|
| Date | Signature |

Printed/typed name:
Benjamin E. Horowitz, Venable LLP

as  counsel for Girl Scouts of the United States of America

of _____.

**Duty to Avoid Unnecessary Costs of Service of Summons**

Rule 4 of the Tennessee Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons and the complaint. A defendant located in the United States who, after being notified of an action and asked by a plaintiff located in the United States to waive service of a summons, fails to do so will be required to bear the cost of such service unless good cause be shown for the failure to sign and return the waiver.

It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property. A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney (or unrepresented plaintiff) a response to the complaint and must also file a signed copy of the response with the court. If the answer or motion is not served within this time, a default judgment may be taken against that defendant. By waiving service, a defendant is allowed more time to answer than if the summons had been actually served when the request for waiver of service was received.

**IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE**
**20TH JUDICIAL DISTRICT, DAVIDSON COUNTY**

## PART II – BUSINESS COURT DOCKET

| | |
|---|---|
| GIRL SCOUTS OF MIDDLE TENNESSEE, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 21-0388-II |
| | ) |
| GIRL SCOUTS OF THE UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| Defendant. | ) |

### REQUEST FOR DESIGNATION TO THE BUSINESS COURT DOCKET

Girl Scouts of Middle Tennessee, Inc., through Counsel or self-represented, requests that the above styled Case filed on April 29, 2021 in the Chancery Court of Davidson County be transferred by the Chief Justice of the Tennessee Supreme Court to the Business Court Docket.

Counsel or self-represented party, in good faith and based on information reasonably available, has completed and filed herewith the attached checklist certifying that the Case meets the eligibility criteria set forth in the Tennessee Supreme Court *Order Establishing the Davidson County Business Court Docket Pilot Project - Phase 2*.

/s/ *Laura P. Merritt*
Counsel or Self-represented Party

---

### FOR BUSINESS COURT DOCKET JUDGE USE ONLY

I ☒ Recommend ☐ Decline to Recommend that this Case is eligible for transfer to the Business Court Docket.

Signature of Business Court Docket Judge     5.11.21   Date

4817-9198-4359.1

**REQUEST FOR DESIGNATION TO THE BUSINESS COURT DOCKET**

**CHECKLIST**

        In certifying that this case meets the eligibility criteria for transfer to the Business Court Docket, please check below the applicable boxes. To be eligible, the case must fit within items 1 and 2, and one or more subsections of item 3.

☒  1.  This lawsuit was filed on or after May 1, 2017; and

☒  2.  Compensatory damages of at least $250,000 are alleged, or this lawsuit seeks primarily injunctive or declaratory relief; and

     3.  This lawsuit:

☒  Relates to the governance or internal affairs of businesses (i.e., corporations, limited liability companies, general partnerships, limited liability partnerships, sole proprietorships, professional associations, real estate investment trusts, and joint ventures), including the rights or obligations of shareholders, officers, directors, partners, and members, or the liability or indemnity of officers, directors, managers, trustees or partners.

☒  involves claims of breach of fiduciary duty or statutory violations between businesses arising out of business transactions or relationships.

☐  involves a commercial class action.

☒  arises from technology licensing agreements, including software and biotechnology licensing agreements, or any agreement involving the licensing of any intellectual property right, including patent rights.

☒  involves antitrust, trade secrets, trademark law, or securities-related actions.

☒  involves claims that present sufficiently complex commercial issues that would have significant implications for the larger business community, including but not limited to cases with subject matter that technically would render the case "Excluded" pursuant to Section 2 of the Business Court Docket Eligibility Criteria, as recommended by the Business Court Judge and as determined within the discretion of the Chief Justice.

Form for Davidson County Chancery Court Case

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2021, a true and exact copy of the foregoing was served via U.S. Certified Mail, return receipt requested, upon the following:

Girl Scouts of the United States of America
420 Fifth Avenue
New York, NY 10018

/s/ *Laura P. Merritt*

cc by U.S. Mail, email, or efiling as applicable to:

Laura P. Merritt, Esq.
Karolyn Perry, Esq.
Waller Lansden Dortch & Davis, LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
laura.merritt@wallerlaw.com
karolyn.perry@wallerlaw.com

Benjamin E. Horowitz, Esq.
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
behorowitz@Venable.com

**FILED**
05/14/2021
Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE

## IN RE: REQUEST FOR DESIGNATION TO THE BUSINESS COURT PILOT PROJECT IN DAVIDSON COUNTY CHANCERY COURT

### CASE NO. 21-0388-II
### GIRL SCOUTS OF MIDDLE TENNESSEE, INC. v.
### GIRL SCOUTS OF THE UNITED STATES OF AMERICA

_____

### No. ADM2017-00638

_____

### ORDER TRANSFERRING CASE TO
### THE BUSINESS COURT PILOT PROJECT

It is ORDERED that the above-referenced case shall be transferred to the Business Court Docket Pilot Project.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

**E-FILED**
**5/18/2021 9:11 AM**
**CLERK & MASTER**
**DAVIDSON CO. CHANCERY CT.**

**IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY**

| | | |
|---|---|---|
| **GIRL SCOUTS OF MIDDLE TENNESSEE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-0388-BC** |
| | ) | |
| **GIRL SCOUTS OF THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>BUSINESS COURT NOTICE</u>

This case has been transferred from Chancery Court Part II to the Davidson County Business Court Pilot Project. On all future filings, use the above caption, in particular the "BC" at the end of the case number.

Additionally, an important procedure in the Pilot Project is to conduct a Rule 16 Conference early in the case but after issues have been joined. Accordingly, the timing on holding the Conference varies with each case depending on whether the case leads off with an application for extraordinary relief, a Rule 12 motion, a counterclaim and/or third party complaint, or a complaint and answer. To set the Rule 16 Conference, the Court monitors the filings in the case, and when the Court sees preliminary issues have been dealt with, the issues are joined, and it is meaningful to prepare a litigation schedule, then the Docket Clerk contacts Counsel to select a date for the Conference. Also, attached are some instructions pertaining to the Pilot Project.

*s/Anne C. Martin*

ANNE C. MARTIN
CHANCELLOR
BUSINESS COURT DOCKET
PILOT PROJECT

cc by U.S. Mail, email, or efiling as applicable to:

Laura P. Merritt, Esq.
Karolyn Perry, Esq.
Waller Lansden Dortch & Davis, LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
laura.merritt@wallerlaw.com
karolyn.perry@wallerlaw.com

Benjamin E. Horowitz, Esq.
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
behorowitz@Venable.com

2

1. <u>Party Attendance at Rule 16 Conference</u>. The provision in the *Guide to the Business Court* that parties attend the Case Litigation Plan Conference has been shown to be logistically difficult and results in delay due to scheduling conflicts. For these reasons, client attendance at the Conference is not required but is certainly welcomed.

2. <u>Setting Motion Hearings</u>. For processing motions, Counsel, in the first instance shall docket the motion for hearing on a regular Friday docket or for an expedited hearing by stating at the end of the motion the docket date and text provided in Local Rule 26 and following the procedures stated therein. If the Court, through its case monitoring, determines to customize the process, such as by deciding the motion on the papers or combining it with a hearing on other matters or specially setting oral argument, the Docket Clerk will notify Counsel.

3. <u>Bundling Motions</u>. In monitoring filings, the Court may adjust docket settings to, where feasible, schedule various matters to be heard at one hearing.

4. <u>Court reporters</u>. From time to time the Court may conduct oral argument or Rule 16 Conferences by telephone. Even though the medium is less formal, the content of the proceedings is binding. Accordingly, if Counsel wishes to have a court reporter transcribe the proceedings, the court reporter should come to the Court office to record the proceedings at that location.

5. <u>Last Part of Local Rule § 26.04(b) to File Copies of Cases Not Required</u>. It is not necessary for Counsel to provide the Court a copy of unreported Tennessee decisions, out-of-state cases, or federal decisions cited in their briefs as instructed in the last part of Local Rule § 26.04(b).

6. <u>Business Court Website</u>. For links to *Guide to the Business Court*, and Business Court Decisions, go to the website TNcourts.gov/bizcourt, and click on these links.