# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| GIRL SCOUTS OF MIDDLE TENNESSEE, INC., ) ) ) | |
| Plaintiff, ) ) | NO. 3:21-cv-00433 |
| v. ) ) | JUDGE CAMPBELL |
| ) | MAGISTRATE JUDGE FRENSLEY |
| GIRL SCOUTS OF THE UNITED ) STATES OF AMERICA, ) ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiff Girl Scouts of Middle Tennessee's ("GSMT") Motion for a Preliminary Injunction. (Doc. No. 34). Defendant Girl Scouts of the United States of America ("GSUSA") filed a Response (Doc. No. 41) and a supplement to that response (Doc. No. 61). GSMT filed a Reply. (Doc. No. 52). The Court held a hearing on the pending motion on October 8, 2021. For the reasons stated herein, Plaintiff's motion for a preliminary injunction is **DENIED**.

## I. FACTUAL BACKGROUND

The case before the Court involves a dispute between two nonprofit corporations. GSUSA is a Congressionally chartered nonprofit that licenses over one hundred local nonprofit councils to establish local Girl Scout programs. (Am. Compl., Doc. No. 17 ¶¶ 2,9). GSUSA licenses these local nonprofits through a charter agreement. (*Id*. ¶¶ 9,13). The licensed nonprofits are separate legal entities, incorporated in the state in which they operate. (*Id*. ¶¶ 1, 9). GSMT is one such local nonprofit offering Girl Scout programming in Middle Tennessee. (*Id*.) GSUSA renews the

charters licensing these local councils at set intervals. Before this dispute arose, GSMT's charter had been consistently renewed for three-year periods. (*Id*. ¶ 70).

Local councils, like GSMT, are responsible for the development and implementation of programming in their respective jurisdictions. (*Id*. ¶ 12). Their conduct, however, is bound by the GSUSA constitution and other organizational documents contained in the Blue Book of Basic Documents ("Blue Book") (*Id*. ¶¶ 25-27; Batty Decl., Doc. No. 42 ¶ 16). The Blue Book refers to two groups at the executive level of the Girl Scouts organization: the National Board and the National Council. The parties disagree about the authority of the National Board to implement requirements for local councils.

As early as 2014, GSUSA's National Board began implementing an organization-wide transition to a common technology platform. (Swanson Decl., Doc. No. 43 ¶ 10). Between 2014 and 2017, selected local councils across the nation received and tested the technology platform. (*Id*.) Upon completion of the testing period, GSUSA's National Board promulgated Criterion II, Standard 7 for local councils, which was added to the Blue Book and required all councils to use the common technology platform. (*Id*. ¶¶ 13-15). At the time the new standard was promulgated, GSMT was utilizing CouncilAlignMENT, a technology platform that GSMT developed and owns through the business entity Align 3C. (Clark Decl., Doc. No. 53 ¶¶ 30-35).

The dispute over implementation of the GSUSA's platform appears to have begun immediately after the National Board promulgated the new standard and focuses on the terms of the platform contracts. Implementation of GSUSA's common technology platform is two-pronged. Local councils must sign the Customer Engagement Initiative agreements ("CEI agreements") with GSUSA, and then the council may begin using the technology platform. The CEI agreements consist of the Membership Management Systems Use Agreement ("MMSUA") and Schedules

2

attached thereto. (Doc. No. 17 ¶ 43; Doc. No. 17-3). GSMT alleges that the terms of the CEI agreements are problematic in a variety of ways, including because they allow GSUSA to pass costs to GSMT without limit, to change the terms of the contact "at any time," and do not guarantee the availability of certain software features that are important to GSMT operations. (Doc. No. 35 Page ID# 671).

For these and other reasons, GSMT states that the CEI agreements are commercially unreasonable. Dr. Agenia Clark, Chief Executive Officer of GSMT, testified that GSMT is willing to use the technology platform but is not willing to sign the CEI agreements. (Doc. No. 64 PageID# 1424). To that end, parties have engaged in numerous discussions since 2017 about GSMT's objections to the CEI agreements. (Doc. No. 42 ¶ 51).[1] GSMT submitted objections and a proposed addendum to the CEI agreements, which GSUSA rejected. (Doc. No. 64 PageID# 1418, 1449). GSUSA revised the agreements to address some of GSMT's concerns and offered to take on the data migration and training costs associated with the contracts. (Doc. No. 42 ¶ 51). GSMT rejected their offer. (*Id*.). While discussions have been ongoing, the GSMT Board has twice approved a resolution not to sign the CEI agreements, first in 2019 and again in 2021, due to ongoing concerns with the terms of the agreements. (Doc. No. 53 ¶¶ 28-29).

During the pendency of the discussions, GSUSA began renewing GSMT's charter for one-year periods, rather than for three-year periods. (Doc. Nos. 36-2, 36-4, 36-5). Each cover letter to the one-year agreement expresses that the one-year charter period is to provide GSUSA and GSMT with more time to work toward GSMT's adoption of the common technology platform. (*Id*.) When

---

[1] GSMT alleges that the National Board lacks the authority to promulgate and enforce this technology agreement and that the authority rests soundly with the National Council. Notwithstanding that argument, GSMT appears to have communicated exclusively with members of the National Board—not the much larger National Council—when proposing addendums and amendments to the CEI and proposing the potential sale of GSMT's platform to GSUSA. (*See* Doc. Nos. 42-5, 42-6)

3

GSUSA approved GSMT's one-year charter in 2021, it informed GSMT that the National Board was initiating a viability review of GSMT due to its refusal to use the technology platform and sign the necessary agreements, as well as GSMT's alleged failure to pay membership dues and processing fees. (Doc. No. 42-7). The viability review process has since been suspended. (Doc. No. 42 ¶ 72; Doc. No. 64 Page ID# 1369-71). In September 2021, GSUSA renewed GSMT's charter for a six-month term, from January 1, 2022 to June 30, 2022. (Doc. No. 42 ¶28).

GSMT filed suit in Davidson County Chancery Court seeking declaratory judgment as to the authority of the National Board and alleging violations of the Tennessee Nonprofit Fair Asset Protection Act. GSUSA removed the action to this Court. (Doc. No. 1).

## II. LAW AND ANALYSIS

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to issue a preliminary injunction under Federal Rule of Civil Procedure 65, the Court considers: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *See, e.g. Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). While these factors are a balancing test, "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T. v. Sumner Cty. Schools,* 942 F.3d 324, 326-27 (6th Cir. 2019) (internal quotations omitted).

GSMT moves the Court to enter a preliminary injunction to: (1) maintain the status quo of GSMT as a Girl Scout council; (2) bar GSUSA from any retaliatory conduct during the pendency

of the litigation, including a viability review of GSMT; (3) require GSUSA to process registrations from GSMT; (4) bar GSUSA from enforcing a data processing fee against GSMT; (5) restore the positions of GSMT representatives on GSUSA committees; and (6) prohibit GSUSA from taking any punitive action against GSMT related to the refusal of GSMT to use the common technology platform. (Doc. No. 34). GSMT alleges that absent injunctive relief, it will suffer the irreparable harm of no longer being able to provide Girl Scouts programming in Middle Tennessee. The Court will address these requests in two categories: Requests for Specific Relief and Requests for General Relief.

A.  **Requests for Specific Relief**

GSMT requests three forms of specific injunctive relief: that GSUSA process GSMT registrations; that GSUSA be barred from enforcing a data processing fee; and that GSUSA be ordered to reinstate GSMT representatives onto advisory committees. GSUSA represents that all registrations from GSMT have been processed. (Doc. No. 42 ¶ 40). GSMT does not rebut this assertion. The request for injunctive relief related to processing GSMT registrations is therefore moot.

As for the remaining requests, GSMT only generally alleges that the data processing fee and the loss of representation on an advisory committee are evidence of "harmful retaliatory action." (Doc. No. 35 at 14). GSMT has not put forth any argument supporting the notion that they will suffer irreparable harm absent this specific relief. The Court cannot find it to be so on its own. The request regarding the processing fees appears to the Court to be a purely monetary issue, compensable by an award of damages, and therefore outside of the scope of injunctive relief. *See Overstreet*, 305 F.3d at 578 (explaining that for an injury to be irreparable it must not be "fully compensable by monetary damages.").

5

Likewise, the Court cannot find that removal from specific committees within the larger body of the National Council is irreparable harm. GSMT's ability to send delegates to and participate in the National Council has not been impeded, merely their placement on subcommittees. (Doc. No. 64 Page ID# 1404-05). The Court is less convinced of the import of this placement when GSMT has only generally stated that its representatives were removed from unspecified advisory committees and do not allege any right of local councils to be represented on such committees. It is the movant's burden to show irreparable harm, and Plaintiff has failed to do so here. Absent a showing of irreparable harm related to these two requests, the Court finds the granting of the specific injunctive relief inappropriate.

**B.     Requests for General Relief**

The remaining three requests, though listed separately, all relate to the potential revocation of GSMT's charter. GSMT's charter has been renewed for an additional six months, to expire on June 30, 2022. Dr. Clark testified that GSMT felt as if the National Board would revoke their charter if they did not sign the CEI agreements and use the technology platform. (Doc. No. 64 PageID# 1418). Dr. Clark testified that she interprets the diminishing charter periods and viability review as threats by GSUSA, indicating that it may revoke or not renew GSMT's charter. (Doc. No. 64 Page ID# 1426). Dr. Clark acknowledges, however, that GSMT is entitled to notice and a reasonable chance to respond should GSUSA decide to take such action and that she would have to speculate as to whether GSUSA would ever take any action to revoke or not re-issue GSMT's charter. (*Id*. PageID# 1452-54).

To satisfy the irreparable harm prong, "an injury must be both certain and immediate, not speculative or theoretical." *D.T.*, 942 F.3d at 327. There is no evidence or testimony to suggest that the revocation of GSMT's charter is certain or immediate. GSUSA has represented that there

6

is a procedure for revoking or not re-issuing a charter. This procedure is reflected in the Blue Book. (Doc. No. 42-1 at PageID# 800 "Procedures for Non-Issuance or Revocation of Charters"). This process has not been implemented, and GSMT has not shown that a revocation or non-issuance of their charter is certain, much less immediate.

GSMT argues that this procedure is illusory and that GSUSA's past conduct demonstrates that the Court cannot rely on assurances of this process. The evidence before the Court shows the opposite to be true. Despite maintaining its position that GSMT is in violation of their standards, GSUSA has consistently renewed GSMT's charter during the pendency of their dispute. Accordingly, the Court finds that GSMT has failed to show that their concerns related to the revocation of the charter are more than speculation. Speculation is insufficient to support a preliminary injunction. *D.T.*, 942 F.3d at 327.

Because Plaintiff has failed to show immediate and irreparable harm, the motion for a preliminary injunction (Doc. No. 34) is **DENIED**. The Court need not consider the other factors. (*Id*. stating that "a district court is well within its province when it denies a preliminary injunction based solely on the lack of an irreparable injury.") Nevertheless, should GSUSA decide to implement its procedures for non-issuance or revocation of GSMT's charter during the pendency of this litigation, GSUSA **MUST** promptly file a notice to that effect with this Court. At that time, GSMT may renew its request for injunctive relief, if necessary.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE